**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:     (619) 798-2006
Facsimile:     (619) 343-2789

**Counsel for Plaintiffs**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SABRINA SILVA and NANCY SHIER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>B&G FOODS, INC. and B&G FOODS NORTH AMERICA, INC.,<br><br>Defendants. | Case No. 4:20-cv-137-JST<br>Related Case No. 4:15-cv-3772-JST<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>**THE UNFAIR COMPETITION LAW (BUS. & PROF. CODE §§ 17200 *et seq.*) and CONSUMER LEGAL REMEDIES ACT (CIV. §§ CODE 1750 *et seq.*)**<br><br>Judge: The Honorable Jon S. Tigar<br>Action Filed: January 7, 2020<br><br>NO JURY TRIAL DEMANDED |

# **TABLE OF CONTENTS**

I.     JURISDICTION AND VENUE ....................................................................................1

II.    INTRADISTRICT ASSIGNMENT ..............................................................................1

III.   NATURE OF THE ACTION .......................................................................................1

IV.    PARTIES ...................................................................................................................2

V.     NATURE OF TRANS FAT ........................................................................................3

    A.   There is a Well-Established Scientific Consensus That Trans Fat is Extremely Harmful. ............4

    B.   The Artificial Trans Fat in Ortega Caused Cardiovascular Disease. ...............................6

    C.   The Artificial Trans Fat in Ortega Caused Type-2 Diabetes. .........................................7

    D.   The Artificial Trans Fat in Ortega Caused Breast, Prostate, and Colorectal Cancer.......................8

    E.   The Artificial Trans Fat in Ortega Caused Alzheimer's Disease and Cognitive Decline. .............9

    F.   The Artificial Trans Fat in Ortega Caused Organ Damage. ...........................................10

    G.   PHO Use is Unlawful in California, the United States, and European Nations. ...........................11

VI.    PLAINTIFFS' PURCHASES OF ORTEGA .............................................................12

VII.   ORTEGA'S "0G TRANS FAT!" STATEMENT IS A FALSE, UNLAWFUL, AND UNAUTHORIZED NUTRIENT CONTENT CLAIM ...............................................13

VIII.  ORTEGA CONTAINED PHO/ARTIFICIAL TRANS FAT .....................................13

IX.    DEFENDANTS' PRACTICES ARE "UNFAIR" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW .......................................................14

X.     DEFENDANTS' PRACTICES ARE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW .................................................15

XI.    RELIANCE AND INJURY .......................................................................................18

XII.   DELAYED DISCOVERY .........................................................................................19

XIII.  ADDITIONAL TOLLING ALLEGATIONS ..............................................................20

XIV.   CLASS ACTION ALLEGATIONS ...........................................................................22

XV.    CAUSES OF ACTION .............................................................................................23

XVI.   PRAYER FOR RELIEF ...........................................................................................27

XVII.  NO JURY DEMAND ...............................................................................................28

XVIII. APPENDIX A: THE TRANS FAT TACOS ................................................................I

Plaintiffs Sabrina Silva and Nancy Schier, ("collectively "Plaintiffs") on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby sue Defendants B&G Foods, Inc. and B&G Foods North America, Inc. (collectively, "B&G" or "Defendants"), and upon information and belief and investigation of counsel, allege as follows:

## I.      JURISDICTION AND VENUE

1.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and because more than two-thirds of the members of the class defined herein reside in states other than the states of which Defendants are residents.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff Sabrina Silva suffered injuries as a result of Defendants' acts in this District; many of the acts and transactions giving rise to this action occurred in this District; and Defendants: (1) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets of this District through the distribution and sale of its products in this District, and (2) are subject to personal jurisdiction in this District.

## II.      INTRADISTRICT ASSIGNMENT

3.      This civil action arises, in part, out of the events and omissions of Defendants, which occurred, in part, in Alameda County, California. Pursuant to Civil Local Rule 3-2(c), this action is properly assigned to the Oakland Division. It is also properly assigned to the Oakland courthouse because it has been deemed related to a prior case assigned to the Honorable Jon S. Tigar.

## III.      NATURE OF THE ACTION

4.      During the Class Period, Defendants manufactured, marketed, and sold taco shells containing partially hydrogenated oil ("PHO").

5.      Defendants' taco shells containing PHO included two different varieties sold under the label of Ortega (collectively "Ortega" or "Trans Fat Tacos"), more particularly identified in Appendix A hereto.

1

6.      PHO is a food additive banned in many parts of the world due to its artificial trans fat content.

7.      Artificial trans fat is a toxic carcinogen for which there are many safe and commercially viable substitutes.

8.      On June 17, 2015, the FDA determined that PHO is unsafe for use in food. Final Determination Regarding Partially Hydrogenated Oils, 80 Fed. Reg. 34650 (June 17, 2015) (hereinafter "Final Determination"). Yet Defendants continued to insert this illegal, dangerous additive into the Trans Fat Tacos, even after the FDA tentatively, and now finally, declared it unsafe for use in food, rendering products made with PHO unlawful and adulterated.

9.      Defendants falsely marketed and falsely represented Ortega as free of trans fat when it contained dangerous levels of trans fat.

10.     Although safe, low-cost, and commercially acceptable alternatives to PHO exist, including those used in competing brands, Defendants unfairly elected *not* to use safe alternatives in Ortega in order to increase their profits at the expense of the health of consumers.

11.     Additionally, Defendants misleadingly marketed Ortega with an unauthorized nutrient content claim. This misleading and unauthorized claim deceived consumers into purchasing a product that is harmful to their health.

12.     Plaintiffs Sabrina Silva and Nancy Schier repeatedly purchased and consumed Ortega during the Class Period defined herein.

13.     This action is brought to remedy Defendants' unlawful conduct. On behalf of the class as defined herein, Plaintiffs seek an order awarding Plaintiffs and other Class members restitution, actual damages, punitive damages to the extent permitted under the law and for costs, expenses, and reasonable attorneys' fees.

## IV.      **PARTIES**

14.     Defendant B&G Foods, Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey. B&G Foods, Inc. manufactures, distributes, and sells the Trans Fat Tacos.

15.     Defendant B&G Foods North America, Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey. B&G Foods North America, Inc. is a subsidiary of B&G Foods, Inc. and owns the trademark for Ortega.

16.     Plaintiff Sabrina Silva is a citizen of California who repeatedly purchased the Trans Fat Tacos for personal and household consumption.

17.     Plaintiff Nancy Schier is a citizen of California who repeatedly purchased Ortega for personal and household consumption.

## V.     NATURE OF TRANS FAT

18.     Artificial trans fat is manufactured via an industrial process called partial hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above 400°F in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.[1] The resulting product is known as partially hydrogenated oil, or PHO.

19.     PHO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. PHO molecules chemically differ from the natural fat molecules in other food products.[2]

20.     Natural fat, except the trace amounts of natural trans fat from ruminant animal sources like beef, milk, and mutton, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat"); and (2) fats that have carbon double bonds. Trans fat, in contrast to cis fat, has carbon double bonds with hydrogen atoms on opposite sides of the carbon chain.



---

[1] *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 CIRCULATION 2588, 2588-90 (1997).

[2] *See* Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999). *See also* Walter Willett, *The Scientific Case for Banning Trans Fats*, Scientific American, *available at* www.scientificamerican.com/article/the-scientific-case-for-banning-trans-fats/ (last visited February 26, 2020).

21.     PHO was initially a "wonder product" attractive to the processed food industry because it combined the low cost of unsaturated cis fat with the flexibility and long shelf life of saturated fat. Like processed cis fat, PHO is manufactured from low-cost legumes,[3] while saturated fat is derived from relatively expensive animal and tropical plant sources.[4]

22.     As detailed herein, PHO causes cardiovascular disease, diabetes, cancer, and Alzheimer's disease, and accelerates memory damage and cognitive decline. These risks were well known during the entire class period, and at no point during the class period was there ever a consensus that PHO was safe to use, neither in general nor as an ingredient in taco shells.

23.     In using PHO as a food additive prior to 2015, Defendants failed to submit a food additive petition and failed to undertake a GRAS self-determination.

A.   **There Is a Well-Established Scientific Consensus That Trans Fat Is Extremely Harmful.**

24.     The National Academies of Science were charted by an act of Congress, signed by President Lincoln in 1863. Under that charter, in 1970, the National Academy of Medicine was created. In a 2005 report, under its former name of the Institute of Medicine, it concluded there was "no safe level" of PHO or artificial trans fat intake.[5] Therefore, in 2005, there was no consensus that PHO was a safe ingredient to use in food. To the contrary, the consensus was that it is unsafe.

25.     In addition, "trans fatty acids are not essential and provide no known benefit to human health."[6] Thus, while IOM provided safe maximum levels for other food elements like saturated fat, in could not and declined to provide one for trans fat when requested by the FDA, the reason being that "**any** incremental increase in trans fatty acid intake increases the risk of CHD." *Id.* (emphasis added).

26.     In 2006, Dariush Mozaffarian of Harvard Medical School wrote in the New England Journal of Medicine, "the consumption of trans fatty acids results in considerable potential harm but no

---

[3] e.g., corn oil, cottonseed oil, soybean oil, peanut oil

[4] e.g., butter, cream, tallow, palm oil, coconut oil

[5] Food & Nutrition Bd., Inst. of Med., *Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (2005).

[6] *Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease; Proposed Rule*, 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).

apparent benefit."[7]

27.     Julie Louise Gerberding, who served eight years as the head of the United States Centers for Disease Control and Prevention, wrote in 2009:

> The scientific rationale for eliminating exposure to artificial trans fatty acids in foods is rock solid. There is no evidence that they provide any health benefit, and they are certainly harmful. These compounds adversely affect both low- and high-density lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at relatively low levels of dietary intake. Gram for gram, trans fats are far more potent than saturated fats in increasing the risk for heart disease, perhaps because they also have pro-inflammatory properties and other adverse effects on vascular endothelium . . . Eliminating exposure to these dangerous fats could have a powerful population impact—potentially protecting 30,000 to 100,000 Americans from death related to heart disease each year.[8]

28.     Dr. Mozaffarian further writes:

> Given the adverse effects of trans fatty acids on serum lipid levels, systemic inflammation, and possibly other risk factors for cardiovascular disease and the positive associations with the risk of CHD, sudden death from cardiac causes, and possibly diabetes, the potential for harm is clear. The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues, which have in some cases received considerable attention.[9]

29.     In 2011, Walter Willet, also a professor at Harvard Medical School, described Defendants' behavior of selling food made with PHO as "a food safety issue . . . this is actually contamination."[10]

30.     The views of these experts, and many others, show that, even before the FDA formally declared PHO to be unsafe for use in food in 2015, its use was still unlawful because there was not a consensus of scientific experts that PHO was a safe food additive.

---

[7] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601, 1608-1609 (2006).

[8] Julie Louise Gerberding, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 ANN. INTERN. MED. 137-138 (2009).

[9] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601 (2006).

[10] Rebecca Coombes, *Trans fats: chasing a global ban*, 343 BRITISH MED. J. (2011).

**B.    The Artificial Trans Fat in Ortega Caused Cardiovascular Disease.**

31.    Trans fat raises the risk of CHD more than any other known consumed substance.[11]

32.    A 1999 estimate published in the New England Journal of Medicine found that removing PHO from the American diet "would prevent approximately 30,000 premature coronary deaths per year, and epidemiologic evidence suggests this number is closer to 100,000 premature deaths annually."[12]

33.    By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of dangerous heart conditions, including vasodilation, coronary artery disease, and primary cardiac arrest.

34.    In a joint Dietary Guidelines Advisory Committee Report, the Department of Health and Human Services and the U.S. Department of Agriculture recognized "[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."[13]

35.    The American Heart Association warns, "trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart disease."[14]

36.    Even further back, in 2003, a review of literature on the connection between the consumption of artificial trans fat and coronary heart disease, the FDA concluded:

> [B]ased on the consistent results across a number of the most persuasive types of study designs (i.e., intervention trials and prospective cohort studies) that were conducted using a range of test conditions and across different geographical regions and populations . . . the available evidence for an adverse relationship between trans fat intake and CHD risk is strong.[15]

37.    The FDA concluded in 2010 that "there have been no reports issued by authoritative

---

[11] Mozaffarian, 354 New Eng. J. Med. at 1603.

[12] Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 New Eng. J. Med. 94, 94-8 (1999).

[13] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

[14] Am. Heart Ass'n., *Trans Fat Overview*, *available at* tinyurl.com/TransFatOverview (last visited February 26, 2020).

[15] FDA, Final Rule, 68 Fed. Reg. 41433, 41445 (July 11, 2003).

sources that provide a level of trans fat in the diet . . . below which there is no risk of [Coronary Heart Disease]." 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010). Rather, there "is a positive linear trend between trans fatty acid intake and LDL cholesterol concentration, and therefore there is a positive relationship between trans fatty acid intake and the risk of CHD." *Id.*

38.    A study published in American Heart Association's *Circulation* found that the largest consumers of trans fat have three times the risk of suffering primary cardiac arrest, even after controlling for a variety of medical and lifestyle risk factors.[16]

39.    Australian researchers observed that heart attack patients possess elevated amounts of trans fat in their adipose tissue (stored body fat) compared to controls. The effects of consuming trans fat are therefore shown to be long-lived because of its storage within the body in place of natural fats.[17]

40.    Cholesterol dysregulation and systemic inflammation/immune system dysregulation are the most important pathways through which PHO consumption causes morbidity and death. Another route is by promoting atherosclerosis by degrading the function of TGF-β, a protein responsible for preventing the development of atherosclerotic lesions.[18]

41.    TGF-β also functions to suppress cancerous tumors. Degradation of TGF-β function is also likely one route by which artificial trans fat consumption promotes cancers in fatty organs and the digestive system. *Id.*

**C.    The Artificial Trans Fat in Ortega Caused Type-2 Diabetes.**

42.    Artificial trans fat also causes type-2 diabetes.[19]

43.    In particular, trans fat disrupts the body's glucose and insulin regulation system by

---

[16] Rozenn N. Lemaitre et al., *Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac Arrest*, 105 CIRCULATION 697, 697-701 (2002).

[17] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*. 134 J. NUTR. 874, 874-79 (2004).

[18] Chen, C.L. et al., *A mechanism by which dietary trans fats cause atherosclerosis*, J. NUTR. BIOCHEMISTRY 22(7) 649-655 (2011).

[19] Am. Heart Ass'n., *Trans Fat Overview*, *available at* tinyurl.com/TransFatOverview (last visited February 26, 2020).

incorporating itself into cell membranes, causing the insulin receptors on cell walls to misform and malfunction, and in turn elevating blood glucose levels and stimulating further release of insulin.

44.     Researchers at Northwestern University's medical school found that mice show multiple markers of type-2 diabetes after eating PHO for only four weeks.[20]

45.     By the eighth week of the study, mice fed the high trans fat diet showed a 500% increase compared to the control group in hepatic interleukin-1β gene expression, one such marker of diabetes, indicating the extreme stress even short-term exposure to artificial trans fat places on the body. *Id.*

46.     A 14-year study of 84,204 women found that for every 2 percent increase in energy intake from artificial trans fat, the relative risk of type-2 diabetes was increased by 39 percent.[21]

**D.   The Artificial Trans Fat in Ortega Caused Breast, Prostate, and Colorectal Cancer.**

47.     Trans fat is a carcinogen which causes breast, prostate, and colorectal cancer.

48.     A 13-year study of 19,934 French women showed 75 percent more women contracted breast cancer in the highest quintile of trans fat consumption than did those in the lowest.[22]

49.     In a 25-year study of 14,916 American physicians, those in the highest quintile of trans fat consumption had more than double the risk of developing prostate cancer than the doctors in the lowest quintile.[23]

50.     A study of 1,012 American males observing trans fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile are 58% more

---

[20] Sean W. P. Koppe et al., *Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet*, 297 AM. J. PHYSIOL. GASTROINTEST LIVER PHYSIOL. 378 (2009).

[21] Jorge Salmeron et al., *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 AM. J. CLINICAL NUTRITION 1019, 1023 (2001).

[22] Véronique Chajès et al., *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study*. 167 AM. J. EPIDEMIOLOGY 1312, 1316 (2008).

[23] Jorge Chavarro et al., *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer*. 47 PROC. AM. ASSOC. CANCER RESEARCH 95, 99 (2006).

likely to contract prostate cancer than those in the lowest.[24]

51.     A 600-person study found an 86 percent greater risk of colorectal cancer in the highest trans fat consumption quartile.[25]

52.     A 2,910-person study found "trans-monounsaturated fatty acids . . . were dose-dependently associated with colorectal cancer risk," which showed "the importance of type of fat in the etiology and prevention of colorectal cancer."[26]

**E.     The Artificial Trans Fat in Ortega Caused Alzheimer's Disease and Cognitive Decline.**

53.     Trans fat causes Alzheimer's disease and cognitive decline.

54.     In a study examining 815 Chicago area seniors, researchers found "increased risk of incident Alzheimer disease among persons with high intakes of . . . trans-unsaturated fats."[27]

55.     The study "observed a strong increased risk of Alzheimer disease with consumption of trans-unsaturated fat." *Id.*

56.     In a study of 1,486 women with type-2 diabetes, researchers found "[h]igher intakes of . . . trans fat since midlife . . . were [] highly associated with worse cognitive decline . . . ."[28]

57.     The study cautioned "[d]ietary fat intake can alter glucose and lipid metabolism and is related to cardiovascular disease risk in individuals with type 2 diabetes. Because insulin, cholesterol, and vascular disease all appear to play important roles in brain aging and cognitive impairments, dietary fat modification may be a particularly effective strategy for preventing cognitive decline, especially in individuals with diabetes." *Id.* (citations omitted).

---

[24] Xin Liu et al., *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 CARCINOGENESIS 1232, 1232 (2007).

[25] L.C. Vinikoor et al., *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 AM. J. EPIDEMIOLOGY 289, 294 (2008).

[26] Evropi Theodoratou et al., *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 AM. J. EPIDEMIOLOGY 181 (2007).

[27] Martha Clare Morris et al., *Dietary Fats and the Risk of Incident Alzheimer Disease*, 60 ARCH. NEUROL. 194, 198-99 (2003).

[28] Elizabeth E. Devore et al., *Dietary Fat Intake and Cognitive Decline in Women with Type 2 Diabetes*, 32 DIABETES CARE 635 (2009).

9

58.     Artificial trans fat also damages the brains of those who consume it. A study conducted by UCSD School of Medicine of 1,018 men, mostly younger men, found trans fat consumption to be strongly correlated with impaired memory.[29] The authors of the study, appearing in *Circulation*, the American Heart Association's peer-reviewed journal, conclude that "Greater dTFA [dietary trans fatty acid] was significantly associated with worse word memory in adults aged 20-45 years, often critical years for career building."

59.     Performing a word memory test, each additional gram per day of trans fat consumed was associated with 0.76 fewer words correctly recalled. The authors suggest trans fat's well-established pro-oxidant effect and its damage to cell energy processes is the pathway by which trans fat consumption damages memory ability. The young men with the highest trans fat consumption scored 12 fewer recalled words on the 104-word test. *Id.*

**F.    The Artificial Trans Fat in Ortega Caused Organ Damage.**

60.     Artificial trans fat molecules are readily incorporated into blood and organ cells in place of natural fat molecules, which damages vital organs, including the heart, brain, and reproductive system. Further, changing the chemical composition of cells induces systemic inflammation, where the immune system fails to recognize such cells as native to the body and becomes persistently overactive, leading to further organ damage.[30]

---

[29] Golomb, B. et al., *Trans Fat Consumption is Adversely Linked to Memory in Working-Age Adults*, CIRCULATION. 130:A15572 (2014).

[30] *See*:

Lopez-Garcia et al., *Consumption of Trans Fat is Related to Plasma Markers of Inflammation and Endothelial Dysfunction*, 135 J. NUTR. 562-66 (2005);

Baer et al., *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets; a randomized crossover study*, 79 AM. J. CLIN. NUTR. 969-73 (2004);

Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils*, 63 EURO. J. CLIN. NUTR. S22-33 (2009);

Mozaffarian et al., *Trans Fatty acids and systemic inflammation in heart failure*, 80 AM. J. CLIN. NUTR. 1521-25 (2004).

### G.   PHO Use is Unlawful in California, the United States, and European Nations.

61.   New York City banned trans fat in restaurants in 2006. Similar laws exist in Philadelphia; Baltimore; Stamford, Connecticut; and Montgomery County, Maryland.

62.   A 2004 Danish law restricted all foods to fewer than 2 percent of calories from artificial trans fat, a test that the Trans Fat Tacos did not meet during the class period.

63.   Switzerland passed the same restriction in 2008.[31]

64.   A study of Denmark's 2004 trans fat ban concluded it "did not appreciably affect the quality, cost or availability of food" and did not have "any noticeable effect for the consumers."[32]

65.   These laws were all motivated by the strong evidence trans fat is dangerous, showing there was not a scientific consensus during the class period that PHO was a safe food additive.

66.   On June 17, 2015, the FDA released a declaratory order which it called its Final Determination Regarding Partially Hydrogenated Oils, finding that "PHOs are not GRAS for any use in human food." 80 Fed. Reg. 34650, 34651 (June 17, 2015) ("Final Determination").

67.   The FDA's Final Determination noted that "if there are data and information that demonstrates to a reasonable certainty that no harm will result from a specific use of a PHO in food, that information could be submitted as part of a food additive petition to FDA seeking issuance of a regulation to prescribe conditions under which the additive may be safely used in food." Final Determination at 34664.

68.   On June 11, 2015 and March 7, 2017, the Grocery Manufacturers Association ("GMA") submitted such a food additive petition and then an amended petition seeking approval to use partially hydrogenated oil in "approximately 60 food categories." On May 21, 2018, the FDA denied the amended GMA petition, and stated it considered the first one abandoned. In doing so, the FDA rejected the GMA's argument for a "non-linear dose response" model and noted that "the vast majority of scientific studies have been consistent in their conclusions that trans fat consumption has a progressive

---

[31] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

[32] Mozaffarian, 354 NEW ENG. J. MED. at 1610; *see also* Steen, Stender, *High Levels of Industrially Produced Trans Fat in Popular Fast Food*, 354 NEW ENG. J. MED. 1650, 1652 (2006).

and linear adverse effect on blood lipids and CHD risk." Denial of Food Additive Petition, 83 Fed. Reg. 23382, 23390 (May 21, 2018).

## VI.   **PLAINTIFFS' PURCHASES OF ORTEGA**

69.     Plaintiff Sabrina Silva repeatedly purchased Ortega during the Class Period defined herein.

70.     Ms. Silva purchased the Trans Fat Tacos dozens of times and regularly during the class period. The most frequent location of her purchases were the Safeway located at 2401 Waterman Dr, Fairfield, CA, 94534.

71.     Plaintiff Sabrina Silva first discovered Defendants' unlawful acts described herein in April 2019, when she learned during a conversation with her counsel that Ortega Taco Shell products contained artificial trans fat, which causes heart disease, diabetes, cancer, and death, despite being advertised as containing "0g Trans Fat!"

72.     Had Ms. Silva known that the Trans Fat Tacos were falsely labeled as containing "0g Trans Fat!" and unlawfully offered for sale, she never would have purchased them.

73.     Plaintiff Nany Schier regularly purchased Ortega during the Class Period. She purchased the Yellow Corn Taco Shells approximately 20 times annually throughout the Class Period. She also purchased Ortega White Corn Taco Shells on one occasion.

74.     Ms. Schier purchased Trans Fat Tacos from California grocery stores. The most frequent locations of Plaintiff's purchases were the Vons located at 26518 Bouquet Canyon Rd., Saugus, CA 91350 and the Ralphs located at 19340 Soledad Canyon Rd., Canyon Country, CA 91351.

75.     Plaintiff Nancy Schier first discovered Defendants' unlawful acts described herein in April 2019, when she learned during a conversation with her counsel that the Trans Fat Tacos contained artificial trans fat, which causes heart disease, diabetes, cancer, and death, despite being advertised as containing "0g Trans Fat!"

76.     Had Ms. Schier known that the Trans Fat Tacos were falsely labeled as containing "0g Trans Fat!" and unlawfully offered for sale, she never would have purchased them.

77.     Because of Plaintiffs' high frequency of purchase, their last purchases of Ortega containing the deceptive claim and containing PHO would have been shortly before they stopped appearing on store shelves.

78.     Plaintiffs, in the exercise of reasonable diligence, could not have discovered earlier Defendants' unlawful acts described herein. Plaintiffs are not nutritionists or food scientists, but rather lay consumers who did not have the specialized knowledge that Defendants. Even today the nature and extensive utilization of artificial trans fats—including that they necessarily exist where partially hydrogenated oil is used an ingredient in a food product—is generally unknown to the average consumer. Plaintiffs relied on Defendants' "0g Trans Fat!" claim as a substantial factor in their purchases.

79.     Plaintiffs expected the "0g Trans Fat!" to be true and honest when it was in fact false, so they did not receive the benefit of their purchases. Instead of receiving the benefit of products free of trans fat, they received products that contained trans fat.

## VII.     ORTEGA'S "0g TRANS FAT!" STATEMENT IS A FALSE, UNLAWFUL, AND UNAUTHORIZED NUTRIENT CONTENT CLAIM

80.     During the Class Period, the Ortega was made with PHO yet contained the deceptive health and wellness claim "0g Trans Fat!" prominently displayed on the front of the products' packaging. Exemplary photos of the packaging of the product are attached hereto with Appendix A.

81.     Defendants' conduct is especially egregious because taco shells, a classic Tex-Mex staple, normally contain no trans fat.

## VIII.     ORTEGA CONTAINED PHO/ARTIFICIAL TRANS FAT

82.     Defendants' use of PHO in Ortega was unnecessary. Throughout the Class Period, there were several safe substitutes for PHO/artificial trans fat.

83.     Several manufacturers of competing taco products responsibly decided to refrain from adding artificial trans fat to their products during the period Ortega contained trans fat, such as Old El Paso, Mission, and Bearitos.

84.     Although commercially viable alternative formulations and substitutes for PHO were

1  available, Defendants elected not to use them in Ortega in order to increase their profits.

2  **IX.**      **DEFENDANTS' PRACTICES ARE "UNFAIR" WITHIN THE MEANING OF THE**

3  **CALIFORNIA UNFAIR COMPETITION LAW**

4      85.    Defendants' practices as described herein are "unfair" within the meaning of the

5  California Unfair Competition Law because their conduct was immoral, unethical, unscrupulous, and

6  substantially injurious to consumers, and the utility of the conduct to Defendants does not outweigh the

7  gravity of the harm to Defendants' victims.

8      86.    Plaintiffs' claims for unfair business practices are independent of their claims for false

9  advertising. Even absent Defendants' false advertising, the sale of their Trans Fat Tacos violated the

10  UCL, as well as state and federal laws prohibiting the sale of adulterated food.

11      87.    In particular, while Defendants' use of PHO in Ortega may have had some utility in that

12  it allowed Defendants to realize higher profit margins than if they had used safe alternatives, this utility

13  was small and far outweighed by the gravity of the serious health harm B&G inflicted upon consumers.

14      88.    Defendants' conduct injured competing manufacturers of taco shells that did not engage

15  in their unlawful, unfair, and immoral behavior, especially given Defendants' market share and the

16  limited shelf space in retailers' packaged food sections.

17      89.    Moreover, Defendants' practices violated public policy expressed by specific

18  constitutional, statutory, or regulatory provisions, including the California Health and Safety Code §

19  114377 and California Education Code § 49431.7.

20      90.    Defendants' actions also violated public policy by causing the United States, California,

21  and every other state to pay—via Medicare, Medicaid, Affordable Care Act Exchange subsidies,

22  veterans' health programs, public employee and retiree health insurance—for treatment of trans fat-

23  related illnesses.

24      91.    Further, the injury to consumers from Defendants' practices was substantial, not

25  outweighed by benefits to consumers or competition, and not one consumers themselves could

26  reasonably have avoided.

27

28

*Silva et al. v. B&G Foods, Inc. et al.*, Case No. 4:20-cv-137-JST
FIRST AMENDED CLASS ACTION COMPLAINT

## X.      DEFENDANTS' PRACTICES ARE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW

92.      Defendants' practices as described herein are "unlawful" within the meaning of the California Unfair Competition Law because PHO is not Generally Recognized as Safe (GRAS). Therefore, Defendants' use of PHO renders Ortega adulterated within the meaning of 21 U.S.C. § 342(a)(2)(C).

93.      The PHO used in Ortega is not on the FDA's list of the hundreds of substances it considers GRAS.[33]

94.      PHO also fails to meet the fundamental requirement for GRAS status—that the substance is safe. In fact, the FDA has explicitly recognized that there is no safe level of artificial trans fat consumption.

95.      Under the Food Additives Amendment of 1958, which amended the FDCA, all food additives are unsafe unless they (1) fall within a specified exemption to the statute's definition of food additive, or (2) their use is pursuant to FDA approval. Because the PHOs used in Ortega do not meet either of these exceptions, they are, and long have been, unsafe and unlawful for use in food.

96.       Defendants' use of PHO in their Trans Fat Tacos thus constituted adulteration under 21 U.S.C. § 342.

97.      On November 8, 2013, the FDA tentatively determined PHO is not GRAS.[34]

98.      On June 17, 2015, after extensive public comment, the FDA determined trans fat is not GRAS.[35]

99.      At no point during the class period was there a scientific consensus PHO was safe. Indeed, for more than two decades, the scientific consensus has been that it is unsafe.

100.      Defendants' conduct is also "unlawful" because it violates the Federal Food, Drug and Cosmetic Act ("FDCA"), specifically, (a) 21 U.S.C. § 343(a), which deems food misbranded when the

[33] *See* 21 C.F.R. §§ 181, 182, 184, and 186.

[34] 78 Fed. Reg. 67169 (November 8, 2013).

[35] 80 Fed. Reg. 34650 (June 17, 2015).

*Silva et al. v. B&G Foods, Inc. et al.*, Case No. 4:20-cv-137-JST
FIRST AMENDED CLASS ACTION COMPLAINT

label contains a statement that is "false or misleading in any particular," and (b) 21 C.F.R. § 101.13(i)(3), which bars nutrient content claims voluntarily placed on the front of a product label that are "false or misleading in any respect."

101.    Defendants further violate the FDCA's implementing regulation, 21 C.F.R. § 1.21, because Ortega's packaging fails to reveal material facts, namely the dangers of PHO described in detail herein, "in light of other representations," namely the misleading "0g Trans Fat!" front label claim.

102.    Defendants' conduct was further "unlawful" because it violated the Federal Food, Drug and Cosmetic Act ("FDCA"), specifically,

- 21 U.S.C. § 331(a) (prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded");

- 21 U.S.C. § 331(b) (prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce");

- 21 U.S.C. § 331(c) (prohibiting the "receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise");

- 21 U.S.C. § 331(g) (prohibiting the "giving of a guaranty or undertaking . . . which guaranty or undertaking is false");

- 21 U.S.C. § 348 (prohibiting the use of any food additive unless it has been deemed GRAS);

103.    Defendants' conduct further violates The California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Health & Safety Code § 110660, which deems food products "misbranded" if their labeling is "false or misleading in any particular," and Health & Safety Code § 110670, which bars nutrient content claims voluntarily placed on the front of a product label that fail to comply with the federal regulation for nutrient content claims (i.e., "may not be false or misleading in any respect"). Defendants' conduct also violates the following sections of the Sherman Law:

- <u>§ 110290</u> ("In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these shall be taken into account. The extent that the labeling or advertising fails to reveal facts concerning the food . . . or consequences of customary use of the food . . . shall also be considered.");

- § 110390 ("It is unlawful for any person to disseminate any false advertisement of any food . . . . An advertisement is false if it is false or misleading in any particular.");

- § 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.");

- § 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

- § 110400 ("It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . .");

- § 110680 ("Any food is misbranded if its labeling or packaging does not conform to the requirements of Chapter 4 (commencing with Section 110290).");

- § 110705 ("Any food is misbranded if any word, statement, or other information required pursuant to this part to appear on the label or labeling is not prominently placed upon the label or labeling and in terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.");

- § 110760 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.");

- § 110765 ("It is unlawful for any person to misbrand any food."); and

- § 110770 ("It is unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.").

17

## XI.     RELIANCE AND INJURY

104.    When purchasing Ortega, Plaintiffs were seeking products of particular qualities, including products that did not negatively affect blood cholesterol levels or the health of their cardiovascular system, and products made with safe, lawful ingredients.

105.    Plaintiffs' read and relied on Defendants "0g Trans Fat!" claim as a substantial factor in deciding to purchase Ortega over competing taco shells.

106.    Plaintiffs purchased the Trans Fat Tacos believing they had the qualities they sought based on Ortega's deceptive labeling, and the natural assumption that food sold in stores by large companies would not have unsafe and unlawful ingredients.

107.    Instead, they were actually unsatisfactory to Plaintiffs for the reasons described herein.

108.    Plaintiffs lost money as a result of Defendants' conduct because they purchased products that were detrimental to their health and were unfairly offered for sale in violation of federal and California law. Had Defendants not violated the law, Plaintiffs would not have been able to purchase Ortega.

109.    Plaintiffs suffered physical injury when they repeatedly consumed Defendants' Trans Fat Tacos, because consuming artificial trans fat in *any* quantity, including the quantity they actually consumed, inflames and damages vital organs and increases the risk of heart disease, diabetes, cancer, and death.

110.    Plaintiffs and every single person who purchased and consumed Ortega suffered damage to their heart, blood cells, brain cells, and immune system.

111.    The Trans Fat Tacos cost more than similar products without the misleading labeling, and would have cost less, for example demanded less in the marketplace, absent Defendants' false and misleading statements and material omissions. Thus, the Trans Fat Tacos were worth less than what Plaintiff paid for it.

112.    The Trans Fat Tacos were not fit for human consumption and have a value of $0.

113.    Plaintiffs, on one or more occasions, would not have purchased the Trans Fat Tacos absent Defendants' misleading and unlawful "0g Trans Fat!" nutrient content claim, and they never

18

1  would have purchased the Trans Fat Tacos had they known they were misbranded, contained a
2  prominent false statement on the front of the product label about its content, and were unlawfully
3  offered for sale.

4       114.   Plaintiffs purchased the Trans Fat Tacos instead of competing products based on the false
5  statements and misrepresentations described herein.

6       115.   Plaintiffs were unaware that the Trans Fat Tacos were dangerous when they purchased
7  them.

8       116.   Plaintiffs are not nutritionists, food experts, or food scientists, but rather lay consumers
9  who did not have the specialized knowledge of Defendants of trans fat. Even today, the details of the
10 dangers of artificial trans fats are unknown to millions of Americans.

11      117.   Plaintiffs lost money as a result of Defendants' unlawful behavior. Plaintiffs altered their
12 position to their detriment and suffered loss in an amount equal to the amount they paid for the Trans Fat
13 Tacos.

14                 **XII.        DELAYED DISCOVERY**

15      118.   Defendants' false representation for many years that Ortega has "0g Trans Fat!" actively
16 impeded Plaintiffs' and Class members' abilities to discover these claims.

17      119.   Plaintiffs did not discover that Defendants' labeling of Ortega was false and that it
18 contained, despite its representation, a dangerous and illegal ingredient until April 2019, when they
19 learned this from discussing the matter with their counsel. Until this time, they lacked the knowledge
20 regarding the facts of their claims against Defendants.

21      120.   Specifically, while Plaintiffs were generally aware that trans fat should be avoided, they
22 were not aware that trans fat necessarily exists in products which contain partially hydrogenated oil as
23 an ingredient.

24      121.   Plaintiffs are reasonably diligent consumers who exercised reasonable diligence in their
25 purchase, use, and consumption of Ortega. Nevertheless, they would not have been able to discover
26 Defendants' deceptive practices and lacked the means to discover them given that, like nearly all
27 consumers, they are not experts on nutrition and they do not typically read or have ready access to

28
                                        19

scholarly journals such as The Journal of Nutrition,[36] The European Journal of Clinical Nutrition,[37] and The New England Journal of Medicine,[38] where the scientific evidence of artificial trans fat's dangers has been published.

## XIII.   ADDITIONAL TOLLING ALLEGATIONS

122.   During the period that Ortega contained PHO, Defendants were aware that Ortega was not safe for human consumption and made a decision to conceal this fact and deceive their customers by marketing Ortega as containing "0g Trans Fat!"

123.   After the fraud was discontinued, Defendants made no effort to inform their customers that Ortega labeled as containing "0g Trans Fat!" did, in fact, contain trans fat.

124.   Defendants chose not to inform their customers of the fraud because had they informed their customers, consumers would have returned the boxes of Ortega that they purchased to retailers.

125.   Defendants were aware that Ortega did not contain "0g Trans Fat!" at all times during the time that they made this claim.

126.   Defendants made this claim knowing that it was false and illegal in order to deceive their customers and increase their sales.

127.   Defendants were aware that the absence of trans fat was a major selling point that allowed them to sell more Ortega Taco Shells, and at a higher price, which is why their "0g Trans Fat!" nutrient content claim was made so prominently, and for so long, on the front of their product label.

128.   Defendants had a continuing and affirmative moral and legal obligation to correct their false and illegal nutrient content claim about the amount of trans fat but intentionally choose to ignore their obligation to do so.

---

[36] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*, 134 J. NUTR. 874, 874-79 (2004).

[37] A. Tavani et al., *Margarine intake and risk of nonfatal acute myocardial infarction in Italian women*, 51 EUR. J. CLIN. NUTR. 30–32 (1997) (estimating a 50 percent greater risk of heart attack in women with high consumption of margarine, an association "independent of body mass index, hertory of hypertension and hyperlipidemia").

[38] Mozaffarian, 354 NEW ENG. J. MED. at 1611 ("10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat").

129.     Class members had no duty and no reason to inquire as to whether nutrient content claims made on packaged food labels like the Trans Fat Tacos were true but were rather entitled to rely on their accuracy. They likewise had no reason to disbelieve a prominent statement on a product label was false. Nor did they have a reason to suspect the nutrient content claim was unauthorized. Plaintiffs have no training on the interpretation of nutrient content claim regulations promulgated by the FDA, and reasonably relied on the assumption that Defendants would not manufacture and sell a product with prominent, false, unauthorized, and unlawful statements about its ingredients. The complexity of the regulations is such that Plaintiffs lacked the means to discover their falsehood and illegality until they discussed the issue with their counsel.

130.     Because of the fraudulent concealment of the fact that the Trans Fat Tacos did not contain "0g Trans Fat!" when they were promoted as such, as well as the concealment of the fact that this claim is separately an unauthorized and unlawful nutrient content claim, class members are unaware even now of their claims against Defendants.

131.     Reasonable consumers, including Plaintiffs, had no reason to suspect Defendants' unfair competition and violations of federal and state law prohibiting misbranding and unauthorized nutrient content claims.

132.     Defendants owed a special duty of honesty toward Plaintiffs and all Class Members, akin to a fiduciary duty, which they violated by falsely and unlawfully manufacturing and selling the Trans Fat Tacos with a false and unlawful nutrient content claim.

133.     California's strong public policy against consumer fraud applies with special force where, as here, the fraud concerns a toxic substance that has caused the untimely deaths of many thousands of class members. This fraud and its harms are described in detail herein, and in even more detail in the referenced scientific studies quoted and cited. During the entire class period, Defendants were aware that their acts were oppressive and cruel, causing permanent physical as well as economic injury, and consciously continued these acts for years while knowing the extent of the harm they were causing. Equity and the public policy of California, embodied in its statutes jointly demand, in such circumstance, that laches and tolling cannot apply in such a way to permit Defendants to continue to

enjoy the fruits of their intentional, cruel, fraudulent, oppressive, and unlawful acts.

## XIV.     CLASS ACTION ALLEGATIONS

134.    Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class"), excluding Defendants' officers, directors, and employees, and the Court, its officers and their families.

135.    The Class is defined as follows:

All citizens of Arkansas, California, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Michigan, Missouri, New York, Rhode Island, Vermont, Washington, and Wisconsin who purchased, on or after January 1, 2008 and before December 31, 2016, for household or personal use, the Ortega taco products containing partially hydrogenated oil.

136.    The Fraud Sub-Class is defined as follows:

All class members who purchased Ortega taco products containing trans fat that used the labeling claim "0g Trans Fat!" on or after January 1, 2008 and before December 31, 2016

137.    Questions of law and fact common to Plaintiffs and the Class include:

a.   Is the label claim "**0g Trans Fat!**" deceptive when used on products which contain added trans fat?

b.   Was PHO an unlawful food additive when Defendants used it in Ortega?

c.   Is the Class entitled to actual damages, restitution, and punitive damages?

d.   Should the statute of limitations be tolled on behalf of the Class?

e.   Was B&G's conduct was immoral, unscrupulous, or offensive of public policy?

f.   Was "**0g Trans Fat!**" an unauthorized nutrient content claim?

138.    All Class members were subjected to the same wrongful conduct.

139.    Plaintiffs will fairly and adequately protect the interests of the Class, have no interests that are incompatible with the interests of the Class, and have retained counsel competent and experienced in class litigation.

140.    The Class is sufficiently numerous, as it includes thousands of individuals who purchased Ortega.

141.    Class representation is superior to other options for the resolution of the controversy. The

22

relief sought for each Class member is small, as little as two dollars for some Class members. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

142. Questions of law and fact common to the Class predominate over any questions affecting only individual members.

143. Class treatment is appropriate under Fed. R. Civ. P. 23(a) and 23(b)(3).

## XV.     CAUSES OF ACTION

### First Cause of Action

### California Unfair Competition Law, Unlawful Prong

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

144. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

145. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute "unlawful" business acts and practices in that Defendants' conduct violates the California False Advertising Law, and the California Consumer Legal Remedies Act, as alleged herein.

146. Defendants' conduct was further "unlawful" because it violated the Federal Food, Drug and Cosmetic Act ("FDCA"), specifically,

- 21 U.S.C. § 331(a) (prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded");

- 21 U.S.C. § 331(b) (prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce");

- 21 U.S.C. § 331(c) (prohibiting the "receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise");

- 21 U.S.C. § 331(g) (prohibiting the "giving of a guaranty or undertaking . . . which guaranty or undertaking is false");

- 21 U.S.C. § 342(a) (which deems any food adulterated if it "contains any poisonous or deleterious substance which may render it injurious to health");

- 21 U.S.C. § 343(a) (which deems food misbranded when the label contains a statement that is "false or misleading in any particular");

- 21 U.S.C. § 348 (prohibiting the use of any food additive unless it has been deemed GRAS);

- 21 C.F.R. § 101.13(i)(3) (prohibiting nutrient content claims that are "false or misleading in any respect.")

147.    Defendants further violated the FDCA's implementing regulation, 21 C.F.R. § 1.21, because the Trans Fat Tacos' packaging fails to reveal material facts, namely the dangers of PHO described in detail herein, "in light of other representations," namely the "0g Trans Fat" claim described herein as misleading.

148.    Defendants' conduct further violated The California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code § 110660, which deems food products "misbranded" if their labeling is "false or misleading in any particular."

149.    Defendants' conduct also violated the following sections of the Health & Safety Code:

- § 110290 ("In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these shall be taken into account. The extent that the labeling or advertising fails to reveal facts concerning the food . . . or consequences of customary use of the food . . . shall also be considered.");

- § 110390 ("It is unlawful for any person to disseminate any false advertisement of any food . . . . An advertisement is false if it is false or misleading in any particular.");

- § 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.");

- § 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

- § 110400 ("It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . .");

- § 110680 ("Any food is misbranded if its labeling or packaging does not conform to the requirements of Chapter 4 (commencing with Section 110290).");

- § 110760 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.");

- § 110765 ("It is unlawful for any person to misbrand any food."); and

- § 110770 ("It is unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.").

150.    The challenged labeling statement made by Defendants thus constituted violations of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

151.    Defendants leveraged their deception to induce Plaintiffs and members of the Class to purchase products that were of lesser value and quality than advertised.

152.    Plaintiffs suffered injury in fact and lost money or property as a result of Defendants' deceptive advertising: they were denied the benefit of the bargain when they decided to purchase Ortega over competitor products that are less expensive and/or contain no artificial trans fat.

153.    Had Plaintiffs been aware of Defendants' false and misleading advertising tactics, they would not have purchased Ortega, and had Defendants not advertised them in a fraudulent manner, they would have paid less for them.

## Second Cause of Action

### California Unfair Competition Law, Fraudulent Prong

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

154.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

155.    Defendants leveraged their deception to induce Plaintiffs and members of the Class to purchase products that were of lesser value and quality than advertised.

1    156.   Plaintiffs suffered injury in fact and lost money or property as a result of Defendants'

2    deceptive advertising: they were denied the benefit of the bargain when they decided to purchase the

3    Trans Fat Tacos over competitor products, which are less expensive and/or contain no artificial trans

4    fat.

5    157.   Had Plaintiffs been aware of Defendants' false and misleading advertising tactics, they

6    would not have purchased the Trans Fat Tacos, and had Defendants not advertised them in a fraudulent

7    manner, Plaintiffs would have paid less for them.

8    **Third Cause of Action**

9    **California Unfair Competition Law, Unfair Prong**

10   **Cal. Bus. & Prof. Code §§ 17200 *et seq.***

11   158.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set

12   forth in full herein.

13   159.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as

14   alleged herein constitute "unfair" business acts and practices because Defendants' conduct is:

15       a.   immoral, unethical, unscrupulous, and offensive to public policy;

16       b.   the gravity of Defendants' conduct outweighs any conceivable benefit of such conduct; and

17       c.   the injury to consumers caused by Defendants' conduct is substantial, not outweighed by any

18           countervailing benefits to consumers or competition, and not one that consumers themselves

19           could reasonably have avoided.

20   **Fourth Cause of Action**

21   **California Consumer Legal Remedies Act**

22   **Cal. Civ. Code §§ 1750 *et seq.***

23   160.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set

24   forth in full herein.

25   161.   The CLRA prohibits deceptive practices in connection with the conduct of a business that

26   provides goods, property, or services primarily for personal, family, or household purposes.

27

28

162.    Defendants' policies, acts and practices were designed to, and did, result in the purchase and use of Ortega primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

a.   § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.   § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.   § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.   § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

163.    As a result, Plaintiffs and the Class have suffered irreparable harm and are entitled to injunctive relief and restitution.

164.    As a further result, Plaintiffs and the Class have suffered damages, and because the conduct was deliberate, immoral, oppressive, made with malice and/or contrary to public policy, they are entitled to punitive or exemplary damages.

165.    Pursuant to section 1782 *et seq.* of the CLRA, Plaintiffs notified Defendants in writing by certified mail of the particular violations of § 1770 of the Act as to Ortega and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.

166.    Defendants received Plaintiff Silva's written notice on April 29, 2019 and Plaintiff Schier's written notice on May 3, 2019.

## XVI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Defendants as follows:

A.   An order confirming that this class action is properly maintainable as a nationwide class action as defined above, appointing Plaintiffs and their undersigned counsel to represent the Class, and requiring Defendants to bear the cost of class notice;

1    B.    Actual damages of at least $5 million, and punitive damages nine times actual damages;

2    C.    Restitution of the purchase price of Ortega to each class member;

3    D.    Pre-judgment and post-judgment interest;

4    E.    Attorney fees and costs; and

5    F.    Such other and further relief as this Court may deem just, equitable or proper.

6              **XVII.      NO JURY DEMAND**

7    Plaintiffs do not demand a trial by jury.

8  DATED: February 28, 2020                    Respectfully Submitted,

9

10                                             /s/ Gregory S. Weston
                                               **THE WESTON FIRM**
11                                             GREGORY S. WESTON
                                               1405 Morena Blvd., Suite 201
12                                             San Diego, CA 92110
                                               Telephone:    (619) 798-2006
13                                             Facsimile:    (619) 343-2789

14                                             **Counsel for Plaintiffs**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Silva et al. v. B&G Foods, Inc. et al.*, Case No. 4:20-cv-137-JST
FIRST AMENDED CLASS ACTION COMPLAINT

1

## XVIII.    APPENDIX A: THE TRANS FAT TACOS

2

- Ortega White Corn Taco Shells

3

- Ortega Yellow Corn Taco Shells

4

5



6

7

8

9

10

11

12

13

14

15

16

17

18





19

20

21

22

23

24

25

26

27

28

I