**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:      (619) 798-2006
Facsimile:      (619) 343-2789

**Counsel for Plaintiffs**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SABRINA SILVA and NANCY SCHIER, on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br><br>   v.<br><br>B&G FOODS, INC. and B&G FOODS NORTH AMERICA, INC.,<br><br>              Defendants. | Case No: 4:20-cv-137-JST<br><br>**PLAINTIFFS SABRINA SILVA AND NANCY SCHIER'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION [REDACTED VERSION FOR PUBLIC FILING]**<br><br>Judge: The Honorable Jon S. Tigar<br>Date: February 3, 2022<br>Time: 2:00 p.m.<br>Location: Courtroom 6 |

1

## NOTICE OF MOTION

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3

    **PLEASE TAKE NOTICE** that on February 3, 2022 at 2:00 p.m., or as soon thereafter as the

4

matter may be heard, before the Honorable Jon S. Tigar in Courtroom 6 of the United States District

5

Court for the Northern District of California, located at 1301 Clay St., Oakland, CA 94612, Plaintiffs

6

Sabrina Silva and Nancy Schier (collectively, "Plaintiffs") respectfully move the Court certify the claims

7

in Second Amended Complaint for class treatment, appoint them class representatives, and appoint the

8

Weston Firm class counsel. Their proposed class definition is:

9

10

11

> All citizens of California, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Michigan, Missouri, Rhode Island, Vermont, and Washington, who purchased, between 1/1/2010 and 12/31/2016, for household or personal use, Ortega taco shell products containing partially hydrogenated oil in packaging bearing the labeling claim "0g Trans Fat!"

12

13

14

15

16

17

    This Motion is based on this Notice, the Memorandum of Points and Authorities which follows, the concurrently-filed Public and Under-Seal Declarations of Gregory S. Weston ("Weston Public Decl." and "Weston Under-Seal Decl."), the expert reports of Nathan Wong and Robert Bowen and the notice plan provided in the Declaration of Gajan Retnasaba ("Retnasaba Decl."), and on all other pleadings and papers on file in this action, and on such oral and documentary evidence and argument as may be presented at the time of hearing.

18

DATED: October 22, 2021

               Respectfully Submitted,

19

20

               /s/Gregory S. Weston
               Gregory S. Weston

21

               **THE WESTON FIRM**
               GREGORY S. WESTON

22

               1405 Morena Blvd., Suite 201
               San Diego, CA 92110

23

               Telephone:    (619) 798-2006
               Facsimile:    (619) 343-2789

24

25

               **Counsel for Plaintiffs**

26

27

28

1

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF RELEVANT FACTS ..................................................... 2

       A.   B&G Used PHO, a Non-GRAS Additive, in Ortega. ........................ 2

       B.   B&G Hid Its Use of Trans Fats With the False, Deceptive, and Unlawful
            Nutrient Content Claim "0g Trans Fat." ......................................... 5

III.   PLAINTIFFS HAVE ARTICLE III STANDING. ...................................... 6

IV.    STANDARDS FOR CLASS CERTIFICATION ......................................... 8

V.     THE FOUR RULE 23(A) PREREQUISITES ARE SATISFIED ................. 9

       A.   Numerosity Is Satisfied Because Defendant Sold Millions of Boxes of Ortega ............... 9

       B.   The Truthfulness and Legality of the "0g Trans Fat" Claim Are Predominating
            Common Issues. ............................................................................. 9

       C.   Typicality Is Satisfied Because Plaintiffs Suffered the Same Injury as Other
            Putative Class Members. ............................................................... 11

       D.   Adequacy of Representation Is Satisfied Because Plaintiffs Have No Conflicts
            and Proposed Class Counsel Is Experienced and Capable. ............. 11

VI.    THE CLASS SATISFIES RULE 23(B)(3) ................................................ 13

       A.   Common Issues Predominate ......................................................... 13

       B.   Plaintiffs Will Show B&G's Liability by Common Evidence ......... 14

       C.   No Individualized Proof of Reliance, Deception, or Injury Is Needed .......... 15

       D.   Plaintiffs Will Calculate Restitution Using Common Evidence ...... 16

       D.   Any Individual Issues of Damages Do Not Predominate. ............... 17

       F.   The Prerequisite of Superiority is Satisfied. ................................. 17

VII.   THE CLASS IS ASCERTAINABLE AND MANAGEABLE. ................... 18

VIII.  CALIFORNIA MAY APPLY ITS LAW TO A MULTI-STATE CLASS. ........... 18

IX.    B&G SHOULD BE REQUIRED TO PAY THE COSTS OF CLASS NOTICE ............ 20

       A.   Plaintiffs' Claims Are Strong ........................................................ 21

       B.   Defendants Will Benefit From Res Judicata Should They Prevail ... 23

       C.   Plaintiffs' Interest is Small Compared with the Entire Class. ......... 23

       D.   Plaintiffs Do Not Have the Ability to Pay Class Notice. ................ 23

X.     CONCLUSION ......................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Alfred v. Pepbridge Farm, Inc.*,
    322 F.R.D. 519 (C.D. Cal. 2017) ................................................................. 18

*Allen v. ConAgra Foods, Inc.*,
    331 F.R.D. 641 (N.D. Cal. 2019) ................................................................. 6

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP*,
    247 F.R.D. 156 (C.D. Cal. 2007) ................................................................. 13

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................... 13

*Amgen v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ................................................................................... 9

*Anderson v. Apple Inc.*,
    500 F. Supp. 3d 993 (N.D. Cal. 2020) ......................................................... 6

*Astiana v. Kashi Co.*,
    291 F.R.D. 493 (S.D. Cal. 2013) ........................................................ passim

*Avilez v. Pinkerton Gov't Servs.*,
    286 F.R.D. 450 (C.D. Cal. 2012) ................................................................. 9

*Baghdasarian v. Amazon.com, Inc.*,
    258 F.R.D. 383 (C.D. Cal. 2009) ................................................................. 15

*Bates v. United Parcel Serv., Inc.*,
    511 F.3d 974 (9th Cir. 2007) ....................................................................... 6

*Benedecit v. Hewlett-Packard Co.*,
    314 F.R.D. 457 (N.D. Cal. 2016) ................................................................. 11

*Berland v. Mack*,
    48 F.R.D. 121 (S.D.N.Y. 1969) ................................................................... 21

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ............................................................ 9, 12, 17

*Brinker Rest. Corp. v. Super. Ct.*,
    53 Cal. 4th 1004 (2012) .............................................................................. 17

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ..................................................................... 13

iii

*Brockey v. Moore*,
    107 Cal. App. 4th 86 (2003) ....................................................................................... 14

*Bruno v. Quten Research Inst., LLC*,
    280 F.R.D. 524 (C.D. Cal. 2011) .................................................................................. 9

*Chacanaca v. Quaker Oats Co.*,
    2011 U.S. Dist. LEXIS 65023 (N.D. Cal. June 14, 2011) ........................................... 12

*Chavez v. Blue Sky Natural Bev. Co.*,
    268 F.R.D. 365 (N.D. Cal. 2010) ................................................................................ 10

*Chen v. All State Ins. Co.*,
    819 F.3d 1136 (9th Cir. 2016) .................................................................................... 18

*Church v. Consol. Freightways, Inc.*,
    1992 U.S. Dist. LEXIS 18234 (N.D. Cal. Sept. 14, 1992) ......................................... 19

*Civil Serv. Emps. Ins. Co. v. Super. Ct.*,
    22 Cal. 3d 362 (1978) ................................................................................................. 21

*Colgan v. Leatherman Tool Group, Inc.*,
    135 Cal. App. 4th 663 (2006) ..................................................................................... 16

*Cummings v. Connell*,
    316 F.3d 886 (9th Cir. 2003) ...................................................................................... 12

*Davis v. HSBC Bank*,
    691 F.3d 1152 (9th Cir. 2012) .................................................................................... 14

*Deposit Guar. Nat'l Bank v. Roper*,
    445 U.S. 326 (1980) .................................................................................................... 18

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ........................................................................................ 9

*Fournigault v. Indep. One Mortg. Corp.*,
    242 F.R.D. 486 (N.D. Ill. 2007) ................................................................................. 22

*Franchise Tax Bd. Ltd. Liab. Corp. Tax Refund Cases*,
    25 Cal. App. 5th 369 (2018) ......................................................................................... 8

*Gallucci v. Boiron, Inc.*,
    2012 U.S. Dist. LEXIS 157039 (S.D. Cal. Oct. 31, 2012) ........................................ 12

*Gonzales v. Simplexgrinnell LP*,
    289 F.R.D. 463 (N.D. Cal. 2013) .................................................................................. 9

iv

*Hadley v. Kellogg Sales Co.*,
    324 F. Supp. 3d 1084 (N.D. Cal. 2018) ................................................................ 8, 14

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ........................................................................ 11, 13

*Hawkins v. Kroger Co.*,
    2021 U.S. Dist. LEXIS 124454 (S.D. Cal. July 2, 2021) ...................................... 2

*Hawkins v. Kroger Co.*,
    337 F.R.D. 518 (S.D. Cal. 2020) ................................................. 11, 12, 14, 18

*Hawkins v. Kroger Co.*,
    512 F. Supp. 3d 1079 (S.D. Cal. 2021) ........................................................ passim

*Hawkins v. Kroger Co.*,
    906 F.3d 763 (9th Cir. 2018) ..................................................................... passim

*Hinojos v. Kohl's Corp.*,
    718 F.3d 1098 (9th Cir. 2013) ............................................................................ 8

*Hohenberg v. Ferrero*,
    2011 U.S. Dist. LEXIS 38471 (S.D. Cal. March 22, 2011) ................................ 12

*Hunt v. Check Recovery Sys.*,
    2007 U.S. Dist. LEXIS 58800 (N.D. Cal. July 25, 2007) ......................... 21, 22, 23

*Hunt v. Imperial Merch. Servs., Inc.*,
    560 F.3d 1137 (9th Cir. 2009) ......................................................................... 21

*In re Activision Sec. Litig.*,
    621 F. Supp. 415 (N.D. Cal. 1985) .................................................................. 20

*In re First Am. Home Buyers Prot. Corp. Class Action Litig.*,
    313 F.R.D 578 (S.D. Cal. 2016) ....................................................................... 15

*In re High-Tech Employee Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ........................................................... 13

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
    268 F.R.D. 652 (S.D. Cal. 2010) ..................................................................... 15

*In re TFT-LCD Antitrust Litig.*,
    267 F.R.D. 291 (N.D. Cal. 2010) ..................................................................... 18

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2011) ............................................................................... 8, 15

*Johns v. Bayer Corp.*,
280 F.R.D. 551 (S.D. Cal. 2010) ..................................................................... passim

*Johnson v. General Mills*,
275 F.R.D. 282 (C.D. Cal. 2011) ............................................................................. 15

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ............................................................................. 8, 11

*Kamakahi v. Am. Soc't for Reprod. Med.*,
305 F.R.D. 164 (N.D. Cal. 2015) ............................................................................ 12

*Keilholtz v. Lennox Hearth Prods.*,
268 F.R.D. 330 (N.D. Cal. 2010) ............................................................................ 10

*Klaxon v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941) ................................................................................................ 18

*Lambert v. Nutraceutical Corp.*,
870 F.3d 1170 (9th Cir. 2017) ................................................................................ 17

*Leyva v. Medline Indus.*,
716 F.3d 510 (9th Cir. 2013) .................................................................................. 17

*Lilly v. Jamba Juice Co.*,
308 F.R.D. 231 (N.D. Cal. 2014) ............................................................................ 18

*Lozano v. AT&T Wireless Servs.*,
504 F.3d 718 (9th Cir. 2007) .................................................................................. 15

*Lyon v. U.S. Immigration & Customs Enf't*,
300 F.R.D. 628 (N.D. Cal. 2014) ............................................................................ 12

*Marsh v. First Bank of Del.*,
2014 U.S. Dist. LEXIS 17577 (N.D. Cal. Feb. 7, 2014) ......................................... 19

*Mass. Mut. Life Ins. Co. v. Super. Ct.*,
97 Cal. App. 4th 1282 (2002) ................................................................................. 15

*McAdams v. Monier, Inc.*,
182 Cal. App. 4th 174 (2010) ................................................................................. 15

*Morgan v. U.S. Soccer Fed'n*,
2019 U.S. Dist. LEXIS 221602 (C.D. Cal. Nov. 8, 2019) ....................................... 11

*Nelson v. Pearson Ford Co.*,
186 Cal. App. 4th 983 (2010) ................................................................................. 16

*Nevarez v. Forty Niners Football Co.*, LLC,
    326 F.R.D. 562 (N.D. Cal. 2018) ............................................................................ 11

*Nutraceutical Corp. v. Lambert*,
    139 S. Ct. 710 (2019) .................................................................................................. 17

*Ogden v. Bumble Bee Foods, LLC*,
    2014 U.S. Dist. LEXIS 565 (N.D. Cal. Jan. 2, 2014) ............................................. 16

*Ortega v. Natural Balance, Inc.*,
    300 F.R.D. 422 (C.D. Cal. 2014) ........................................................................ 6, 13

*Parkinson v. Hyundai Motor Am.*,
    258 F.R.D. 580 (C.D. Cal. 2008) ............................................................................. 13

*Patel v. Trans Union, LLC*,
    308 F.R.D. 292 (N.D. Cal. 2015) ............................................................................... 9

*Petersen v. Costco Wholesale Co.*,
    312 F.R.D. 565 (C.D. Cal. 2016) ............................................................................. 17

*Phillips Petroleum Co v. Shutts*,
    472 U.S. 797 (1985) ............................................................................................ 18, 19

*Reid v. Johnson & Johnson*,
    780 F.3d 952 (9th Cir. 2015) ................................................................................... 1, 6

*Richmond v. Dart Indus., Inc.*,
    29 Cal. 3d 462 (1981) .................................................................................................. 8

*Ries v. Ariz. Bevs. U.S. LLC*,
    287 F.R.D. 523 (N.D. Cal. 2012) ..................................................................... 6, 8, 10

*Roberts v. Helm*,
    670 F. Supp. 1466 (N.D. Cal. 1987) ................................................................... 19, 20

*Rubio v. Capital One Bank*,
    613 F.3d 1195 (9th Cir. 2010) .................................................................................. 10

*Sali v. Corona Med. Ctr.*,
    889 F.3d 623 (9th Cir. 2018) .................................................................................... 17

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ..................................................................................................... 8

*Shersher v. Superior Court*,
    154 Cal. App. 4th 1491 (2007) ................................................................................. 16

vii

*Silva v. B&G Foods, Inc.*,
    2021 U.S. Dist. LEXIS 137792 (N.D. Cal. July 23, 2021) .......................................... 22

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ........................................................................................ 12

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011) .............................................................................. passim

*Steroid Hormone Prod. Cases*,
    181 Cal. App. 4th 145 (2010) ........................................................................................ 15

*Stockwell v. City & County of San Francisco*,
    749 F.3d 1109 (9th Cir. 2014) .................................................................................. 9, 10

*Tait v. BSH Home Appliances Corp*,
    289 F.R.D. 466 (C.D. Cal. 2012) ................................................................................. 17

*Townsend v. Monster Bev. Corp.*,
    303 F. Supp. 3d 1010 (C.D. Cal. 2018) ....................................................................... 15

*Valle v. Glob. Exch. Vacation Club*,
    320 F.R.D. 50 (C.D. Cal. 2017) ............................................................................... 9, 10

*Victorino v. FCA US Ltd. Liab Co.*,
    326 F.R.D. 282 (S.D. Cal. 2018) .................................................................................... 9

*Wal-Mart Stores Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................................. 9, 10

*Wash. Mut. Bank v. Super. Ct.*,
    24 Cal. 4th 906 (2001) ..................................................................................... 18, 19, 20

*Wershba v. Apple Computer, Inc.*,
    91 Cal. App. 4th 224 (2001) ......................................................................................... 20

*Wiener v. Dannon Co.*,
    255 F.R.D. 658 (C.D. Cal. 2009) ................................................................................. 16

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008) ........................................................................................ 14

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ...................................................................................... 17

*Wolph v. Acer Am. Corp.*,
    272 F.R.D. 477 (N.D. Cal. 2011) ................................................................................. 16

*Wortman v. Air New Zealand*,
   326 F.R.D. 549 (N.D. Cal. 2018) ......................................................................................... 9, 10

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
   594 F.3d 1087 (9th Cir. 2010) ................................................................................................ 14

**STATUTES**

Cal. Bus. & Prof. Code § 17204 ...................................................................................................... 6

Cal. Civ. Code § 1781(d) ............................................................................................................... 21

**OTHER AUTHORITIES**

Chajès, *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer
   Risk in the E3N-EPIC Study*, 167 Am. J. of Epid. 1312 (2008) ......................................... 3

Chavarro, *A Prospective Study of Trans-Fatty Acid Levels in Blood and Risk of Prostate
   Cancer*, 47 Proc. Am. Assoc. of Cancer Research 95 (2008) ................................... 3

Chavarro, *Dietary fatty acid intakes and the risk of ovulatory infertility*, 85 Am. J. Clin.
   Nutr. 231 (2007) ................................................................................................................... 3

Devore, *Dietary Fat Intake and Cognitive Decline in Women with Type 2 Diabetes*, 32
   Diabetes Care 635 (2009) ..................................................................................................... 3

Final Determination Regarding Partially Hydrogenated Oils, 80 Fed. Reg. 34650 (June 15,
   2015) ..................................................................................................................................... 2

Lopez-Garcia, *Consumption of Trans Fatty Acids Is Related to Plasma Biomarkers of
   Inflammation and Endothelial Dysfunction*, 135 J. Nutr. 562 (2005) ........................... 3

Mozaffarrian, *Trans Fatty Acids & Coronary Heart Disease*, 354 New Eng. J. Med. 1601
   (2006) ................................................................................................................................ 2, 3

Newberg on Class Actions §18.14 (4th ed. 2002) ........................................................................ 12

Tentative Determination Regarding Partially Hydrogenated Oils, 78 Fed. Reg. 67169 (Nov.
   8, 2013) .................................................................................................................................. 2

Vinikoor, *Consumption of Trans-Fatty Acid and Its Association with Colorectal Adenomas*,
   168 Am. J. Epid. 289 (2008) ................................................................................................. 3

## I.   INTRODUCTION

During the Class Period, B&G promoted Ortega Taco Shells ("Ortega") with the front-label nutrient content claim "0g Trans Fat." The claim was always an illegal nutrient content claim under 21 C.F.R. §§ 101.13 and 101.62. *Hawkins v. Kroger Co*., 906 F.3d 763, 770-72 (9th Cir. 2018); *Reid v. Johnson & Johnson*, 780 F.3d 952, 962-63 (9th Cir. 2015). The legality of the claim under this regulation is a predominating common issue.

In addition to being an illegal claim, the claim was also fraudulent because B&G added trans fat to every package of Ortega. The evidence here is also common: documents showing the presence of trans fat in the products marketed as free of it, as well as internal documents and expert testimony showing the terrifying health impact of the trans fat added to Ortega Taco Shells.

Also common is the evidence that Plaintiffs will submit for punitive damages. This includes evidence that B&G always knew the dangers of PHO and trans fat, but used it anyway, then claimed that its taco shells contained "0g Trans Fat" to drive sales and reduce its costs. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (listing as punitive damage factors whether conduct was intentional or a mere accident, and whether it evinces an "indifference to or a reckless disregard of the health or safety of others"). Plaintiffs will also submit expert epidemiological evidence of the impact on public health of targeting consumers, who wanted and believed they would receive a product with no trans fat, but instead paid for one which contained trans fat.  *See also Hawkins*, 906 F.3d 763 at 772 ("And unlike other products, where the distinction may not be inimical to the public health, falsely advertising that a food product does not contain trans fat is a health hazard.").

In addition to the more general guidance on this motion from the Ninth Circuit in *Reid* and *Hawkins*, which are reversals of dismissals, the Court also has the persuasive authority of Judge Miller's decisions on summary judgment and class certification in the *Hawkins* action after the Ninth Circuit's remand. In those decisions, a class was certified and then, on a classwide basis, key liability issues and a number of affirmative defenses were resolved.

*Hawkins v. Kroger Co.*, 337 F.R.D. 518, 544 (S.D. Cal. 2020) certified this class:

All citizens of California who purchased, between January 1, 2010 and December 31, 2015, Kroger Bread Crumb containing partially hydrogenated oil and the front label claim "0g Trans Fat."

Kroger challenged the certification order with both a motion for reconsideration and a Rule 23(f) petition to the Ninth Circuit, both of which were denied. *See Hawkins v. Kroger Co.*, 2021 U.S. Dist. LEXIS 124454, at *2-3 (S.D. Cal. July 2, 2021) (describing case's procedural history in order approving settlement). With regard to summary judgment, the key issue of the legality of the trans fat claim was resolved class-wide with common evidence:

> Plaintiff's motion for summary judgment that the "0g Trans Fat" label violated 21 C.F.R. §§ 101.62(a)(1)-(2) and 101.13(i)(3) is GRANTED as to that particular issue.

*Hawkins v. Kroger Co.*, 512 F. Supp. 3d 1079, 1091 (S.D. Cal. 2021). Similarly, a number of the same affirmative defenses raised by B&G here were summarily resolved for the entire class. *Hawkins*, 512 F. Supp. 3d at 1095-97. Class treatment worked.

## II.      STATEMENT OF RELEVANT FACTS

### A.      B&G Used PHO, a Non-GRAS Additive, in Ortega.

During the class period, Ortega was made with partially hydrogenated oil ("PHO"). *See* Weston Public Declaration, Exs. A-B (B&G002, B&G007); ███████████████████████ ███████). In 2013 and 2015 declaratory orders, the FDA determined PHOs "are not generally recognized as safe (GRAS) for any use in food based on current scientific evidence establishing the health risks associated with the consumption of *trans* fat." *See* Tentative Determination Regarding Partially Hydrogenated Oils, 78 Fed. Reg. 67169, 67169 (Nov. 8, 2013); Final Determination Regarding Partially Hydrogenated Oils, 80 Fed. Reg. 34650, 34651 (June 15, 2015) ("PHOs are not GRAS for any use in human food.").

PHO was the only significant source of artificial trans fat in the American diet during the class period. PHO damages the heart in several distinct ways. First, it causes cholesterol dysregulation, uniquely by both raising "bad" LDL cholesterol levels and lowering "good" HDL cholesterol levels. *See* Mozaffarrian, *Trans Fatty Acids & Coronary Heart Disease*, 354 NEW ENG. J. MED. 1601, 1602 (2006), Wong Report, Ex. F (Wong Report attached as Exhibit 3 to Weston Under-Seal Declaration). This causes atherosclerotic lesions to form on the inside of the coronary arteries. *Id.* at 1602-03. By themselves, these lesions harm the body by restricting blood flow around the heart. When atherosclerotic lesions caused by trans fat rupture and break loose, they can block an artery, resulting in a heart attack. *Id.* at 1605-06. Artificial trans fat <u>*also*</u> causes these ruptures, meaning that it contributes to the

2

underlying cause of heart disease _and_ promotes the fatal end of heart disease. _Id._ at 1605-06.

Further, trans fat causes multiple forms of cancer, for example, increasing the risk of colorectal neoplasia in high-consumption groups by 86% and increasing the risk of one type of prostate tumors in men by 121%.[1] In younger women trans fat causes infertility, in middle-aged women trans fat causes breast cancer, and in older women trans fat accelerates memory loss and age-related memory loss.[2]

Trans fat also deforms the endothelial cells that line blood vessels and major organ systems, leading to brain dysfunction, diabetes, systemic inflammation, and autoimmune disorders.[3]

UC Irvine epidemiologist Nathan Wong will testify for the class. He has published more than 250 scholarly medical journal articles, with a focus on heart disease prevention and epidemiology. He is superbly qualified to testify on the exact questions at issue here: he served as **President of the American Society for Preventative Cardiology**, is a long-term member of the **American Heart Association's Statistics Committee**, is the long-time **Director of UC Irvine's Heart Disease Prevention Program** and is **President of the InterAmerican Heart Foundation**, a multinational nonprofit that advocates for education and public policy to prevent heart disease in Latin America and the Caribbean. _See_ Weston Under-Seal Decl. Ex. 3 (Wong Report at 2).

Throughout the class period, B&G was both aware that trans fat consumption was dangerous and that consumers seek to avoid trans fat. B&G warned its investors, for example, that there are "consumer concerns regarding the safety and quality of certain food products, including the health implications of . . . obesity and trans fatty acids." Weston Public Decl. Ex. C (B&G Foods 2004 10-Q); Weston Public Decl. Ex. E (B&G Foods 2007 10-K) (noting "recent publicity concerning the health

---

[1] Vinikoor, _Consumption of Trans-Fatty Acid and Its Association with Colorectal Adenomas_, 168 AM. J. EPID. 289 (2008); Chavarro, _A Prospective Study of Trans-Fatty Acid Levels in Blood and Risk of Prostate Cancer_, 47 PROC. AM. ASSOC. OF CANCER RESEARCH 95, 99 (2008) (Wong Report, Exs. K-L); SAC ¶¶ 44-49.

[2] Chavarro, _Dietary fatty acid intakes and the risk of ovulatory infertility_, 85 AM. J. CLIN. NUTR. 231-37 (2007); Chajès, _Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study_, 167 AM. J. OF EPID. 1312 (2008) (Wong Report, Ex. J); Devore, _Dietary Fat Intake and Cognitive Decline in Women with Type 2 Diabetes_, 32 DIABETES CARE 635-640 (2009); SAC ¶¶ 45-56.

[3] Lopez-Garcia, _Consumption of Trans Fatty Acids Is Related to Plasma Biomarkers of Inflammation and Endothelial Dysfunction_, 135 J. NUTR. 562-66 (2005); SAC ¶ 57.

1    implications of obesity and trans fatty acids"); Weston Public Decl. Ex. D (B&G Foods 2005 10-Q)

2    (noting "consumer concerns regarding the safety and quality of certain food products, including the

3    health implications of . . . obesity and trans fatty acids.").

4         Further, in a 2008 quarterly report, Defendants informed their investors that "important factors

5    that could cause actual results to differ materially from our expectations" included

6         recalls if products become adulterated or misbranded, liability if product consumption causes
     injury, ingredient disclosure and labeling laws and regulations and the possibility that
7         consumers could lose confidence in the safety and quality of certain food products, as well as
         recent publicity concerning the health implications of obesity and trans fatty acids
8

9    Weston Public Decl. Ex. F (B&G 2008 10-Q).

10        B&G's document production further demonstrates that it was well aware that Ortega contained

11   trans fat yet chose to place a "0g Trans Fat" claim on the front label of the product in an attempt to

12   deceive consumers and increase sales. Weston Public Decl. Exs. A-B (B&G002 and B&G007). ███

13   ███████████████████████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████

15   █ ██████████████████████████████████████████████████████████
     ███████████████████████████

16   █ █████████████████████████████████████████████

17   █ ████████████████████████████████████████████

18   █ ███████████████████████████████████████████████████████████

19   █ ███████████████████████████████████████████████████████████

20   █ █████████████

21   █ ██████████████████████████████████████████████████████████

22   █ ███████████████████████████████████████████

23   *See also* Weston Under-Seal Decl, Ex. 14 ██████████████████████████████████████

24   ██████████). Thus, B&G was aware that whether taco shells were "████████████████████████

25   was "████████████████████████████████████ Weston Under-Seal Decl. Ex. 13

26   (B&G506), and sought to ████████████ by using a "0g Trans Fat!" claim to position Ortega as a

27   healthier option. Weston Under-Seal Decl. Ex. 10 (B&G458). Further, Defendants made this false claim

28   despite their knowledge that trans fat consumption "████████████████████████ Weston Under-

Seal Decl. Ex. 15 (B&G24-32).  Further, in 2014, David Wenner, B&G's CEO, stated B&G was "trying to make those claims that we think are relevant to dry grocery, be it lower sodium, be it less fat, those kinds of claims." Weston Public Decl. Ex. G (Wenner's Food Business News interview). Additionally, B&G currently advertises other products as "made from the good stuff, free of partially hydrogenated oils [so] you can enjoy it without guilt or compromise." Weston Public Decl. Ex. H (Canoleo screenshot).

B&G also launched during the class period a "Healthy Mex" social media and influencer campaign advertising Ortega Taco Shells and their trans fat as a health food. On Facebook in 2011 B&G promoted this "healthy taco alternative" recipe that included Ortega Taco Shells. Weston Public Decl. Ex. I (SILVA 6636). In 2012, B&G hired Sandra Lee, a celebrity chef whose specialty is easy to cook healthy meals. Lee was during this time especially prominent as New York Governor Andrew Cuomo's domestic partner and host of the TV cooking show *Semi-Homemade Cooking*. In the video, Lee uses Ortega Taco Shells and promises her recipe will let her viewers "eat smarter and healthier." Weston Public Decl. Ex J-K (SILVA6617 and transcript).

It was not any corporate crisis of conscience that led B&G to stop its practice of dumping trans fat into Ortega when its competitors used safe alternative ingredients. ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**B.**     **B&G Hid Its Use of Trans Fats With the False, Deceptive, and Unlawful Nutrient Content Claim "0g Trans Fat."**

"The marketing industry is based on the premise that labels matter—that consumers will choose one product over another similar product based on its label." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 328, (2011). B&G put the "**0g Trans Fat!**" nutrient content claim on Ortega's front label because it knows consumers want products with no trans fat. B&G was well aware of "consumer concerns regarding the safety and quality of certain food products, including the health implications of . . . obesity and trans fatty acids." Weston Public Decl. Ex. D.  Moreover, it "strains credulity to think that a merchant would select exclusively immaterial statements to print on its product's packaging." *Ortega v. Natural Balance, Inc.*, 300 F.R.D. 422, 429 (C.D. Cal. 2014).

In *Reid v. Johnson & Johnson*, 780 F.3d 952, 963 (9th Cir. 2015), the Ninth Circuit found the "No Trans Fat" claim on a product with trans fat was deceptive. In the *Hawkins* "0g Trans Fat" case, the Ninth Circuit held:

> We held that "No Trans Fat" was misleading because a reasonable consumer might infer that the product did not contain trans fat. [...] *Reid* squarely controls here. [...] Just as in *Reid*, a consumer reading the label could be misled into believing that the product was free of trans fat. [...] In this case, as we have explained, the "rounding rules" applicable to the Nutrition Facts Panel do not apply to the nutrient content claim on the face of the label. And unlike other products, where the distinction may not be inimical to the public health, falsely advertising that a food product does not contain trans fat is a health hazard.

*Hawkins v. Kroger Co.*, 906 F.3d 763, 771-72 (9th Cir. 2018). On remand, after certifying the class, Judge Miller granted the class partial summary judgment because the "0g Trans Fat" claim "violated 21 C.F.R. §§ 101.62(a)(1)-(2) and 101.13(i)(3)." *Hawkins v. Kroger Co.*, 512 F. Supp. 3d 1079, 1091 (S.D. Cal. 2021).

## III.   PLAINTIFFS HAVE ARTICLE III STANDING.

"'In a class action, standing is satisfied if at least one named plaintiff meets the requirements.'" *Allen v. ConAgra Foods, Inc.*, 331 F.R.D. 641, 654 (N.D. Cal. 2019) (quoting *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007)). *See also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011) (same); *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1005 (N.D. Cal. 2020) (same). The UCL and CLRA "apply the same standard" to determine whether a named plaintiff has standing to assert a claim—plaintiff must have suffered an injury in fact and lost money or property as a result of the unfair competition. *Ries v. Ariz. Bevs. U.S. LLC*, 287 F.R.D. 523, 529 (N.D. Cal. 2012) (citing Cal. Bus. & Prof. Code § 17204).

Here, Plaintiffs read and relied on the "0g Trans Fat!" claim, which was a substantial factor in their purchases. Ms. Silva "trusted Ortega to have zero trans fat." Weston Public Decl. Ex. L (Silva Dep. Tr. at 110:19-21). She chose to purchase Ortega over competing brands because she wanted to protect "the health of my family and make good health choices." Weston Public Decl. Ex. L (Silva Dep. Tr. at 42:18-23). *See also* Weston Public Decl. Ex. L (Silva Dep. Tr. at 109:12-13) ("I purchased them because it said, 'Zero trans fat.'").  B&G's false "0g Trans Fat!" claim "was important to" Silva because she "didn't want to have cancer. [She] didn't want to have diabetes or any health problems or give that to [her] children from feeding them poison." Weston Public Decl. Ex. L (Silva Dep. Tr. at 53:15-18).

Ms. Schier is likewise "passionate about keeping my kids healthy." Weston Public Decl. Ex. M (Schier Dep. Tr. at 18:5). She purchased Ortega after viewing the label's "[b]ig, bright yellow" health claims which "sounded really healthy."  Weston Public Decl. Ex. M (Schier Dep. Tr. at 40:9-24). Schier "[r]ead the label, trusted the label, and took it off the shelves." Weston Public Decl. Ex. M (Schier Dep. Tr. at 35:5-6). *See also id. at* 90:20-24 ("You bought the Ortega-brand taco shells a lot of times, and it was in reliance on this trans fat language on the front of the package because you knew that trans fats were bad; fair? A. Correct.").

Ms. Silva first purchased Ortega in the "early 2000s." Ortega "was a staple" in Silva's household for many years, and she ate them about "[t]wice a week." Weston Public Decl. Ex. L (Silva Dep. Tr. at 32:17-25). She bought both the white and yellow corn versions but "would buy the yellow more." Weston Public Decl. Ex. L (Silva Dep. Tr. at 36:21-37:2).

Ms. Schier "first purchased the product in 2012." Weston Public Decl. Ex. M (Schier Dep. Tr. at 66:22-24). She purchased Ortega about "20 times" annually during the class period, with most of her purchases occurring at "Vons or Ralphs." Weston Public Decl. Ex. M (Schier Dep. Tr. at 31:8-14). Generally, Ms. Schier purchased a twelve pack of the yellow corn Ortega. She "tried the white kind once," but "like[d] the yellow better." Weston Public Decl. Ex. M (Schier Dep. Tr. at 32:2-14).

Further, this Court previously held that "Plaintiffs have adequately alleged standing as to their labeling claims because they have 'adequately alleged that [they] relied on the label's misrepresentations and would not have purchased the product without those misrepresentations.'" *Silva v. B&G Foods*, 2020 U.S. Dist. LEXIS 192590, at *2 (N.D. Cal. Sep. 8, 2020) (quoting *Hawkins*, 906 F.3d at 769).

The "focus" of the UCL is "on the Defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2011)). By definition, all Class members purchased the product bearing the alleged misrepresentations. Such "a showing of concrete injury under the UCL and FAL is sufficient to establish Article III standing." *Ries v. Ariz. Bevs. U.S. LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012) (citation omitted); *Guido v. L'Oreal USA, Inc.*, 284 F.R.D. 468, 475 (C.D. Cal. 2012) (plaintiffs had standing where they testified that had they known the truth, they would not have purchased the product); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 500-01 (S.D. Cal. 2013) (plaintiff has standing where, absent the alleged misrepresentations, he "would have paid less or purchased other products"); *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (finding standing where misrepresentations induced the plaintiff "to buy products he would not otherwise have purchased").

## IV.   STANDARDS FOR CLASS CERTIFICATION

California "has a public policy which encourages the use of the class action device." *Franchise Tax Bd. LLC Tax Refund Cases*, 25 Cal. App. 5th 369, 387 (2018) (quoting *Richmond v. Dart Indus., Inc.*, 29 Cal. 3d 462, 473 (1981)).

A plaintiff must first show that the class meets the following four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Just Film, Inc. v. Buono*, 847 F.3d 1108, 1115 (9th Cir. 2017).

Next, the plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

*Just Film*, 847 F.3d at 1115.

Upon such showing, "a plaintiff whose suit meets the specified criteria" is "entitl[ed]" to an order of certification, as the "discretion suggested by Rule 23's 'may' is discretion residing in the plaintiff." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398-400 (2010).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1093 (N.D. Cal. 2018) (quoting *Amgen v.*

8

*Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). [A]ny inquiry into the merits must be strictly limited to evaluating plaintiffs' allegations to determine whether they satisfy Rule 23." *Gonzales v. Simplexgrinnell LP*, 289 F.R.D. 463, 465 (N.D. Cal. 2013) (following *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)). "'Neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class.'" *Victorino v. FCA US LLC*, 326 F.R.D. 282, 298 (S.D. Cal. 2018) (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975); *Avilez v. Pinkerton Gov't Servs.*, 286 F.R.D. 450, 455 (C.D. Cal. 2012) (same).

## V.    THE FOUR RULE 23(a) PREREQUISITES ARE SATISFIED

### A.    Numerosity Is Satisfied Because Defendant Sold Millions of Boxes of Ortega

Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Where the exact size of the proposed class is unknown, but general knowledge and common sense indicate it is large, the numerosity requirement is satisfied." *Valle v. Glob. Exch. Vacation Club*, 320 F.R.D. 50, 55-56 (C.D. Cal. 2017) (quoting *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 533 (C.D. Cal. 2011)). "[C]ourts have held that classes as small as 40 satisfy the numerosity demand." *Patel v. Trans Union, LLC*, 308 F.R.D. 292, 304 (N.D. Cal. 2015). Here, ███ █ boxes of Ortega were sold in California alone during the class period. *See* Weston Under-Seal Decl. Ex. 16 (sales data).[4] Thus, numerosity is easily satisfied, even before accounting for the sale of Ortega in the other 11 states.

### B.    The Truthfulness and Legality of the "0g Trans Fat" Claim Are Predominating Common Issues.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires Plaintiffs to show their claims "depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wortman v. Air New Zealand*, 326 F.R.D. 549, 556 (N.D. Cal. 2018); *Stockwell v. City & County of San Francisco*, 749 F.3d 1109, 1112 (9th Cir. 2014) (same) (quoting *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

---

[4] Defendants refused to produce sales information for any state beside California. Plaintiffs hope the issue can be resolved as several others already have by informal conference before Judge Spero.

1    Commonality is "construed permissively," and all questions of fact and law need not be

2    common to satisfy the rule. *Valle v. Glob. Exch. Vacation Club*, 320 F.R.D. 50, 59-60 (C.D. Cal. 2017).

3    "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core

4    of salient facts coupled with disparate legal remedies within the class." *Id.*; *see also Keilholtz v. Lennox

5    Hearth Prods.*, 268 F.R.D. 330, 337 (N.D. Cal. 2010) (same). "[E]ven a single [common] question will

6    do." *Stockwell*, 749 F.3d at 1111 (quoting *Wal-Mart Stores,* 564 U.S. at 359).

7    Here, two common questions predominate. First, was the "**0g Trans Fat!**" nutrient content

8    claim deceptive in violation of California consumer fraud law? Second, was the claim an unlawful and

9    unauthorized nutrient content claim in violation of 21 C.F.R. §§ 101.13 and 101.62 and therefore the

10   UCL? The answers will resolve "in one stroke" an issue that is "central to the validity of each [class

11   member's] claims." *Wortman v. Air New Zealand*, 326 F.R.D. 549, 556 (N.D. Cal. 2018). *See also

12   Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010) ("By properly alleging a TILA

13   violation, Rubio has also alleged a UCL violation under the prong of the UCL that prohibits 'unlawful'

14   business acts or practices."); *Astiana*, 291 F.R.D. at 501 (certifying class because there was "a common

15   core of salient facts" as to "whether the use of the term 'Nothing Artificial' to advertise food products

16   that contain the allegedly synthetic ingredients violates the UCL, FAL, CLRA, or Defendant's own

17   warranties").

18   As for the first question, if Plaintiffs establish that the "0g Trans Fat" claim is likely to deceive,

19   a finding of injury necessarily follows: "California has created what amounts to a conclusive

20   presumption that when a defendant puts out tainted bait and a person sees it and bites, the defendant has

21   caused an injury." *Stearns*, 655 F.3d at 1021 n.13. Moreover, the "substantive right extended to the

22   public by the UCL is the right to protection from fraud, deceit and unlawful conduct." *Ries*, 287 F.R.D.

23   at 537 (following *Tobacco II,* 46 Cal. 4th at 324). Class members who purchased Ortega were denied

24   this right. *See Ries*, 287 F.R.D. at 538 ("Plaintiffs meet the *Dukes* [commonality] standard because the

25   entire proposed class has suffered the same injuries flowing from the alleged misrepresentations.").

26   "Courts routinely find commonality in false advertising cases that are materially indistinguishable from

27   the matter at bar." *Ries*, 287 F.R.D. at 537 (citing *Chavez v. Blue Sky Natural Bev. Co.*, 268 F.R.D. 365,

28   377 (N.D. Cal. 2010)). *Chavez*, like this case, involved a single allegedly deceptive and unlawful claim

10

on a single food product, and was certified for the same reasons that apply here. *Chavez*, 268 F.R.D. at 380. In *Hawkins*, "at least one common question exists, i.e. whether the '0g Trans Fat' nutrient content claim was sufficiently deceptive to violate the FAL, UCL, CLRA, and express and implied warranties." *Hawkins v. Kroger Co.*, 337 F.R.D. 518, 533 (S.D. Cal. 2020).

### C. Typicality Is Satisfied Because Plaintiffs Suffered the Same Injury as Other Putative Class Members.

The typicality "requirement is 'permissive and requires only that the representative's claims are reasonably co-extensive with those of the absent class members; they need not be substantially identical.'" *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 578 (N.D. Cal. 2018) (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1029 (9th Cir. 1998)). "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Just Film, Inc. v. Buono,* 847 F.3d 1108, 1116 (9th Cir. 2017).

Plaintiffs satisfy the typicality standard because their claims are not just "reasonably coextensive," but completely identical to the claims of class members: they all purchased Ortega with the same deceptive, unlawful labeling. Both Plaintiffs and "other class members have been injured by the same course of conduct." *Just Film*, 847 F.3d at 1116. *See also Johns v. Bayer Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2010) ("typicality is met because [plaintiffs] and the proposed class assert exactly the same claim, arising from the same course of conduct—[Defendant]'s marketing campaign."); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501 (S.D. Cal. 2013) ("Typicality is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability.").

### D. Adequacy of Representation Is Satisfied Because Plaintiffs Have No Conflicts and Proposed Class Counsel Is Experienced and Capable.

"Adequate representation is usually presumed in the absence of contrary evidence." *Benedecit v. Hewlett-Packard Co.*, 314 F.R.D. 457, 471 (N.D. Cal. 2016) (quoting *Californians for Disability Rights, Inc. v. Cal. DOT*, 249 F.R.D. 334, 349 (N.D. Cal. 2008); *Morgan v. U.S. Soccer Fed'n*, 2019 U.S. Dist. LEXIS 221602, at *20-21 (C.D. Cal. Nov. 8, 2019) (same).

"The Ninth Circuit set a two-prong test for this requirement: '(1) do the named plaintiffs and

11

their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Astiana v. Kashi Co.*, 291 F.R.D. 493, 503 (S.D. Cal. 2013) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003)). To defeat adequacy, any supposed conflict of interest "must go to the heart of the litigation, relating to the subject matter of the suit." Newberg on Class Actions §18.14 at 40-41 (4th ed. 2002). The supposed conflict must be "apparent, imminent, and on an issue at the very heart of the suit" to preclude certification. *Lyon v. U.S. Immigration & Customs Enf't*, 300 F.R.D. 628, 640 (N.D. Cal. 2014) (quoting *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975)). "Mere speculation as to conflicts" "is insufficient." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 185 (N.D. Cal. 2015) (quoting *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003)).

Here, there is no conflict between Plaintiffs, their counsel, and the Class, who all share the same interest: establishing B&G's liability. Plaintiffs and their counsel have actively shown their commitment to this case. Plaintiffs regularly speak with their counsel, voluntarily produced documents prior to being served with discovery, and have responded to written discovery and sat for lengthy depositions that included probing personal questions about their health, jobs, and families. *See* Weston Public Decl. Ex. L (Silva Dep. Tr. at 9:7-11:4, 18:5-11, 19:4-16, 40:5-19, 68:8-71:1, 83:10-15; 97:13-21; 118:22-119:2, 127:8-128:14); Weston Public Decl. Ex. M (Schier Dep. Tr. at 23:20-24:24, 25:10-26:2, 31:16-21, 128:10-131:23).

In 2011 Judge Seeborg noted the Weston Firm "has particular familiarity with suits involving issues of mislabeling in the food industry [and] developed a niche expertise in litigation centered on trans fat." *Chacanaca v. Quaker Oats Co.*, 2011 U.S. Dist. LEXIS 65023, at *8-9 (N.D. Cal. June 14, 2011) (appointing Weston Firm one of two interim class counsel over other competing firms). *See also Hohenberg v. Ferrero*, 2011 U.S. Dist. LEXIS 38471, at *6 (S.D. Cal. March 22, 2011) (The Weston Firm "appears to be well qualified to represent the interest of the purported class and to manage this litigation."); *Gallucci v. Boiron, Inc.*, 2012 U.S. Dist. LEXIS 157039, at *9 (S.D. Cal. Oct. 31, 2012) (finding the Weston Firm "fully and competently prosecuted all causes of action, claims, theories of liability, and remedies reasonably available to the Class Members"); *Hawkins v. Kroger Co.*, 337 F.R.D. 518, 544 (S.D. Cal. 2020) (appointing The Weston Firm class counsel in similar case). The

12

1  qualifications of counsel are further documented in its firm resume. *See* Weston Public Decl. Ex. N.

2  **VI.    THE CLASS SATISFIES RULE 23(b)(3).**

3       Fed. R. Civ. P. 23(b)(3) requires the Court to find that common questions of law or fact

4  predominate over any questions affecting only individual members, and that a class action is superior to

5  other available methods to adjudicate the controversy.

6       **A.    Common Issues Predominate.**

7       While Rule 23(a) requires only the existence of common questions among members of the

8  proposed class, Rule 23(b)(3) requires a finding that those common questions predominate over

9  individual ones. "The predominance inquiry hinges on the cohesiveness of the class—whether common

10  legal and factual questions appear more significant than individual legal and factual questions."

11  *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 588-89 (C.D. Cal. 2008) (citing *Hanlon*, 150 F.3d at

12  1022). "Predominance is a test readily met" in consumer fraud cases. *In re High-Tech Employee*

13  *Antitrust Litig.*, 985 F. Supp. 2d 1167, 1185 (N.D. Cal. 2013) (quoting *Amchem Prods., Inc. v. Windsor*,

14  521 U.S. 591, 625 (1997)). *See also Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017)

15  (affirming UCL/CLRA class certification in a case, like this, involving a single allegedly deceptive and

16  unlawful claim on a food label).

17       "The predominance element requires only that questions common to the class predominate over

18  those affecting individual members; it does not require that all questions be identical." *Ortega v. Natural*

19  *Balance, Inc.*, 300 F.R.D. 422, 428 (C.D. Cal. 2014) (quotation omitted); *Allied Orthopedic Appliances,*

20  *Inc. v. Tyco Healthcare Group LP*, 247 F.R.D. 156, 176 n.28 (C.D. Cal. 2007) ("The predominance

21  requirement calls only for predominance, not exclusivity, of common questions.").

22       As described above, the two central questions are (1) whether B&G's "**0g Trans Fat!**" claim is

23  unlawful and (2) whether the claim is misleading. "Importantly, California consumer protection laws

24  take an objective approach of the reasonable consumer, not the particular consumer." *Johns v. Bayer*

25  *Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2012) (following *Williams v. Gerber Prods. Co.*, 523 F.3d 934,

26  938 (9th Cir. 2008)). Here, "there is no reason to look at the circumstances of each individual purchase

27  in this case, because [under the objective standard,] the fact-finder need only determine whether those

28  [representations] were capable of misleading a reasonable consumer." *Yokoyama v. Midland Nat'l Life*

13

*Ins. Co.*, 594 F.3d 1087, 1089, 1094 (9th Cir. 2010). Likewise in *Hawkins*, Judge Miller held:

> Here, the common and cohesive issue is whether Kroger wrongfully labeled its breadcrumbs as containing "0g Trans Fat." This is the most significant aspect of the case, and constitutes a common nucleus of fact and law that is a central feature of the litigation. There is justification in terms of efficiency and judicial economy to resolve this question in a single adjudication, rather than having each individual who purchased an approximately $2 can of Kroger breadcrumbs to file suit on their own. It is also plausible that classwide methods of proof are available to prove Plaintiff's claims.

*Hawkins v. Kroger Co.*, 337 F.R.D. 518, 541 (S.D. Cal. 2020).

### B.   Plaintiffs Will Show B&G's Liability by Common Evidence.

"[T]he primary evidence in a false advertising case is the advertising itself." *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018); *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (same) (quoting *Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003)). When "plaintiffs are exposed to a common advertising campaign, common issues predominate." *Johns v. Bayer Corp.*, 280 F.R.D. 551, 558 (S.D. Cal. 2012); *accord In re Ferrero Litig.*, 278 F.R.D. 552, 560 (S.D. Cal. 2011) (predominance satisfied and class certified where defendant "made a material misrepresentation regarding the nutritious benefits of Nutella® that violated the UCL").

Here, by definition every member of the proposed class was exposed to the challenged label. Whether "**0g Trans Fat!**" is deceptive does not depend on each class member's subjective interpretation, but on a single, objective "reasonable person" standard. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) (certifying food label class); *Davis v. HSBC Bank*, 691 F.3d 1152, 1161-62 (9th Cir. 2012) ("Whether an advertisement is 'misleading' must be judged by the effect it would have on a reasonable consumer.") To show the labels are false, Plaintiffs will also offer expert testimony as to why the claim is important. Further, the Ninth Circuit has already determined that "a consumer reading the [0g Trans Fat] label could be misled into believing that the product was free of trans fat." *Hawkins*, 906 F.3d at 771. And false statements about trans fat are also material under the objective reasonable consumer standard, because "falsely advertising that a food product does not contain trans fat is a health hazard." *Hawkins*, 906 F.3d at 772. *See also Hawkins v. Kroger Co.*, 512 F. Supp. 3d at 1088 (The "label itself, combined with Kroger's admission that the breadcrumbs contained some trans fat, is 'actual evidence'" that the claim was false and misleading.) This evidence supports certification. *See In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 668-69 (S.D. Cal.

14

2010) (certifying class under UCL unfair prong where the "evidence . . . shows class-wide practices by Defendant" which "indicates that this determination is entirely dependent on common proof"); *Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 737 (9th Cir. 2007) (affirming certification of UCL class because the claims are "based on uniform disclosures made by AWS to all its consumers").

Similarly, Plaintiffs will offer common evidence to show B&G's use of PHO in Ortega and "0g Trans Fat!" claim on the label of Ortega violated 21 C.F.R. §§ 101.13 and 101.62. Also common is the evidence showing that B&G knew that trans fat was harmful, and that its customers wanted to avoid products containing trans fat, but chose to label its trans fat laden taco shells "0g Trans Fat!" to increase profits.

**C.      No Individualized Proof of Reliance, Deception, or Injury Is Needed.**

If B&G's "0g Trans Fat!" claim is "likely to deceive," B&G is liable under the UCL without individualized proof of reliance, deception, or injury. *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009); *see also Stearns*, 655 F. 3d at 1020-22 (following *Tobacco II* and reversing order denying class certification that held individualized proof of reliance and causation is required for UCL claims); *Guido*, 284 F.R.D. at 482 ("Importantly, relief under any of the UCL's three prongs is available 'without individualized proof of deception, reliance and injury.'") (quoting *Mass. Mut. Life Ins. Co. v. Super. Ct.*, 97 Cal. App. 4th 1282, 1289 (2002) and *Tobacco II*, 46 Cal. 4th at 326-27); *McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174, 189 (2010) (same); *Johnson v. General Mills*, 275 F.R.D. 282, 287 (C.D. Cal. 2011) (same); *Baghdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383, 387 (C.D. Cal. 2009) ("Plaintiff does not need to show affirmative proof that each individual class member relied on Defendant's deceptive conduct.").

For Plaintiffs' CLRA claims, when misrepresentations are material "an inference of reliance arises as to the entire class." *In re First Am. Home Buyers Litig.*, 313 F.R.D 578, 605 (S.D. Cal. 2016); *Mass. Mutual Life Ins. Co.*, 97 Cal. App. 4th at 1292-93 (same); *Johns*, 280 F.R.D. at 558 n.4. "A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1029 (C.D. Cal. 2018) (quoting *Kwikset Corp.*, 51 Cal. 4th at 332-33); *Steroid Hormone Product Cases*, 181 Cal. App. 4th 145, 157 (2010) ("Materiality of the

15

alleged misrepresentation generally is judged by a 'reasonable man' standard."); *Johns*, 280 F.R.D. at 558 ("California's consumer protection laws evaluate materiality under a reasonable person standard, not on an individualized basis."); *Guido*, 284 F.R.D. at 475 (class certification granted because plaintiff can prove a "UCL claim on behalf of a class without individualized proof of reliance"). Thus, "statements made on the packaging and labels present common proof on the issues of materiality and falsity." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 488 (N.D. Cal. 2011) (citation omitted).

Here, the Ninth Circuit has already held false claims of "No Trans Fat" and "0g Trans Fat" on products with added trans fat to be material and misleading. *See Hawkins*, 906 F.3d at 771. *See also id.* ("We held [in *Reid*] that 'No Trans Fat' was misleading because a reasonable consumer might infer that the product did not contain trans fat."). In *Hawkins*, Judge Miller held

> the nutrition label itself, which lists PHO as an ingredient, is **actual evidence the "0g Trans Fat" label was false or misleading.** Plus, Kroger does not dispute the breadcrumbs contain some trans fat. Furthermore, *Reid* and *Kroger* clearly hinge on the courts' findings that "No Trans Fat" or "0g Trans Fat" labels are false or misleading if the products contain "some" trans fat. *See Hawkins*, 906 F.3d at 771 (describing the "0g Trans Fat" label as "false[]"); *Reid*, 780 F.3d at 962 ("No Trans Fat" is "misleading in at least one respect").

*Hawkins v. Kroger Co.*, 512 F. Supp. 2d 3d 1079, 1090 (S.D. Cal. 2021) (emphasis added). Here, too, the "nutrition label itself, which lists PHO as an ingredient, is actual evidence the '0g Trans Fat' label was false or misleading." *Id.*

**D.    Plaintiffs Will Calculate Restitution Using Common Evidence.**

California's "UCL, CLRA, and false advertising law all provide for restitution." *Shersher v. Superior Court*, 154 Cal. App. 4th 1491, 1495 n.4 (2007). The "standards for awarding restitution are the same in UCL, FAL, and CLRA actions." *Ogden v. Bumble Bee Foods, LLC*, 2014 U.S. Dist. LEXIS 565, at *48 (N.D. Cal. Jan. 2, 2014) (following *Colgan v. Leatherman Tool Group, Inc*., 135 Cal. App. 4th 663, 694 & n.22 (2006)). "Under the UCL, a trial court has broad equitable power to award restitution." *Nelson v. Pearson Ford Co*., 186 Cal. App. 4th 983, 1015 (2010). This broad power has the "purpose of restoring to the plaintiff the amount that the defendant wrongfully acquired." *Wiener v. Dannon Co.*, 255 F.R.D. 658, 670-71 (C.D. Cal. 2009) (citing *Colgan*, 135 Cal. App. 4th at 695).

As described above, Plaintiffs will prove B&G's liability to the class using common evidence. The restitution award will be calculated using B&G's own sales data. Weston Under-Seal Decl., Exs. 16 (sales data) and 17 (Bowen Report). Plaintiff's accounting expert, Robert Bowen, is Distinguished

16

Professor of Accounting at Chapman University and has taught accounting since 1976. He holds a Ph.D. in Accounting from Stanford University and is widely published on accounting topics. He has agreed to review the financial information B&G provided to calculate damages, restitution, and prejudgment interest, and indeed has already done for California. Weston Under-Seal Decl., Ex. 17 (Bowen Report)

### E.    Any Individual Issues of Damages Do Not Predominate.

> In almost every class action, factual determinations of damages to individual class members must be made. Still we know of no case where this has prevented a court from aiding the class to obtain its just restitution. Indeed, to decertify a class on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device.

*Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1054 (2012) (cleaned up). The Ninth Circuit, too, has "repeatedly emphasized that uncertain damages calculations should not defeat certification." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd in part on other grounds*, 139 S. Ct. 710 (2019). The "amount of damages is invariably an individual question and does not defeat class action treatment." *Sali v. Corona Med. Ctr.*, 889 F.3d 623, 639 (9th Cir. 2018) (quoting *Blackie*, 524 F.2d at 905). The "mere fact that there might be differences in damage calculations is not sufficient to defeat class certification." *Stearns*, 655 F.3d at 1026.

### F.    The Prerequisite of Superiority is Satisfied.

Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). This superiority requirement is met "'[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis.'" *Alger v. FCA US LLC*, 334 F.R.D. 415, 430 (E.D. Cal. 2020) (quoting *Wolin v. Jaguar Land Rover N. Am.*, *LLC,* 617 F.3d 1168, 1175 (9th Cir. 2010)). "Given the small size of each class member's claim at issue here, class treatment is not merely the superior, but the only manner in which to ensure fair and efficient adjudication of the present action." *Petersen v. Costco Wholesale Co.*, 312 F.R.D. 565, 583 (C.D. Cal. 2016) (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 486 (C.D. Cal. 2012)); *see also Leyva v. Medline Indus.*, 716 F.3d 510, 515 (9th Cir. 2013) (the district court erred in concluding that class certification was not the superior method of adjudication where it "did not suggest any other means for putative class members to adjudicate their claims" and finding that "none exist[ed] . . . [i]n light of the small size of the putative class members' potential individual monetary recovery").

> Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device.

*Chen v. All State Ins. Co.*, 819 F.3d 1136, 1147 (9th Cir. 2016) (quoting *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980)). This element was met in *Hawkins*:

> given the relative inexpensiveness of the breadcrumbs, the monetary damages suffered by each putative class member are not large. [citation]. It is more efficient to resolve the common questions regarding accuracy and materiality of the "0g Trans Fat" label in a single proceeding rather than to have individual courts separately hear these cases.

*Hawkins v. Kroger Co.*, 337 F.R.D. 518, 543 (S.D. Cal. 2020). In summary, the low price of Ortega, the complexity of the legal issues, the need for expert testimony, and the vigorous defense B&G has marshalled all show that these claims could not be prosecuted by individual consumers.

## VII.   THE CLASS IS ASCERTAINABLE AND MANAGEABLE.

"Although there is no explicit requirement concerning the class definition in Fed. R. Civ. P. 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed." *Alfred v. Pepbridge Farm, Inc.*, 322 F.R.D. 519, 551 (C.D. Cal. 2017) (quotation omitted). "An identifiable class exists if its members can be ascertained by reference to objective criteria." *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 291, 299 (N.D. Cal. 2010); *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 237 (N.D. Cal. 2014) (same). Thus, a class is ascertainable where, as here,

> the proposed class definition simply identifies purchasers of Defendant's products that included the allegedly material misrepresentations. Because the alleged misrepresentations appeared on the actual packages of the product[] purchased, there is no concern that the class includes individuals who were not exposed to the misrepresentation.

*Astiana*, 291 F.R.D. at 500.

## VIII.   CALIFORNIA MAY APPLY ITS LAW TO A MULTI-STATE CLASS.

A federal court in a diversity action applies the conflicts-of-law rules of the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). California may apply its law to a multi-state class where "application of the forum law is not arbitrary or unfair" and "so long as the interests of other states are not found to outweigh California's interest in having its law applied." *Wash. Mut. Bank v. Super. Ct.*, 24 Cal. 4th 906, 919-21 (2001) (citing *Phillips Petroleum Co v. Shutts*, 472 U.S. 797, 821-22 (1985)). In determining whether a significant contact or aggregation of contracts exists such that the application of the forum law is not arbitrary and violate the Due Process Clause, "the focus . . . is on

both the plaintiffs' and defendant's contacts with the forum state." *Marsh v. First Bank of Del.*, 2014 U.S. Dist. LEXIS 17577, at *34 (N.D. Cal. Feb. 7, 2014). "[S]o long as the requisite significant contacts to California exist . . . California may constitutionally require the [Defendant] to shoulder the burden of demonstrating that foreign law, rather than California law, should apply to class claims." *Wash. Mut.*, 24 Cal. 4th at 921. "California could have a smaller actual interest in the claims than that of other states yet still have significant contacts to satisfy due process." *Pecover v. Elec. Arts Inc.*, 2010 U.S. Dist. LEXIS 140632, at *50 (N.D. Cal. Dec. 21, 2010).

Here, Ortega was sold at virtually every mainstream grocery store in California. Millions of packages were sold. Such sales easily satisfy *Shutts*. In *Parkinson,* for example, the court certified a nationwide California law class where "plaintiffs allege that defendant conducts substantial business in the state through its fifty California dealerships" and "given the volume of California automobile sales and the number of in-state dealerships, plaintiffs claim it is likely that more class members reside in California than any other state. Thus, plaintiffs' alleged contacts are sufficient to satisfy the test under *Shutts*." 258 F.R.D. at 598 (citation omitted).

In *Roberts v. Helm*, the Honorable Thelton E. Henderson noted that "*Shutts* does not require the court to undertake an individual choice-of-law inquiry into the claims of each and every plaintiff. *Shutts* requires only that a threshold due process inquiry be made into whether the application of a given state's law to the claims of all class members would be arbitrary or unfair." 670 F. Supp. 1466, 1493-95 (N.D. Cal. 1987) (citations omitted). In *Pecover v. Elec. Arts Inc.*, the court held "California, for purposes of its UCL, 'has a clear and substantial interest in preventing fraudulent practices in this state and a legitimate and compelling interest in preserving a business climate free of . . . deceptive practice.' . . . For this reason, the state 'has a legitimate interest in extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California." 2010 U.S. Dist. LEXIS 140632, at *56 (N.D. Cal. Dec. 21, 2010) (citations omitted). Likewise, in *Church v. Consol. Freightways, Inc.*, the court noted that "California has a strong interest in preventing fraud by corporations . . .  conducting business in California." 1992 U.S. Dist. LEXIS 18234, at *13-14 (N.D. Cal. Sept. 14, 1992). Further, the court noted that "it is very probable that the deceit claims would not be addressed comprehensively if California law is not applied. Thus, even if other states have an interest in applying their own law, this

interest does not outweigh California's interest in facilitating a class action." *Id.* Moreover, "[a]ll jurisdictions share the goal of deterring fraudulent conduct and providing a remedy for the victims of fraud [and e]ach jurisdiction would rather have the injuries of its citizens litigated and compensated under another state's law than not litigated or compensated at all. . . . It appears that the maximum attainment of the underlying purposes of all the states will be achieved best by certifying the class." *Id.*

Where "plaintiffs show that application of California law is constitutional under *Shutts*, defendant must show that another state's laws apply under the California governmental interest choice-of-law test." *Parkinson*, 258 F.R.D. at 598. "California follows a three-step 'governmental interest analysis' to address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement." *Wash. Mut.*, 24 Cal. 4th at 919. Under the first step of the governmental interest analysis, the foreign law proponent "must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California." *Id.* Importantly, "[t]he fact that two or more states are involved does not in itself indicate there is a conflict of laws problem." *Id.* at 919-20. *See also Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 242 (2001) (differences among states' consumer protection laws insufficient basis on which to deny nationwide class treatment).

Only if the trial court finds the laws are "materially different" must it proceed and "determine what interest, if any, each state has in having its own law applied to the case." *Wash. Mut.,* 24 Cal. 4th at 920. "This means the trial court may properly find California law applicable without proceeding to the third step in the analysis if the foreign law proponent fails to identify any actual conflict or to establish the other state's interest in having its own laws applied." *Id.* "Defendants must do more than show a variance in the law. They must show that the interest of other states in having their laws followed in this case is greater than California's interest in applying its own laws." *In re Activision Sec. Litig.*, 621 F. Supp. 415, 430 (N.D. Cal. 1985). Here, Plaintiffs took a second look at the laws of each of the states in their proposed class to ensure they were in close accord with California law, and would not be prejudiced by the application of California law. To be safe, they removed Arkansas and Wisconsin from their initial list in the Complaint after conducting this review.

## IX.     B&G SHOULD BE REQUIRED TO PAY THE COSTS OF CLASS NOTICE.

A district court has discretion to place part or all of the cost and responsibility for class notice on the defendant. *Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137, 1144 (9th Cir. 2009) (affirming order assigning cost of class notice to the defendant). The CLRA provides a specific statutory authorization for doing so. *See* Cal. Civ. Code § 1781(d) ("If the action is permitted as a class action, the court may direct either party to notify each member of the class of the action.").

Allocating notice costs to a defendant conforms to both substantive and procedural due process. *See Civil Serv. Employees Ins. Co. v. Super. Ct.*, 22 Cal. 3d 362, 366 (1978). "In California . . . the Legislature has specifically authorized trial courts in class actions to impose the cost of notice upon either the plaintiff or the defendant." *Id.* at 376 (citing Cal. Civ. Code § 1781(d)). Thus, *Civil Service* provides for cost shifting here, where Plaintiff has alleged a violation of the CLRA. "Indeed, the Supreme Court [] makes it clear that [] a federal district court, in appropriate circumstances, is empowered to require a defendant to bear some of the expense entailed in identifying and notifying absent class members." *Id.* at 375.

Factors for this discretionary analysis were laid out in *Hunt v. Check Recovery Sys.*, 2007 U.S. Dist. LEXIS 58800 (N.D. Cal. July 25, 2007) ("*Hunt*"), *aff'd sub. nom. Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137 (9th Cir. 2009): (1) the strength of the class action claim; (2) defendant's desire to take advantage of the res judicata effects of the class action; (3) the number of named plaintiffs and their financial responsibility; (4) the named plaintiffs' interests compared with the entire class; and (5) the named plaintiffs' ability to pay the cost of notice. *Hunt* at *13-14 (citing *Berland v. Mack*, 48 F.R.D. 121 (S.D.N.Y. 1969)). In *Hunt*, the trial court allocated a notice cost of $22,341 to the defendant where defendants had been found liable, the Court could not determine from the record the extent of defendant's desire to take advantage of the res judicata effect of the class action, and the named two plaintiffs had an interest of less than $38. *Hunt* at *18-19. The court concluded that because "[t]he Plaintiffs ha[d] a small absolute stake in the class action, and their claims [were] miniscule compared with the cumulative claims of the class . . . ordering Plaintiffs to pay the cost of notice . . . would impose a burden out of proportion to their personal stake in the lawsuit." *Hunt* at *18-19.

## A. Plaintiffs' Claims Are Strong.

As noted in *Hunt*, courts have "required a defendant to bear the cost of notice based on the

21

1   *likelihood* that summary judgment would be entered against the defendant." *Hunt*, at \*15 (emphasis in

2   original) (citing *Fournigault v. Indep. One Mortg. Corp.*, 242 F.R.D. 486, 490 (N.D. Ill. 2007)).

3          Here, Plaintiffs have demonstrated a "likelihood of success on the merits." In a nearly identical

4   action challenging the use of a "0g Trans Fat" claim on a product containing PHO, the Ninth Circuit, has

5   effectively found merit in the claims here. Specifically, the Ninth Circuit found "just as the regulations

6   do not authorize a 'no trans fat' claim, they also do not authorize a 'zero trans fat' claim." *Hawkins*, 906

7   F.3d at 771. It further found "the FDA regulations do not authorize the contested statement." *Id*. at 772.

8   On remand, Judge Miller held

9          the claim '0g Trans Fat' is not defined in the regulations, and there is no genuine dispute the
10         breadcrumbs contain some trans fat. Accordingly, Plaintiff's motion for summary judgment that
           the "0g Trans Fat" label violated 21 C.F.R. §§ 101.62(a)(1)-(2) and 101.13(i)(3) is GRANTED
11         as to that particular issue.

12  *Hawkins v. Kroger Co*., 512 F. Supp. 3d 1079, 1091 (S.D. Cal. 2021). This Court similarly held:

13         On the more narrow question of whether B&G's representation violates 21 C.F.R. §§ 101.13
           and 101.62, the Ninth Circuit has held that these regulations do not authorize a claim of "0g
14         Trans Fat per serving" outside the Nutrition Facts Panel if the product actually contains trans
           fat. *Hawkins v. Kroger Co*., 906 F.3d 763, 770-72 (9th Cir. 2018). This is true even if other
15         regulations require listing 0g trans fat per serving in the Nutrition Facts Panel because each
           serving contains less than 0.5g of trans fat - a requirement that does "not give the manufacturer
16         license to make the same claim elsewhere on the product." *Id*. at 771. On remand, the district
           court in Kroger granted "Plaintiffs motion for summary judgment that the '0g Trans Fat' label
17         violated 21 C.F.R. §§ 101.62(a)(1)-(2) and 101.13(i)(3)" after concluding that "the claim '0g
           Trans Fat' is not defined in the regulations, and there is no genuine dispute the breadcrumbs
18         contain some trans fat." *Hawkins v. Kroger Co*., [citation].

19  *Silva v. B&G Foods, Inc*., 2021 U.S. Dist. LEXIS 137792, at \*3-4 (N.D. Cal. July 23, 2021). The Court

20  only declined to enter judgment on the pleadings against Defendants because they "specifically 'deny

21  that they market and sell taco shells containing PHO' and 'deny that their products contain partially

22  hydrogenated oil,'" even though "based on a declaration B&G submitted in support of its motion for

23  summary judgment, it does not appear that B&G disputes that Ortega taco shells contained PHO prior to

24  June 2015." *Silva*, 2021 U.S. Dist. LEXIS 137792, at \*4-5. The Court noted this contrary evidence, but

25  declined to consider it because it "lies outside the pleadings." *Id*. Now, however, it is not so limited, and

26  such evidence is properly before the Court. See Weston Public Declaration, Exs. A-B (B&G002,

27  B&G007); Weston Under-Seal Decl., Ex. 1, 18 (B&G 19-20; B&G 512-15). *See also* Dkt. 65-1, Decl. of

28  Juv Marchisio ¶¶ 4-6. These documents show: (1) a chemical analysis showing trans fat is added to

Ortega Taco Shells (2) internal e-mails discussing the practice of adding trans fat to Ortega and whether to accede to Wal-Mart's demand it be removed.

### B.    Defendants Will Benefit From *Res Judicata* Should They Prevail.

Just as in *Hunt*, 2007 U.S. Dist. LEXIS 58800, at *19, Defendants' desire to take advantage of the *res judicata* effect of the class action has not been stated on the current record. Nonetheless, as Defendants maintain they are not liable in this case, should they prevail, they will receive the benefit of res judicata. The second factor therefore weighs in favor of Defendants bearing notice costs.

### C.    Plaintiffs' Interest is Small Compared with the Entire Class.

Here, allocating the cost of class notice to B&G is appropriate because Plaintiffs have "a small absolute stake in the class action, and their claims are miniscule compared with the cumulative claims of the class, [and] ordering them to pay the cost of notice . . . would impose a burden out of proportion to [their] personal stakes in the lawsuit." *Hunt*, at *19.

Silva purchased Ortega approximately 48 times annually throughout the class period, generally paying about $2 per package. SAC ¶ 67. Silva's absolute stake in the litigation is this about $672. Schier purchased Ortega approximately 20 times annually throughout the class period. SAC ¶ 70. Schier's absolute stake in the litigation is thus about $280. Thus, Plaintiffs' combined interest of $952 is "miniscule compared with the cumulative claims of the class," *Hunt*, at *19, and this factor therefore supports an order requiring Defendants to pay the cost of notice.

### D.    Plaintiffs Do Not Have the Ability to Pay Class Notice.

Sabrina Silva works in quality control for a fruit grower, ensuring it is not rotten or damaged prior to shipping. Nancy Schier is a graphic illustrator who also helps set up and entertains at children's birthday parties. Their combined purchases of Ortega were approximately $952. The cost of class notice, including internet ads, a website, press releases, and setting up and monitoring a toll free number would be an large burden relative to their middle class incomes and  "ordering Plaintiffs to pay the cost of notice . . . would impose a burden out of proportion to their personal stakes in the lawsuit." *Hunt*, at *19.  Because Plaintiffs' claims are strong, and Plaintiffs' interest is small compared to that of the entire class, the Court should, respectfully, conclude that the cost of notice is more properly borne by Defendants.

1 | **X.     CONCLUSION**

2 |         This motion should, respectfully, be granted.

3

4 | DATED: October 22, 2021                    Respectfully Submitted,

5 |                                            /s/Gregory S. Weston

6 |                                            Gregory S. Weston

7 |                                            **Counsel for Plaintiffs**