1   **THE WESTON FIRM**
    GREGORY S. WESTON (239944)
2   *greg@westonfirm.com*
    1405 Morena Blvd., Suite 201
3   San Diego, CA 92110
    Telephone:    (619) 798-2006
4   Facsimile:    (619) 343-2789

5
    **<u>Counsel for Plaintiffs</u>**
6

7

8                   **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10  SABRINA SILVA and NANCY SCHIER, on     Case No: 4:20-cv-137-JST
    behalf of themselves and all others similarly
11  situated,                              **PUBLIC DECLARATION OF GREGORY S. WESTON IN
                                           SUPPORT OF PLAINTIFF'S MOTION FOR CLASS
12               Plaintiffs,               CERTIFICATION**

13
                 v.                        Judge: The Honorable Jon S. Tigar
14                                         Date: February 3, 2022
    B&G FOODS, INC. and B&G FOODS NORTH    Time: 2:00 p.m.
15  AMERICA, INC.,                         Location: Courtroom 6

16               Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

---

Pursuant to 28 U.S.C. § 1746, I hereby declare and state as follows:

1.      I am a member in good standing of the California Bar and of this Court. I make this Declaration in support of Plaintiffs' Motion for Class Certification.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the label for Ortega Yellow Corn Taco Shells (12 Pack), which was produced by Defendants on January 22, 2021 bearing Bates number B&G2. Defendants initially designated this document "confidential," but agreed to withdraw the designation on March 11.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the label for Ortega White Corn Taco Shells (12 Pack), which was produced by Defendants on January 22, 2021 bearing Bates number B&G7. Defendants initially designated this document "confidential," but agreed to withdraw the designation on March 11.

4.      Attached hereto as **Exhibit C** are true and correct copies of excerpts of Defendant B&G Foods, Inc.'s Quarterly Report (Form 10-Q) for the period ending October 2, 2004**.**

5.      Attached hereto as **Exhibit D** are true and correct copies of excerpts of Defendant B&G Foods, Inc.'s Quarterly Report (Form 10-Q) for the period ending April 2, 2005.

6.      Attached hereto as **Exhibit E** are true and correct copies of excerpts of Defendant B&G Foods, Inc.'s Annual Report (Form 10-K) for the period ending December 30, 2006.

7.      Attached hereto as **Exhibit F** are true and correct copies of excerpts of Defendant B&G Foods, Inc.'s Quarterly Report (Form 10-Q) for the period ending September 27, 2008.

8.      Attached hereto as **Exhibit G** is a true and correct copy of a Food Business News article dated May 14, 2014.

9.      Attached hereto as **Exhibit H** is a true and correct copy of the 'Canoleo' web page from Defendants' website as it appeared on October 12, 2021.

10.      Attached hereto as **Exhibit I** is a true and correct copy of a Facebook post, produced by Plaintiffs bearing Bates number SILVA6636, which appeared on Defendants' Facebook page on October 4, 2011.

---

1

1      11.      Attached hereto as **Exhibit J** is a true and correct copy of a Facebook post, produced by

2  Plaintiffs bearing Bates number SILVA6617, which appeared on Defendants' Facebook page on May 8,

3  2012, which included a link to a video.

4      12.      A transcript of the video described above is attached hereto as **Exhibit K**.

5      13.      Attached hereto as **Exhibit L** are true and correct copies of excerpts from the transcript of

6  the December 16, 2020 deposition of Plaintiff Sabrina Silva.

7      14.      Attached hereto as **Exhibit M** are true and correct copies of excerpts from the transcript of

8  the December 17, 2020 deposition of Plaintiff Nancy Schier.

9      15.      Attached hereto as **Exhibit N** is a true and correct copy of my firm's resume, which

10  details some of the important settlements we have reached and pro-consumer case law our work has

11  generated.

12      16.      Attached hereto as **Exhibit O** is Plaintiffs' proposed Class Notice.

13      I declare under penalty of perjury under the laws of the United States that the foregoing is true

14  and correct.

15      Executed on October 22, 2021 in San Diego, California.

16                                         /s/ Gregory S. Weston
                                           Gregory S. Weston
17

18  DATED: October 22, 2021                Respectfully Submitted,

19                                         s/ Gregory S. Weston

20                                         **THE WESTON FIRM**
                                           GREGORY S. WESTON
21                                         1405 Morena Blvd., Suite 201
                                           San Diego, CA 92110
22                                         Telephone:      (619) 798-2006

23
                                           **Counsel for Plaintiffs**
24

25

26

27

28

2

# EXHIBIT A



CONFIDENTIAL

B&G000002

# EXHIBIT B



CONFIDENTIAL

B&G000007

# EXHIBIT C

```
<DOCUMENT>
<TYPE>10-Q
<SEQUENCE>1
<FILENAME>bg281696-10q.txt
<DESCRIPTION>BG 10-Q
<TEXT>
```

As filed with the Securities and Exchange Commission on November 12, 2004

===========================================================================

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-Q

(Mark one)  Quarterly Report Pursuant to Section 13 or 15(d)
    [x]         of the Securities Exchange Act of 1934

For the quarterly period ended October 2, 2004

or

[ ]   Transition Report Pursuant to Section 13 or 15(d)
        of the Securities Exchange Act of 1934

For the transition period from _____ to _____.

Commission file number 001-32316

B&G FOODS, INC.
----------------------------------------------------
(Exact name of Registrant as specified in its charter)

Delaware                              13-3918742
-------------------------------       -----------------------------------
(State or other jurisdiction of       (I.R.S. Employer Identification No.)
 incorporation or organization)

4 Gatehall Drive, Suite 110, Parsippany, New Jersey      07054
------------------------------------------------       ---------
    (Address of principal executive offices)           (Zip Code)

Registrant's telephone number, including area code: (973) 401-6500

Indicate  by check  mark  whether  the  registrant: (1) has  filed all
reports  required to be filed by Section 13 or 15(d) of the Securities  Exchange
Act of 1934 during the preceding 12 months (or for such shorter  period that the
registrant  was required to file such  reports) and (2) has been subject to such
filing requirements for the past 90 days. Yes  [ ]   No   [x]

Indicate by check mark whether the registrant is an  accelerated  filer
(as defined in Rule 12b-2 of the Exchange Act). Yes  [ ]   No   [x]

As of November 12, 2004, the registrant had 20,000,000 shares of Class
A common stock, par value $0.01 per share, and 7,556,443 shares of Class B
common stock, par value $0.01 per share, outstanding.

===========================================================================

```
<PAGE>
```

B&G Foods, Inc. and Subsidiaries
Index

```
<TABLE>
<CAPTION>
```

|  |  | Page No. |
|---|---|---|
| <S> | <C> | <C> |
| PART I | FINANCIAL INFORMATION................................................................ | 1 |
|  | Item 1.  Financial Statements (Unaudited)......................................... | 1 |
|  | Consolidated Balance Sheets................................................ | 1 |
|  | Consolidated Statements of Operations...................................... | 2 |
|  | Consolidated Statements of Changes in Stockholders' Equity and Comprehensive Income (Loss).... | 3 |
|  | Consolidated Statements of Cash Flows...................................... | 4 |
|  | Notes to Consolidated Financial Statements................................. | 5 |
|  | Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations........ | 19 |
|  | Item 3. Quantitative and Qualitative Disclosures About Market Risk...................... | 36 |
|  | Item 4. Controls and Procedures............................................ | 36 |
| PART II OTHER INFORMATION.................................................................. | | 37 |
|  | Item 1. Legal Proceedings................................................. | 37 |
|  | Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.................... | 37 |
|  | Item 3. Defaults Upon Senior Securities...................................... | 38 |
|  | Item 4. Submission of Matters to a Vote of Security Holders......................... | 38 |
|  | Item 5. Other Information................................................. | 38 |
|  | Item 6. Exhibits........................................................ | 39 |
| SIGNATURE................................................................................ | | 40 |

```
</TABLE>
```

- i -

```
<PAGE>
```

PART I
FINANCIAL INFORMATION

Item 1.  Financial Statements (Unaudited)

B&G Foods, Inc. and Subsidiaries
Consolidated Balance Sheets
(Dollars in thousands, except per share data)
(Unaudited)

```
<TABLE>
<CAPTION>
```

| Assets | October 2, 2004 | January 3, 2004 |
|---|---|---|
| <S> | <C> | <C> |
| Current assets: | | |
| Cash and cash equivalents........................ | $     9,742 | $     8,092 |
| Trade accounts receivable, net.................... | 28,918 | 22,348 |
| Inventories..................................... | 89,005 | 80,789 |
| Prepaid expenses................................ | 7,708 | 2,336 |
| Deferred income taxes........................... | 115 | 115 |
| Total current assets..................... | 135,488 | 113,680 |
| Property, plant and equipment, net....................... | 44,224 | 43,940 |
| Goodwill................................................ | 188,629 | 188,629 |
| Trademarks............................................. | 193,481 | 193,481 |

factors, including those set forth under the heading "Forward-Looking Statements" and elsewhere in this report. The following discussion should be read in conjunction with the consolidated financial statements and related notes for the year ended January 3, 2004 included in Amendment No. 11 to our Registration Statement on Form S-1 filed with the Securities and Exchange Commission (SEC) on October 7, 2004.

General

We manufacture, sell and distribute a diversified portfolio of high quality, shelf-stable, branded food products, many of which have leading regional or national retail market shares. In general, we position our branded products to appeal to the consumer desiring a high quality and reasonably priced branded product.

Our business strategy is to continue to increase sales, profitability and free cash flow by enhancing our existing portfolio of branded shelf-stable products and by capitalizing on our competitive strengths. We intend to implement our strategy through the following initiatives: profitably growing our established brands, leveraging our unique multiple-channel sales and distribution system, introducing new products, capitalizing on the higher growth Mexican segment of the food industry, and expanding our brand portfolio with new licensing arrangements.

Since 1996, we have successfully acquired and integrated 16 separate brands into our operations. We believe that successful future acquisitions, if any, will enhance our portfolio of existing businesses, further leveraging our existing platform.

We completed the acquisition of certain assets of The Ortega Brand of Business from Nestle Prepared Foods Company on August 21, 2003, which we refer to in this report as "Ortega" or the "Ortega acquisition". The Ortega acquisition has been accounted for using the purchase method of accounting and, accordingly, the assets acquired, liabilities assumed and results of operations of the acquired business are included in our consolidated financial statements from the date of acquisition. The Ortega acquisition and the application of the purchase method of accounting affect comparability between periods.

We are subject to a number of challenges that may adversely affect our businesses. These challenges, which are discussed below and under the heading "Forward-Looking Statements" in this report include:

Fluctuations in Commodity Prices: We purchase raw materials, including agricultural products, meat and poultry from growers, commodity processors, other food companies and packaging manufacturers. Raw materials are subject to fluctuations in price attributable to a number of factors. In the past six to twelve months we have seen increasing prices in certain of these commodities, particularly in packaging materials, pork and chicken and we expect this trend may continue. We manage this risk by entering into short-term supply contracts and advance commodities purchase agreements from time to time, and if necessary, by raising prices. There can be no assurance, however, that any price increases by us will offset the increased cost of these raw material commodities, or that we will be able to raise prices at all.

Consolidation in the Retail Trade and Consequent Inventory Reductions: As the retail grocery trade continues to consolidate and our retail customers grow larger and become more sophisticated, our retail customers may demand lower pricing and increased promotional programs. These customers are also reducing their inventories and increasing their emphasis on private label products. To date we have been able to offset these trends by using our marketing expertise, unique products and category leadership to maintain and increase volume.

- 19 -

<PAGE>

Changing Customer Preferences: Consumers in the market categories in which we compete frequently change their taste preferences, dietary habits and product packaging preferences. By anticipating, identifying or developing and marketing products that respond to these changes in consumer preferences, we have largely been able to offset this challenge.

Consumer Concern Regarding Food Safety, Quality and Health: The food industry is subject to consumer concerns regarding the safety and quality of certain food products, including the health implications of genetically modified organisms, obesity and trans fatty acids. By complying with applicable food and

safety laws and regulations, we have been able to produce food products that generate consumer confidence in the safety and quality of our food products.

Changing Valuations of the Canadian Dollar in Relation to the U.S. Dollar: We purchase most of our maple syrup requirements from manufacturers located in Quebec, Canada. Over the past year the U.S. dollar has weakened against the Canadian dollar, which has in turn increased our costs relating to the production of our maple syrup products.

To confront these challenges, we continue to take steps to build the value of our brands, to improve our existing portfolio of products with new product and marketing initiatives, to reduce costs through productivity and to address consumer concerns about food safety, quality and health.

Fluctuations in commodity prices can lead to retail price volatility and intensive price competition, and can influence consumer and trade buying patterns.

Use of Estimates

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires our management to make a number of estimates and assumptions relating to the reporting of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Some of the more significant estimates made by management involve trade and consumer promotion expenses, allowances for excess, obsolete and unsaleable inventories, and the recoverability of goodwill, trademarks, property, plant and equipment and deferred tax assets. Actual results could differ from those estimates.

Trade and Consumer Promotion Expenses

We offer various sales incentive programs to customers and consumers, such as price discounts, in-store display incentives, slotting fees and coupons. The recognition of expense for these programs involves the use of judgment related to performance and redemption estimates. Estimates are made based on historical experience and other factors. Actual expenses may differ if the level of redemption rates and performance vary from estimates.

Inventories

Inventories are valued at the lower of cost or market value and have been reduced by an allowance for excess, obsolete and unsaleable inventories. The estimate is based on our management's review of inventories on hand compared to estimated future usage and sales.

Long-Lived Assets

Long-lived assets, such as property, plant and equipment, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds the fair value of the asset.

- 20 -

<PAGE>

Goodwill and intangible assets (trademarks) not subject to amortization are tested annually for impairment, and are tested for impairment more frequently if events and circumstances indicate that the asset might be impaired. An impairment loss is recognized to the extent that the carrying amount exceeds the asset's fair value.

Accounting Treatment for EISs

Our EISs include Class A common stock and senior subordinated notes. Upon completion of our initial public offering (including the exercise of the over-allotment option), we allocated the proceeds from the issuance of the EISs, based upon relative fair value at the issuance date, to the Class A common stock and the senior subordinated notes. We have assumed that the price paid in the EIS offering was equivalent to the fair value of the Class A common stock and

# EXHIBIT D

10-Q 1 a2156833z10-q.htm 10-Q
QuickLinks -- Click here to rapidly navigate through this document

**As filed with the Securities and Exchange Commission on April 28, 2005**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

**(Mark one)**

☒    **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the quarterly period ended April 2, 2005**

**or**

☐    **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the transition period from            to            .**

**Commission file number 001-32316**

# B&G FOODS, INC.
**(Exact name of Registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **13-3918742** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |
| **4 Gatehall Drive, Suite 110, Parsippany, New Jersey** | **07054** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(973) 401-6500**

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☐    No ☒

As of April 28, 2005, the registrant had 20,000,000 shares of Class A common stock, par value $0.01 per share, and 7,556,443 shares of Class B common stock, par value $0.01 per share, outstanding.

**B&G Foods, Inc. and Subsidiaries**

**Index**

|  |  |  | Page No. |
|---|---|---|---|
| PART I FINANCIAL INFORMATION |  |  | 1 |
|  | Item 1. | Financial Statements (Unaudited) | 1 |
|  |  | Consolidated Balance Sheets | 1 |
|  |  | Consolidated Statements of Operations | 2 |
|  |  | Consolidated Statements of Cash Flows | 3 |
|  |  | Notes to Consolidated Financial Statements | 4 |
|  | Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
|  | Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 54 |
|  | Item 4. | Controls and Procedures | 55 |
| PART II OTHER INFORMATION |  |  | 56 |
|  | Item 1. | Legal Proceedings | 56 |
|  | Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 56 |
|  | Item 3. | Defaults Upon Senior Securities | 56 |
|  | Item 4. | Submission of Matters to a Vote of Security Holders | 56 |
|  | Item 5. | Other Information | 56 |
|  | Item 6. | Exhibits | 56 |
| SIGNATURE |  |  | 57 |

i

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors, including those set forth under the heading "Forward-Looking Statements" and elsewhere in this report. The following discussion should be read in conjunction with the unaudited consolidated interim financial statements and related notes for the thirteen weeks ended April 2, 2005 included elsewhere in this report and the audited consolidated financial statements and related notes for the fiscal year ended January 1, 2005 (fiscal 2004) included in our Annual Report on Form 10-K filed with the Securities and Exchange Commission (SEC) on March 2, 2005.

**General**

We manufacture, sell and distribute a diversified portfolio of high quality, shelf-stable, branded food products, many of which have leading regional or national retail market shares. In general, we position our branded products to appeal to the consumer desiring a high quality and reasonably priced branded product.

Our business strategy is to continue to increase sales, profitability and free cash flow by enhancing our existing portfolio of branded shelf-stable products and by capitalizing on our competitive strengths. We intend to implement our strategy through the following initiatives: profitably growing our established brands, leveraging our unique multiple-channel sales and distribution system, introducing new products, capitalizing on the higher growth Mexican segment of the food industry, and expanding our brand portfolio with new licensing arrangements.

Since 1996, we have successfully acquired and integrated 16 separate brands into our operations. We believe that successful future acquisitions, if any, will enhance our portfolio of existing businesses, further leveraging our existing platform.

We completed the acquisition of certain assets of The Ortega Brand of Business from Nestle Prepared Foods Company on August 21, 2003, which we refer to in this report as "Ortega" or the "Ortega acquisition." The Ortega acquisition has been accounted for using the purchase method of accounting and, accordingly, the assets acquired, liabilities assumed and results of operations of the acquired business are included in our consolidated financial statements from the date of acquisition.

We are subject to a number of challenges that may adversely affect our businesses. These challenges, which are discussed below and under the heading "Forward-Looking Statements" and "Certain Factors That May Affect Future Results" in this report include:

*Fluctuations in Commodity Prices.*   We purchase raw materials, including agricultural products, meat and poultry from growers, commodity processors, other food companies and packaging manufacturers. Raw materials are subject to fluctuations in price attributable to a number of factors. We have seen increasing prices in certain of these commodities, particularly in packaging materials, pork, beans and maple syrup and we expect this trend may continue. We manage this risk by entering into short-term supply contracts and advance commodities purchase agreements from time to time, and if necessary, by raising prices. There can be no assurance, however, that any price increases by us will offset the increased cost of these raw material commodities, or that we will be able to raise prices at all.

*Consolidation in the Retail Trade and Consequent Inventory Reductions.*   As the retail grocery trade continues to consolidate and our retail customers grow larger and become more sophisticated, our retail customers may demand lower pricing and increased promotional programs. These customers are also reducing their inventories and increasing their emphasis on private label products.

*Changing Customer Preferences.*   Consumers in the market categories in which we compete frequently change their taste preferences, dietary habits and product packaging preferences.

*Consumer Concern Regarding Food Safety, Quality and Health.*   The food industry is subject to consumer concerns regarding the safety and quality of certain food products, including the health implications of genetically modified organisms, obesity and trans fatty acids.

*Changing Valuations of the Canadian Dollar in Relation to the U.S. Dollar.*   We purchase most of our maple syrup requirements from manufacturers located in Quebec, Canada. Over the past year the U.S. dollar has weakened against the Canadian dollar, which has in turn increased our costs relating to the production of our maple syrup products.

To confront these challenges, we continue to take steps to build the value of our brands, to improve our existing portfolio of products with new product and marketing initiatives, to reduce costs through improved productivity and to address consumer concerns about food safety, quality and health.

Fluctuations in commodity prices can lead to retail price volatility and intensive price competition, and can influence consumer and trade buying patterns. In the thirteen weeks ended April 2, 2005, our commodity prices for maple syrup, meat, beans and cans have been higher than those incurred during the thirteen weeks ended April 3, 2004.

## Critical Accounting Policies; Use of Estimates

The preparation of financial statements in accordance with U.S. generally accepted accounting principles requires our management to make a number of estimates and assumptions relating to the reporting of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Some of the more significant estimates and assumptions made by management involve trade and consumer promotion expenses, allowances for excess, obsolete and unsaleable inventories, and the recoverability of goodwill, trademarks, property, plant and equipment, and deferred tax assets, and the accounting for our EISs, including their treatment in computing of our income tax expense and the accounting for earnings per share. Actual results could differ from those estimates and assumptions.

### *Trade and Consumer Promotion Expenses*

We offer various sales incentive programs to customers and consumers, such as price discounts, in-store display incentives, slotting fees and coupons. The recognition of expense for these programs involves the use of judgment related to performance and redemption estimates. Estimates are made based on historical experience and other factors. Actual expenses may differ if the level of redemption rates and performance vary from estimates.

### *Inventories*

Inventories are stated at the lower of cost or market. Cost is determined using the first-in, first-out and average cost methods. Inventories have been reduced by an allowance for excess, obsolete and unsaleable inventories. The estimate is based on our management's review of inventories on hand compared to estimated future usage and sales.

### *Long-Lived Assets*

Long-lived assets, such as property, plant and equipment, and intangibles with estimated useful lives are depreciated or amortized over their respective estimated useful lives to their estimated residual values, and reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to estimated undiscounted future cash

# EXHIBIT E

10-K 1 a07-5909_110k.htm ANNUAL REPORT ON FORM 10-K

As filed with the Securities and Exchange Commission on March 8, 2007

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark one)

x  **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the fiscal year ended December 30, 2006**

or

o  **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the transition period from           to**

**Commission file number 001-32316**

# B&G FOODS, INC.
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-3918742** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **Four Gatehall Drive, Suite 110, Parsippany, New Jersey** | **07054** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(973) 401-6500**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of exchange on which registered |
|---|---|
| **Enhanced Income Securities,** each representing one share of Class A Common Stock, par value $0.01 per share, and $7.15 principal amount of 12% Senior Subordinated Notes due 2016 | **American Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes o  No x

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o  No x

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes x  No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. x

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer o          Accelerated filer x          Non-accelerated filer o

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes o  No x

The aggregate market value of the Enhanced Income Securities (EISs) held by non-affiliates of the registrant as of June 30, 2006, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $320,675,557. Each EIS represents one share of Class A common stock, par value $0.01 per share, and $7.15 principal amount of senior subordinated notes due 2016. In determining the market value of the registrant's EISs held by non-affiliates, EISs beneficially owned by directors, officers and holders of more than 10% of the registrant's EISs have been excluded. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

As of February 28, 2007, the registrant had 20,000,000 shares of Class A common stock, par value $0.01 per share, outstanding, all of which were represented by EISs. As of February 28, 2007, the registrant had 7,556,443 shares of Class B common stock, par value $0.01 per share, outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Selected designated portions of the registrant's definitive proxy statement to be filed on or before April 30, 2007 in connection with the registrant's 2007 annual meeting of stockholders are incorporated by reference into Part III of this annual report.

which provides interpretive guidance on the consideration of the effects of prior year misstatements in quantifying current year misstatements for the purpose of a materiality assessment. SAB No. 108 is effective as of the end of our 2006 fiscal year, allowing a one-time transitional cumulative effect adjustment to beginning retained earnings as of January 1, 2006 for errors that were not previously deemed material, but are material under the guidance in SAB No. 108. In accordance with SAB No. 108, we have adjusted our opening accumulated deficit for fiscal 2006 in the amount of $0.6 million to re-establish certain deferred tax liabilities that were reversed prior to fiscal 2001. See Note 2(u) to our consolidated financial statements for additional information regarding this adjustment.

**Off-balance Sheet Arrangements**

As of December 30, 2006, we did not have any off-balance sheet arrangements as defined in Item 303(a)(4)(ii) of Regulation S-K.

**Commitments and Contractual Obligations**

Our contractual obligations and commitments principally include obligations associated with our outstanding indebtedness and future minimum operating lease obligations as set forth in the following table as of December 30, 2006.

| | | Payments Due by Period | | | | |
| Contractual Obligations: | Total | Fiscal 2007 | Fiscal 2008 | Fiscal 2009 | Fiscal 2010 | Fiscal 2011 and Thereafter |
|---|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | | |
| Long-term debt(1) | $726,055 | $41,186 | $41,186 | $41,186 | $41,186 | $561,311 |
| Operating leases | 9,269 | 4,281 | 3,231 | 1,379 | 175 | 203 |
| Pension obligations(2) | 1,335 | 1,335 | — | — | — | — |
| Total | $736,659 | $46,802 | $44,417 | $42,565 | $41,361 | $561,514 |

(1) Includes interest obligations on our senior notes at an interest rate of 8.0% per annum through maturity on October 1, 2011 and on our senior subordinated notes of 12% per annum through maturity on October 30, 2016. Also includes interest obligations under our credit facility. As of December 30, 2006, we had $25.0 million of term loan borrowings under our credit facility, all of which was subject to variable rates of interest. Interest expense on these variable rate term loan borrowings for future years was calculated using a weighted average interest rate of approximately 8.36% based upon a six-month LIBOR contract in effect at December 30, 2006. In February 2007, we incurred additional long-term debt of $205.0 million in the form of additional term loan borrowings, which is not reflected in the table. See "Debt—Senior Secured Credit Facility" above.

(2) Represents expected contributions under our defined benefit pension plans in fiscal 2007. The expected contributions beyond fiscal 2007 are not currently determinable.

**Forward-Looking Statements**

This report includes forward-looking statements, including without limitation the statements under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The words "believes," "anticipates," "plans," "expects," "intends," "estimates," "projects" and similar expressions are intended to identify forward-looking statements. These forward looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance and achievements, or industry results, to be materially different from any future results, performance, or achievements expressed or implied by any forward-looking statements. We believe important factors that could cause actual results to differ materially from our expectations include the following:

· our substantial leverage;

53

- · intense competition, changes in consumer preferences, demand for our products, the effects of changing prices for our raw materials and local economic and market conditions;

- · our continued ability to promote brand equity successfully, to anticipate and respond to new consumer trends, to develop new products and markets, to broaden brand portfolios in order to compete effectively with lower priced products and in markets that are consolidating at the retail and manufacturing levels, to improve productivity and to maintain access to credit markets;

- · the risks associated with the expansion of our business;

- · our possible inability to integrate any businesses we acquire;

- · our borrowing costs and credit ratings, which may be influenced by the credit ratings of our competitors;

- · factors that affect the food industry generally, including:

    — recalls if products become adulterated or misbranded, liability if product consumption causes injury, ingredient disclosure and labeling laws and regulations and the possibility that consumers could lose confidence in the safety and quality of certain food products, as well as recent publicity concerning the health implications of obesity and trans fatty acids;

    — the effects of foreign currency movements between the Canadian and U.S. dollar; and

    — fluctuations in the level of our customers' inventories and credit and other business risks related to our customers operating in a challenging economic and competitive environment;

- · the risk that our senior subordinated notes may be treated as equity for U.S. federal income tax purposes; and

- · other factors discussed elsewhere in this report, including under Item 1A, "Risk Factors," and in our public filings with the SEC.

Developments in any of these areas could cause our results to differ materially from results that have been or may be projected by or on our behalf.

All forward-looking statements included in this report are based on information available to us on the date of this report. We undertake no obligation to publicly update or revise any forward-looking statement, whether as a result of new information, future events or otherwise. All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements contained in this report.

We caution that the foregoing list of important factors is not exclusive. We urge investors not to unduly rely on forward-looking statements contained in this report.

**Item 7A.    Quantitative and Qualitative Disclosures About Market Risk.**

In the normal course of operations, we are exposed to market risks arising from adverse changes in interest rates. Market risk is defined for these purposes as the potential change in the fair value of financial asset or liability resulting from an adverse movement in interest rates. As of December 30, 2006, our revolving credit facility was undrawn. As a result, our only variable rate borrowings as of December 30, 2006, were $25.0 million of term loan borrowings. In February 2007, we amended and restated our credit facility to provide for an additional $205.0 million of term loan borrowings to finance the *Cream of Wheat* acquisition and pay related transaction fees and expenses. Following the amendment and restatement, interest under our $230.0 million of term loan borrowings is determined based on alternative rates as stipulated in the credit facility, including the base lending rate per annum plus an applicable margin of 1.00%, and LIBOR plus an applicable margin of 2.00%. Interest under our revolving credit facility is

54

# EXHIBIT F

10-Q 1 a08-27166_110q.htm 10-Q

Table of Contents

As filed with the Securities and Exchange Commission on October 30, 2008

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C.  20549

# FORM 10-Q

**(Mark one)**

☒

### Quarterly Report Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

**For the quarterly period ended September 27, 2008**

**or**

☐

### Transition Report Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

**For the transition period from          to          .**

**Commission file number 001-32316**

# B&G FOODS, INC.
### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-3918742** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **4 Gatehall Drive, Suite 110, Parsippany, New Jersey** | **07054** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  **(973) 401-6500**

Indicate by check mark whether the registrant:  (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☒          Non-accelerated filer ☐          Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐ No ☒

As of September 27, 2008, the registrant had 36,796,988 shares of Class A common stock, par value $0.01 per share, issued and outstanding, 17,077,331 of which were held in the form of Enhanced Income Securities (EISs) and 19,719,657 of which were held separate from EISs.  Each EIS represents one share of Class A common stock and $7.15 principal amount of 12% senior subordinated notes due 2016.  As of September 27, 2008, the registrant had no shares of Class B common stock, par value $0.01 per share, issued or outstanding.

Table of Contents

B&G Foods, Inc. and Subsidiaries
Index

| | Page No. |
|---|---|
| **PART I FINANCIAL INFORMATION** | 1 |
|     Item 1.    Financial Statements (Unaudited) | 1 |

| | Consolidated Balance Sheets | 1 |
| | Consolidated Statements of Operations | 2 |
| | Consolidated Statements of Cash Flows | 3 |
| | Notes to Consolidated Financial Statements | 4 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 37 |
| Item 4. | Controls and Procedures | 38 |
| **PART II OTHER INFORMATION** | | 40 |
| Item 1. | Legal Proceedings | 40 |
| Item 1A. | Risk Factors | 40 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 40 |
| Item 3. | Defaults Upon Senior Securities | 40 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 40 |
| Item 5. | Other Information | 40 |
| Item 6. | Exhibits | 40 |
| **SIGNATURE** | | 41 |

i

Table of Contents

**PART I**
**FINANCIAL INFORMATION**

**Item 1.  Financial Statements (Unaudited)**

**B&G Foods, Inc. and Subsidiaries**
**Consolidated Balance Sheets**
**(Dollars in thousands, except per share data)**
**(Unaudited)**

| | | September 27, 2008 | | December 29, 2007 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 31,899 | $ | 36,606 |
| Trade accounts receivable, net | | 38,414 | | 42,362 |
| Inventories | | 95,688 | | 93,181 |
| Prepaid expenses | | 3,174 | | 3,556 |
| Income tax receivable | | 597 | | 569 |
| Deferred income taxes | | 648 | | 648 |
| Total current assets | | 170,420 | | 176,922 |
| Property, plant and equipment, net of accumulated depreciation of $62,201 and $55,679 | | 52,878 | | 49,658 |
| Goodwill | | 253,353 | | 253,353 |
| Trademarks | | 227,220 | | 227,220 |
| Customer relationship intangibles, net | | 117,930 | | 122,768 |
| Net deferred debt issuance costs and other assets | | 15,102 | | 17,669 |
| Total assets | $ | 836,903 | $ | 847,590 |
| **Liabilities and Stockholders' Equity** | | | | |
| Current liabilities: | | | | |
| Trade accounts payable | $ | 30,045 | $ | 32,126 |
| Accrued expenses | | 20,314 | | 21,894 |
| Dividends payable | | 7,801 | | 7,797 |
| Total current liabilities | | 58,160 | | 61,817 |
| Long-term debt | | 535,800 | | 535,800 |

Our contractual obligations and commitments principally include obligations associated with our outstanding indebtedness, future minimum operating lease obligations and future pension obligations. During the first three quarters of 2008, there were no material changes outside the ordinary course of business in the specified contractual obligations set forth in our 2007 Annual Report on Form 10-K, except that we entered into a new lease in Tennessee (in connection with the transfer of our warehousing operations in Tennessee from one leased location to another leased location) that will require us to make rental payments of approximately $4.0 million in the aggregate over the course of the lease, which expires in 2013. In addition, our expected contributions to our defined benefit pension plans for fiscal 2008 have increased from $0.1 million to $1.1 because, although not obligated to do so, we made $0.5 million of contributions to our defined benefit pension plans during the third quarter of 2008 and expect to make an additional contribution of $0.6 million during the fourth quarter.

*Forward-Looking Statements*

This report includes forward-looking statements, including without limitation the statements under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The words "believes," "anticipates," "plans," "expects," "intends," "estimates," "projects" and similar expressions are intended to identify forward-looking statements. These forward looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance and achievements, or industry results, to be materially different from any future results, performance, or achievements expressed or implied by any forward-looking statements. We believe important factors that could cause actual results to differ materially from our expectations include the following:

- our substantial leverage;

- the effects of rising costs for our raw materials, packaging and ingredients;

- crude oil prices and their impact on distribution, packaging and energy costs;

- our ability to successfully implement sales price increases and cost saving measures to offset cost increases;

- intense competition, changes in consumer preferences, demand for our products and local economic and market conditions;

- our continued ability to promote brand equity successfully, to anticipate and respond to new consumer trends, to develop new products and markets, to broaden brand portfolios in order to compete effectively with lower priced products and in markets that are consolidating at the retail and manufacturing levels and to improve productivity;

- the risks associated with the expansion of our business;

- our possible inability to integrate any businesses we acquire;

- our ability to access the credit markets and our borrowing costs and credit ratings, which may be influenced by credit markets generally and the credit ratings of our competitors;

- the effects of currency movements of the Canadian dollar as compared to the U.S. dollar;

- other factors that affect the food industry generally, including:

36

Table of Contents

- recalls if products become adulterated or misbranded, liability if product consumption causes injury, ingredient disclosure and labeling laws and regulations and the possibility that consumers could lose confidence in the safety and quality of certain food products, as well as recent publicity concerning the health implications of obesity and trans fatty acids;

- competitors' pricing practices and promotional spending levels;

- the risks associated with third-party suppliers and co-packers, including the risk that any failure by one or more of our third-party suppliers or co-packers to comply with food safety or other laws and regulations may disrupt our supply of raw materials or certain finished goods products; and

- fluctuations in the level of our customers' inventories and credit and other business risks related to our customers operating in a challenging economic and competitive environment; and

- other factors discussed elsewhere in this report and in our other public filings with the SEC, including under Item 1A, "Risk Factors" in our 2007 Annual Report on Form 10-K.

Developments in any of these areas could cause our results to differ materially from results that have been or may be projected by or on our behalf.

All forward-looking statements included in this report are based on information available to us on the date of this report. We undertake no obligation to publicly update or revise any forward-looking statement, whether as a result of new information, future events or otherwise. All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements contained in this report.

We caution that the foregoing list of important factors is not exclusive. We urge investors not to unduly rely on forward-looking statements contained in this report.

**Item 3.  Quantitative and Qualitative Disclosures About Market Risk**

# EXHIBIT G

We use cookies to provide you with a better experience. By continuing to browse the site you are agreeing to our use of cookies in accordance with our Cookie Policy. ✕



SIGN IN    CREATE ACCOUNT    Free Newsletter Sign-up

Companies ▾  Trends ▾  Product Development ▾  Advertising ▾  Subscribe ▾  More ▾      Search 🔍 🛒



# Organic not for everyone: B&G Foods

03.14.2014  By Monica Watrous

😀 🐦 📧 🔗 ✉ 🖨

BOSTON – The center-of-store consumer has a different health agenda than perimeter shoppers, said David Wenner, president, chief executive officer and director of B&G Foods, Inc.

While the company said it seeks opportunities to be on-trend with natural and non-G.M.O. offerings, products with organic claims simply don't resonate in dry grocery as its reduced-sodium products have.



"We have tried any number of organic products in any number of brands in the past, and it really has not resonated," Mr. Wenner said March 13 during a presentation at RBC Capital Markets Consumer & Retail Conference in Boston. "But we are doing things like lowering sodium in a broad array of our products, taking high-fructose corn syrup out of products and replacing it with sugar or lowering the sweetness of the product altogether. … So we're trying to make those claims that we think are relevant to dry grocery, be it lower sodium, be it less fat, those kind of claims."

On the success of an Ortega taco seasoning with 40% less sodium than the regular product, B&G Foods has launched a Mrs. Dash no-sodium taco seasoning that Mr. Wenner said is "doing pretty well."

B&G Foods couldn't resist entering the market for non-G.M.O. products by introducing its Polaner All Fruit preserves line with a Non-G.M.O. Project verification.

"So, if you care about that, we now have something that appeals to somebody like that," he said.

Fundamental shifts in the retail landscape have guided B&G Foods' moves in innovation and acquisition. The company has focused heavily on building its snacks portfolio, with four big purchases over the past year and a half that have helped the company gain distribution in warehouse clubs and other channels.

"I think the consumer does feel better in general, but I really have a hard time getting past the fact that I think there are some fundamental shifts happening in what consumers do in terms of what they eat, in terms of how they eat it and where they buy it," Mr. Wenner said. "So, to the extent you hitch your star just to the center of the store or supermarket business, you're going to have a problem. And even mass merchants to some extent are having their issues in terms of growing same-store sales in that part of the store because I think consumers are snacking more. I think they are buying products at warehouse clubs more. They're buying products at c-stores and dollar stores and all these other outlets more."

Incremental shifts – not a huge jump – will drive demand away from traditional grocery shopping, he said.

"And I just don't see that stopping, underlying the whole business," Mr. Wenner said. "I don't see that changing anytime soon."

BUSINESS  COMPANIES  FOOD PRODUCTS  TRENDS  FOOD MANUFACTURERS  B&G FOODS  SNACKS  HEALTH AND WELLNESS

## Related Articles

Stacking up snack brands pays off for B&G Foods

B&G Foods: 'We are always ready for the next acquisition'

B&G Foods hungry for more acquisitions

B&G Foods to acquire Pirate Brands for $195 million

B&G Foods has big plans for Bear Creek soup brand

**Fresh ideas. Served daily.**
Subscribe to Food Business News' free newsletters to stay up to date about the latest food and beverage news.     Subscribe



Subscribe to Our Newsletters



FEATURED WEBINARS

 10 May 2021  What's next in snack innovation? REGISTER

CURRENT ISSUES



POPULAR ARTICLES

Hot, dry weather supports corn futures

Mondelez may discard gum business

Mondelez acquiring Chipita for $2 billion

General Mills reshaping organization, portfolio with an eye toward growth

POPULAR GALLERIES

 Innovation at Expo West Virtual Week

Dozens of new natural and organic products debuted at Natural Products Expo West Virtual Week, which ran May 24-27.

New on the shelves

Milk innovation is spilling into stores.

 SOSLAND PUBLISHING  

Sosland Publishing  Editorial Staff  Magazine Subscriptions  Newsletter Subscriptions  Media Guide  Contact Us

©2021 SOSLAND PUBLISHING COMPANY
Privacy Policy & Terms Of Use | Terms & Conditions for Advertisers
Design, CMS, Hosting & Web Development – ePublishing

Bakemag.com  Bakingbusiness.com  Dairyprocessing.com  Meatpoultry.com  Petfoodprocessing.net  Purchasingseminar.com  Supermarketperimeter.com  World-grain.com

# EXHIBIT H





Smooth, versatile and delicious, *Canoleo*® is the margarine that brings more to the table than other spreads. Sourced from beautiful fields of yellow flowers, *Canoleo* is unique in having canola oil as its first ingredient. This special oil is what gives *Canoleo* its name – and makes it so easy to use. Straight from the fridge, *Canoleo* is ready to go. Spread it on pancakes, fresh corn or muffins. Use it in place of butter in all of your favorite recipes, whether you're cooking or baking. *Canoleo* is made from the good stuff, free of partially hydrogenated oils, cholesterol*, dairy and gluten. So you can enjoy it without guilt or compromise. Taste the goodness, and you'll know why *Canoleo* is the perfect choice for your family.

*Contains 11g fat and 2g saturated fat per serving.

# Products

# EXHIBIT I



SILVA006636

# EXHIBIT J



## Ortega

@OrtegaTacos · Food

■ Send Message

**Home**   **About**   **Photos**   **Twitter**   **More** ▾      ■ Like   ···



**Ortega**
May 8, 2012 · ■

Did you miss Sandra Lee on Fox & Friends on Friday? Watch her tips and recipes for healthy and yummy Mexican foods.



YOUTUBE.COM
**Sandra Lee on Fox & Friends**
Sandra Lee shows you some fabulous recipes including our Layered Fiesta Dip, Chicken Tacos with Cucumber Salsa and Mexican Pizza.

👍 4

■ Like        ■ Comment        ■ Share

SILVA006617

# EXHIBIT K



**NAME**

Ortega---Sandra-Lee-s-Chicken-Tacos-with-Cucumber-Salsa-Mex-Over-Facebook - Copy - Copy.mp4

**DATE**
June 17, 2021

**DURATION**
5m

**START OF TRANSCRIPT**

**[00:00:03] Sandra Lee**
Everybody s ook ng for ways to eat smarter and eat hea th er. So I've got some deas for you. They're go ng to have a ot of f avor and g ve you a ot of fresh vegetab es n your mea . Th s s my next Ortega Mex over and t's abso ute y de c ous. Ch cken tacos w th cucumber sa sa n my pan. I've got two tab espoons of cano a o go ng w th ha f of a red on on that's just stay ng away unt my on on s a tte b t trans ucent. Here's what you're go ng to do. F rst, crush red pepper f akes and you don't need much at a . Just a p nch. Be carefu w th those. They're a tte hot. So you don't want put your f ngers n there and then n your eye w not be good. G ve that a tte st r. Now, th s I want to add someth ng that you may or may not know even ex sts at the grocery store. I of course, I'm the queen of what's on the grocery store she ves. Th s s part of the new reduced sod um ne that Ortega has out. It's abso ute y de c ous. And t's great whether you're mak ng tacos, you're mak ng ch or you want to make someth ng ke, say, a dry rub for steak on the gr or a wet rub. A tte b t of th s and taco sauce s a great, great sauce on the gr . Ha f th s package goes n here and put t nto the on ons. Just add a b t of f avor.

**[00:01:27] Sandra Lee**
G ve th s a st r. I saved a tte b t of my ch cken from ast n ght's d nner, so I'm go ng to put that n here, but f you don't have some ch cken eft over, you can a ways get a rot sser e ch cken, take the ch cken meat off that and use that for th s d sh as we . Now, st r that through and et that heat up just a tte b t and make sure you coat a the ch cken w th your on ons and your season ng. Let's ta k about taco she s. Th s s rea y mportant. Now, I ove a good taco she and I used to be one of those g r s that wou d take th s taco she and fry t up n the o and pat t dry. But there s someth ng that I ove even more than that, and that s Ortega's corn taco she s. And they just came out w th a who e gra n corn taco she . Th s s great for f ber, by the way. But what I ove about the r taco she s s the r who e kerne corn, abso ute y de c ous. And you get th s beaut fu , authent c f avor and a very d st nct ve texture. And I just adore them. So et's make some tacos. What do you say to taco she s for me? I'm actua y a for taco g r , tera y. I ove tacos. Favor te, favor te food. Before I put my meat, my she s, I want to show you how to make that great cucumber sa sa.

**[00:02:54] Sandra Lee**
It's rea y easy. Th s s just cucumber d ced up and put n a bow . I d dn't even pee t. I want to add the other ha f of my red on on to th s that s d ced up n ce and f ne. And th s s just a sma can of who e stewed tomatoes. Some c antro goes n here. And then Amer ca's number one taco sauce, Ortega Taco Sauce, and I ove the med um f avor, two tab espoons goes a ong way. And by the way, I'm go ng to h t my sour cream w th th s to. Just as a tte spec a someth ng someth ng to that creamy topp ng I'm go ng to put on n just a m nute, take th s st r together and you have cucumber sa sa. And take your sour cream, st r that together w th that taco sauce and you have pumped up sour cream. That's B to tack e a tte b t of meat nto the show, you don't even need cheese w th th s. But by the way, f you d dn't have ch cken, you cou d use Ortega's b ack beans, just open the can stra n them, put that n w th your on ons just as good, I prom se. A tte b t of cabbage goes on the top of th s. Then some c antro, then some of my cucumber sa sa. Look at that, that s a beaut fu th ng. And then my pumped up sour cream. Oh, yeah. Then on top of that, a tte b t more chunky sa sa.

**[00:04:59] Sandra Lee**
That s a.

**END OF TRANSCRIPT**



Automated transcription by Sonix
www.sonix.ai

# EXHIBIT L

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SABRINA SILVA and NANCY SCHIER,      )
on behalf of themselves and all      )
others similarly situated,           )
                                     )
             Plaintiffs,             )
                                     ) Case No.
        vs.                          ) 4:20-cv-00137-
                                     ) JST
B&G FOODS, INC., and B&G FOODS       )
NORTH AMERICA, INC.,                 )
                                     )
             Defendants.             )
_____)

VIDEOTAPED DEPOSITION OF SABRINA SILVA

VIA ZOOM

Wednesday, December 16, 2020

REPORTED BY:
NOELLE C. KRAWIEC
CSR NO. 14255

JOB NO.
678534



Page 2

```
 1   VIDEOTAPED DEPOSITION OF SABRINA SILVA, TAKEN VIA
 2   ZOOM ON BEHALF OF THE DEFENDANTS, COMMENCING AT
 3   10:03 A.M., ON WEDNESDAY, DECEMBER 16, 2020, BEFORE
 4   NOELLE C. KRAWIEC, CSR NO. 14255, A CERTIFIED
 5   SHORTHAND REPORTER IN AND FOR THE COUNTY OF
 6   LOS ANGELES, STATE OF CALIFORNIA.
 7
 8
 9     APPEARANCES:
10
       FOR PLAINTIFFS:
11
           THE WESTON FIRM
12         BY:  GREGORY WESTON, ESQ.
           BY:  CONOR TROMBETTA, ESQ.
13              (VIA ZOOM)
           1405 MORENA BOULEVARD
14         SUITE 201
           SAN DIEGO, CALIFORNIA 92110-3755
15         (619) 798-2006
           GREG@WESTONFIRM.COM
16
17   FOR DEFENDANTS:
18         BRAUNHAGEY & BORDEN LLP
           BY:  MATTHEW BORDEN, ESQ.
19         BY:  DAVID KWASNIEWSKI, ESQ.
                (VIA ZOOM)
20         351 CALIFORNIA STREET
           TENTH FLOOR
21         SAN FRANCISCO, CALIFORNIA 94104
           (415) 599-0210
22         BORDEN@BRAUNHAGEY.COM
23
24   ALSO PRESENT:
25         JOSEPH NEW, VIDEOGRAPHER
```



Page 9

```
 1        Q     Okay.  And is your e-mail up?
 2        A     No, it's not.  It's --
 3        Q     Okay.  So you said that you formerly used
 4    the last name Walker.
 5              Is that your maiden name?
 6        A     Yes.
 7        Q     Are you related to Troy Walker?
 8        A     Yes.
 9        Q     How are you guys related?
10        A     Siblings.
11        Q     Who is older?
12        A     Troy.
13        Q     Where does he live?
14        A     I believe he lives in Fairfield.
15        Q     So he lives near you?
16        A     Close by.
17        Q     How often do you see him?
18        A     Once a month.
19        Q     Has that changed at all, you know, in the
20    past ten years?
21        A     Yes.
22        Q     When did it change?
23        A     When I've had more free time.
24        Q     When was that?
25        A     During the summer.
```



Page 10

1      Q      So during the summer of this year?

2      A      Yes.

3      Q      And during the summer of each of the years

4  for the last ten years, have you had more free time

5  and spent more free time with your brother?

6      A      No.

7      Q      So just during this summer, you spent more

8  time with him?

9      A      Once a month.

10      Q      So for the period over the last ten years

11  or so, it's been roughly once a month that you see

12  him?

13      A      No.

14      Q      How often did you see him, let's say, in

15  2010?

16      A      I'm not sure.

17      Q      Was it more or less frequently than you see

18  him now?

19      A      Less.

20      Q      How come?

21      A      I believe he lived out of state.

22      Q      Where did he live?

23      A      Arizona.

24      Q      What years did he live in Arizona?

25      A      I'm not sure.



Page 11

1     Q    Would you say he lived there for a period
2   of five years or so?
3     A    Approximately.
4     Q    And when did he move back to Fairfield?
5     A    I don't recall.
6     Q    Is there a way you can estimate it for me?
7          One thing I should just tell you just so
8   you understand is I don't want you to guess at any
9   of your answers.  But if you can give me estimates
10  or ballparks, that's helpful.  Just explain, you
11  know, that it's your best estimate or your best
12  ballpark.
13    A    I don't recall.
14    Q    So what does your brother do for a living?
15    A    Repeat that.
16    Q    What does your brother do for a living?
17    A    I'm not sure.
18    Q    I take it that you guys aren't particularly
19  close?
20    A    We're siblings; we're fairly close.
21    Q    Uh-huh.  Well, you understand the reason
22  why I'm asking about this is you know that
23  Mr. Walker also sued B&G Foods over the use of trans
24  fat?
25    A    Is that a question?



Page 18

1       Q      Okay.  Yeah.  It's just hard to hear

2   sometimes.  And if we talk at the same time, it

3   doesn't show up.  So I'm sorry if I'm repeating

4   myself.  I've been told I repeat myself anyway.

5               So we'll start -- have you ever been

6   involved in any criminal cases?

7       A      Me personally been involved in a criminal

8   case?

9       Q      Yeah.  Well, let's just -- here.  Have you

10  ever been convicted of a crime?

11      A      No.

12      Q      Okay.  So what are the other legal

13  proceedings that you have been involved with?

14      A      Is it like the small claims?  Is that --

15      Q      Sure.

16      A      -- a legal proceeding?

17             Yeah, small claims.

18      Q      Okay.  You were involved in small claims.

19             Any other legal proceedings?

20      A      No.

21      Q      How many small claims matters have you been

22  involved with?

23      A      Small claims, I believe one or two.

24      Q      What happened in those proceedings?

25      A      What happened?



Page 19

1      Q      Uh-huh.  Well, let me ask a better question

2    because it sounds like you need a little

3    clarification.

4            The first small claims case that you were

5    involved with, what was the dispute?

6      A      I can't -- I believe it was a roommate, and

7    they were disputing money owed to them.

8      Q      And how did the -- what was the result of

9    that case?

10     A      It was in the -- in the other party's favor

11   partially.

12     Q      So the small claims court judge awarded

13   some money to your former roommate?

14     A      Yes.

15     Q      What year was this?

16     A      2015 approximately.

17     Q      Okay.  And was there another or any other

18   small claims matters that you can remember right

19   now?

20     A      I'm trying to think.  Maybe I missed

21   something.  It was 2018.  I believe it was against a

22   company for using -- what was that?  I forgot the

23   company's name.  It was against a company.

24     Q      And it was a small claims case?

25     A      I believe it was.



Page 31

```
 1        Q     So we talked about sort of doing a
 2   ballpark.
 3              Is there anything that could help you
 4   ballpark, any events or other things that were going
 5   on that would help you sort of pinpoint an
 6   approximate date?
 7        A     No.
 8        Q     And when did you last purchase Ortega taco
 9   shells?
10        A     2000- -- it was 2019.
11        Q     Why did you stop?
12        A     Because my attorney told me that they had
13   poison.
14        Q     In 2019?  Your attorney said in 2019 that
15   the taco shells had poison in them?
16        A     No.  He didn't use the word "poison."
17   That's my own words.  But he did let me know they
18   had trans fats.
19        Q     Okay.  During the period between somewhere
20   in the early 2000s when you first started buying
21   Ortega taco shells and the date in 2019 after you
22   talked to Mr. Weston and stopped buying them, did
23   you purchase them regularly during that time period?
24        A     What period did you say?
25        Q     Between your first purchase and your last
```



```
 1   purchase.

 2       A    What about -- would you repeat the

 3   question.

 4       Q    Sure.

 5            And, you know, maybe it was a bad question.

 6   But, you know, in my household, my wife probably

 7   does most of the cooking, and she likes to top out

 8   things that are in the rotation.  So things that we

 9   sort of regularly eat as a family and then she

10   regularly prepares.

11            My question is, you know, were Ortega taco

12   shells part of the rotation in your house during

13   that period between the time that you first bought

14   them and the time that you stopped buying them?

15       A    They were a staple.

16       Q    How often did you have them?

17       A    How often would I have the staple in my

18   household?

19       Q    Yes.

20       A    It was a staple, so I pretty much kept

21   Ortega taco shells in my pantry.

22       Q    Uh-huh.  And did you eat them once a week?

23   Did you eat them twice a week?  Three times a week?

24   Once a month?

25       A    Twice a week.
```



Page 36

```
 1      Q      And how did it change?

 2      A      When I discovered that the taco shells

 3    contained the trans fat.

 4      Q      When you discovered that the taco shells

 5    contained trans fat, you didn't buy them anymore;

 6    correct?

 7      A      Correct.

 8      Q      And -- but before that time, was your

 9    consumption of taco shells in 2018 and 2017 and 2014

10    or that whole period from when you first started

11    buying the product to when you stopped pretty much

12    the same?

13      A      No.

14      Q      Okay.  When did you eat more taco shells?

15      A      Before 2017.

16      Q      And why did that change?

17      A      My kids became older, and so I wasn't

18    cooking for them as much.  And they moved.

19      Q      So that was in 2017?

20      A      Yes.

21      Q      Did you buy the yellow taco shells or the

22    white ones?

23      A      Both.

24      Q      Which was your favorite?

25      A      The yellow -- the yellow, the white -- I
```



1    really didn't have a favorite, but I would buy the
2    yellow more.

3        Q    And you would always buy the 12-pack?

4        A    Yes.

5        Q    Okay.  So what I'd like you to do now is

6    just go back in time and, you know, think about

7    somewhere in the early 2000s, you said, and you're

8    about to experience buying an Ortega taco shell for

9    the first time.

10            What month of the year was it?

11       A    That I bought Ortega taco shells for the

12   first time?

13       Q    Yes.

14       A    I don't recall.

15       Q    Was it yellow or white taco shells?

16       A    I don't recall.

17       Q    How many taco shells were in the pack?

18       A    Could have been the 18 or 12.  I'm not

19   sure.

20       Q    Where did you buy it?

21       A    The first time, it could have been Safeway.

22       Q    So just going back, you said it could have

23   been 18 or 12.

24            Were there times where you bought the 18 as

25   well as the 12 during the -- this big period that



Page 40

```
 1      Q      How many children do you have?

 2      A      Four.

 3      Q      Were all four with you?

 4      A      No.

 5      Q      Which ones were with you?

 6      A      Do you want names?

 7      Q      Yeah.

 8      A      Kyle, Trevor, and Zachary.

 9      Q      And which one wasn't with you?

10      A      Tanner.

11      Q      Where was Tanner?

12      A      I believe he was in my belly.

13      Q      How old were the other ones at the time?

14      A      Approximately -- hmm.  I'm going to

15   approximate the dates because I'm not sure of the

16   year of the first time in the early 2000s that I

17   purchased the taco shells.

18             So I'm going to say approximately 12, 7,

19   and 5.

20      Q      Okay.  Did you use any type of loyalty

21   card, like a Safeway frequent shopper card or

22   anything like that, when you made your purchase?

23      A      No.

24      Q      Do you have any loyalty cards?

25      A      Yes.
```



Page 42

```
 1      A    Not that I recall.  Not that I recall.
 2      Q    Did you ever see anything on TV about
 3  Ortega taco shells before your first purchase?
 4      A    I don't recall.
 5      Q    Had you ever seen any coupons or anything
 6  like that for Ortega taco shells before your first
 7  purchase?
 8      A    I don't recall.
 9      Q    Had you seen any social media or anything
10  like that about Ortega taco shells before your first
11  purchase?
12      A    No.
13      Q    Would you agree with me that most people
14  you know don't rely on those kind of ads and tend to
15  rely on the actual labels of the products instead
16  when they are making purchase decisions?
17      A    I'm not -- I don't know.
18      Q    What made you decide to buy Ortega taco
19  shells?
20      A    Because I consider the health of my family
21  and make good health choices.  And when I'd seen the
22  taco shells, on the front label it said, "Zero trans
23  fat."  And that's why I chose Ortega.
24      Q    Is that a complete list of all the factors
25  that went into your decision-making?
```



Page 53

1          THE WITNESS:  The front label was

2   misleading.

3   BY MR. BORDEN:

4       Q    I understand.

5            But my question is:  If it said,

6   "Zero grams trans fat per serving," on the front of

7   the label and it also said, "Zero grams trans fat

8   per serving," on the nutrition facts, would that be

9   misleading?

10      A    No.

11      Q    So why was zero grams trans fat important

12  to you when you bought the product?

13      A    Why was it important?

14      Q    Uh-huh.

15      A    Because I didn't want to have cancer.  I

16  didn't want to have diabetes or any health problems

17  or give that to my children from feeding them

18  poison.

19      Q    Well, so what did you know about trans fat

20  in the early 2000s when you first bought the

21  product?

22      A    When I first bought it, not much.

23      Q    When did you begin to learn about the trans

24  fat, the effects of trans fat?

25      A    Watching the news.



Page 68

```
 1              THE VIDEOGRAPHER:  The time is 12:12 p.m.
 2    We are now back on the record.
 3    BY MR. BORDEN:
 4        Q    Great.
 5             So you understand that you're still under
 6    oath; correct?
 7        A    Yes.
 8        Q    Where do you work right now?
 9        A    I work -- the name of the company?
10        Q    Yeah.
11        A    CoreTech.
12        Q    What is it called?  I didn't hear.
13        A    CoreTech.
14        Q    CoreTech?
15        A    Yes.
16        Q    What is CoreTech?
17        A    It's a job agency.
18        Q    What do you do for CoreTech?
19        A    What is my position?
20        Q    Yes.
21        A    I work in quality control.
22        Q    What does CoreTech -- well, what do you do
23    in terms of quality control?
24        A    Checking products to make sure they're
25    suitable for the customers before they're shipped
```



Page 69

1    out.

2        Q     What kind of products do they make?

3        A     Fruit.

4              THE STENOGRAPHER:  Repeat that one more

5    time.

6              THE WITNESS:  Fruit.

7              THE STENOGRAPHER:  Thank you.

8    BY MR. BORDEN:

9        Q     So you inspect the fruit and make sure that

10   it's not rotten or damaged and such?

11       A     Correct.

12       Q     How long have you held this position?

13       A     With CoreTech?

14       Q     Yes.

15       A     For two years approximately.

16       Q     Okay.  Is that a full-time job?

17       A     Off and on.

18       Q     What do you mean by that?

19       A     Due to COVID, it could -- we could have

20   time off, or I'll take time off.

21       Q     Oh, okay.  And what did you do before that?

22       A     I was a stay-at-home mom.

23       Q     Before you were a stay-at-home mom, did

24   you -- were you working at all?

25       A     I did work.



Page 70

```
 1      Q     I'm sorry.  Can you repeat your answer.  I
 2  just didn't hear it.
 3      A     Yes.  I did work.
 4      Q     Okay.  Where did you work?
 5      A     I've worked for Macy's, Vitamin Adventure,
 6  I was a home nurse, and that's pretty much -- and,
 7  yeah, that's pretty much it.
 8      Q     Okay.  What years did you work as a home
 9  nurse?
10      A     2000- -- about 2003 to about 2006 possibly.
11      Q     Okay.  And what years did you work for
12  Vitamin Adventure?
13      A     In '90- -- '98 to about '99.
14      Q     Okay.  And what years did you work for
15  Macy's?
16      A     '97 to about 99.
17      Q     What did you do for Macy's?
18      A     I was a cosmetics manager.
19      Q     Was that a full-time job?
20      A     No.
21      Q     What did you do for Vitamin Adventure?
22      A     I was a counter manager.
23      Q     What did Vitamin Adventure sell?
24      A     Health products.
25      Q     Was that a full-time job?
```



MAGNA
LEGAL SERVICES

```
 1      A    No.
 2      Q    What's the last schooling that you
 3 completed?
 4      A    (No audible response.)
 5           (Technical difficulties.)
 6 BY MR. BORDEN:
 7      Q    Can you please repeat that.  I --
 8      A    I went to some college, but I completed
 9 high school.
10      Q    Okay.  Where did you go to college?
11      A    Trinity -- Trinity College.
12      Q    Where's that?
13      A    In Fairfield.
14      Q    What did you study?
15      A    Nursing.
16      Q    All right.  I'm going to show you a
17 document I hope.
18           MR. BORDEN:  And the reporter is --
19           I'd like you to mark this Exhibit 1,
20 please, Madam Court Reporter.
21           (Exhibit 1 was marked for identification by
22           the certified shorthand reporter.)
23 BY MR. BORDEN:
24      Q    And I am going to try to put the document
25 in the chat as I have been taught to do.  And now to
```



Page 83

```
 1      Q    So it's fair to say that -- you know, is
 2   that true for every year in this period?  About once
 3   a year, you sort of splash out and have some
 4   non-dairy ice cream from either of these two sources
 5   in either of these two flavors?
 6      A    Yes.
 7      Q    How about cookies?  Do you ever eat
 8   cookies?
 9      A    No.
10      Q    Do you ever buy them for your family or
11   your kids during that period?
12      A    Yes.
13      Q    What did you get for them?
14      A    Oreos, Nutter Butters, chocolate chip
15   cookies.  That's it.
16      Q    When you say "chocolate chip," do you mean
17   like Chips Ahoy or just more like something you get
18   from a bakery or a --
19      A    Something I'd make.
20      Q    You'd make -- pardon me.  I didn't mean to
21   step on your testimony.
22           So I believe what you said -- and you can
23   correct me if I'm wrong -- is that you would make,
24   from scratch, chocolate chip cookies for your kids?
25      A    Sometimes.
```



MAGNA
LEGAL SERVICES

Page 97

1    Q    How often was the Steel Cut?

2    A    Which is a Trader Joe's brand.  It's called

3  Steel Cuts.

4         How often?

5    Q    Yeah.  In terms of in this period, how

6  frequently would you purchase steel-cut oats from

7  Trader Joe's?

8    A    Probably three times.

9    Q    And the same question for Quaker oatmeal:

10  During this period, how often would you get Quaker

11  oatmeal for yourself in this time period?

12    A    Once a month.

13    Q    And how about for your kids?  Would you

14  give them oatmeal too?

15    A    No.

16    Q    What kind of cereal do your kids like?

17    A    Corn Flakes, Cheerios.

18    Q    Anything else?

19    A    Rice Chex, Froot Loops.

20    Q    Anything else?

21    A    No.

22    Q    And how about you?  Do you eat any

23  breakfast cereals?

24    A    No.

25    Q    What do you usually have for breakfast?



Page 109

```
 1    BY MR. BORDEN:

 2        Q    Is this statement true:

 3             "Plaintiffs" --

 4             Well, you.

 5             -- "read and relied on the language on the

 6             product label, including, without

 7             limitation, zero grams trans fat, as one of

 8             several marginal factors in deciding to

 9             purchase Ortega taco shells"?

10             MR. WESTON:   Objection.   Misquotes the

11    document and argumentative.

12             THE WITNESS:   I purchased them because it

13    said, "Zero trans fat."

14    BY MR. BORDEN:

15        Q    All right.   Let me --

16             MR. BORDEN:   And, counsel, just to be

17    clear, I think Judge Sparrow's (phonetic) rules on

18    depositions are clear:   That the objections are

19    limited to form.

20        Q    But let me reread you the statement and ask

21    the question again, which is:   Is this statement

22    true:

23             "Plaintiffs read and relied on language on

24             the product label, including, without

25             limitation, zero grams trans fat, as one of
```



```
 1          several marginal factors in deciding to
 2          purchase Ortega taco shells"?
 3          MR. WESTON:   I object to misquoting the
 4   complaint.
 5          MR. BORDEN:   That's --
 6          (Simultaneous crosstalk.)
 7          MR. BORDEN:   Counsel, that's another
 8   speaking objection, and it's violating
 9   Judge Sparrow's rules.   And so I would just ask that
10   you please stop.
11      Q    And I'll read the question again so that
12   hopefully this will come out cleanly.
13          Is this statement true:
14          "Plaintiffs read and relied on language on
15          the product label, including, without
16          limitation, zero grams trans fat, as one of
17          several marginal factors in deciding to
18          purchase Ortega taco shells"?
19      A    I trust that they had -- I trusted Ortega
20   to have zero trans fat.   That's why I purchased the
21   product.
22      Q    So is that statement true or untrue:
23          "Plaintiffs read and relied on language on
24          the product label, including, without
25          limitation, zero grams trans fat" per
```

```
 1          serving, "as one of several marginal
 2          factors in deciding to purchase Ortega taco
 3          shells"?
 4          MR. WESTON:  Objection.  Asked and
 5  answered.  Same objections as before.
 6          THE WITNESS:  On the front of the box
 7  label -- on the front label, the box, on the front,
 8  it said, "Zero trans fat."  I --
 9  BY MR. BORDEN:
10     Q    I understand that.
11          But the question I asked was different,
12  which was:  Is the statement that I read to you true
13  or not true?
14     A    I read the front of the box.  It said,
15  "Zero trans fat."  That's true that I purchased that
16  product because of what the front of the box said.
17     Q    Is the statement that I read true?
18          MR. WESTON:  Objection.  Asked and
19  answered.
20          MR. BORDEN:  I don't think the witness has
21  answered the question, which is why I keep repeating
22  the statement and asking the question.
23     Q    It's just a simple yes-or-no question.  Is
24  the statement that I read to you true?  And I'm glad
25  to read it again if it's not fresh in your mind.
```



1    you're concerned that trans fat in them may impact

2    your future health; is that fair to say?

3        A    That's fair to say, but also my children.

4    I believed I was an excellent mother that looked out

5    for the safety and health of her children.  And I

6    was feeding them something that I didn't know that

7    could possibly harm them, which indeed it still can

8    because of what I was giving them.

9        Q    Okay.  But as we sit here right now, you're

10   not saying that you suffering any current physical

11   injury because of eating the Ortega taco shells; is

12   that fair?

13       A    No.  It's the unknown.  I don't know.

14       Q    Well, do you have any physical injury right

15   now that you blame on Ortega taco shells?

16       A    Besides psychological, no.

17       Q    Okay.  And this is just purely physical.

18            And in terms of your children, are your

19   children suffering from any physical injuries that

20   you blame on Ortega taco shells?

21       A    No.

22       Q    Okay.  Have you seen a psychologist about

23   this psychological injury that you have suffered?

24       A    No.

25       Q    Do you plan to see a psychologist about the



1   psychological injury that you have suffered?

2       A    No.

3       Q    Have we now discussed the total of all the

4   injuries that you're claiming in this case?

5       A    I believe so.

6       Q    Okay.  Now, have -- do you know how much

7   trans fat you have to eat to incur a substantial

8   risk of physical injury?

9       A    No.

10      Q    If someone said that, you know, .2 grams of

11  artificial trans fat a day was an immaterial risk,

12  would that person be lying?

13           MR. WESTON:  Objection to form.

14           THE WITNESS:  Can you repeat that, please.

15  BY MR. BORDEN:

16      Q    Sure.

17           If someone said that .2 grams of artificial

18  trans fat a day was an immaterial risk, would they

19  be lying?

20           MR. WESTON:  Objection to form.

21           THE WITNESS:  I -- I'm not a scientist.  I

22  don't know.

23  BY MR. BORDEN:

24      Q    Do you want B&G Foods to change its label

25  in any way as a result of this case?



Page 127

```
1        Q    Do you go out to eat?  Other than, you
2   know, what we discussed with your family, do you go
3   out to lunch with friends, things like that?
4        A    I have.
5        Q    Was there anyone you would regularly, you
6   know, go out to lunch or dinner with?
7        A    No.
8        Q    Is Mr. Walker your only sibling?
9        A    No.
10       Q    Okay.  What other siblings do you have?
11       A    (Inaudible.)
12       Q    Can you repeat that answer, please.
13       A    I have four siblings.
14       Q    What are their names?
15       A    Bill, that's Dr. Will Walker; Spencer,
16   Attorney Spencer Walker; Lisa May --
17       Q    Uh-huh.
18       A    -- and Troy Walker.
19       Q    Where does Bill Walker, Dr. Bill Walker --
20   does he live in California?
21       A    Yes.
22       Q    Where does he live?
23       A    San Francisco.
24       Q    And Attorney Spencer Walker, where does he
25   live?
```



Page 128

```
 1      A      Sacramento.

 2      Q      What kind of law does he do?

 3      A      Consumer affairs.

 4      Q      What do you mean by that?

 5      A      He's a lead attorney for the State of

 6   California for Consumer Affairs.

 7      Q      He works for the California Attorney

 8   General's office?

 9      A      Yes.

10      Q      Has he done any famous cases that I might

11   have heard of?

12      A      Not that I'm familiar with.

13      Q      And where does Lisa May live?

14      A      In Fairfield.

15      Q      Is there any relief that you're seeking in

16   this case that we haven't talked about yet?

17      A      Yes.

18      Q      What?

19      A      Would you repeat the question.

20      Q      Sure.

21             Is there any relief that you're seeking in

22   this case that we haven't talked about yet?

23      A      Yes.

24      Q      What's that?

25      A      I want to receive a refund for the taco
```



# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SABRINA SILVA and NANCY SCHIER,   )
on behalf of themselves and all   )
others similarly situated,        )
                                  )
            Plaintiffs,           )
                                  ) Case No.
            vs.                   ) 4:20-cv-00137-
                                  ) JST
B&G FOODS, INC., and B&G FOODS    )
NORTH AMERICA, INC.,              )
                                  )
            Defendants.           )
_____  )

VIDEOTAPED DEPOSITION OF NANCY SCHIER
VIA ZOOM
Thursday, December 17, 2020

REPORTED BY:
NOELLE C. KRAWIEC
CSR NO. 14255

JOB NO.
678531



```
 1    VIDEOTAPED DEPOSITION OF NANCY SCHIER, TAKEN VIA
 2    ZOOM ON BEHALF OF THE DEFENDANTS, COMMENCING AT
 3    9:34 A.M., ON THURSDAY, DECEMBER 17, 2020, BEFORE
 4    NOELLE C. KRAWIEC, CSR NO. 14255, A CERTIFIED
 5    SHORTHAND REPORTER IN AND FOR THE COUNTY OF
 6    LOS ANGELES, STATE OF CALIFORNIA.
 7
 8
 9    APPEARANCES:
10
      FOR PLAINTIFFS:
11
          THE WESTON FIRM
12        BY:  GREGORY WESTON, ESQ.
          BY:  CONOR TROMBETTA, ESQ.
13            (VIA ZOOM)
          1405 MORENA BOULEVARD
14        SUITE 201
          SAN DIEGO, CALIFORNIA 92110-3755
15        (619) 798-2006
          GREG@WESTONFIRM.COM
16
17    FOR DEFENDANTS:
18        BRAUNHAGEY & BORDEN LLP
          BY:  MATTHEW BORDEN, ESQ.
19            (VIA ZOOM)
          351 CALIFORNIA STREET
20        TENTH FLOOR
          SAN FRANCISCO, CALIFORNIA 94104
21        (415) 599-0210
          BORDEN@BRAUNHAGEY.COM
22
23
      ALSO PRESENT:
24
          RUSLAN GUGIA, VIDEOGRAPHER
25
```



```
 1      A    Yes, of course.

 2      Q    And do you have any notes or documents in

 3  front of you?

 4      A    Nope.

 5      Q    Okay.  Good.

 6           What did you do to prepare for this

 7  deposition?

 8      A    I consulted with my lawyer a couple times.

 9      Q    When was the first time you consulted with

10  your lawyer?

11      A    The first time was in spring 2019.

12      Q    Okay.  How long did that consultation last?

13      A    Not too long.  Maybe 15, 20 minutes.

14      Q    Okay.  What was the next time that you

15  consulted with your lawyer after that?

16      A    A couple times throughout the year, 2019.

17      Q    Uh-huh.  How long just in terms of minutes

18  were those meetings?

19      A    I couldn't tell you exactly the minutes.

20  It varied.

21      Q    And how about to prepare for this

22  deposition?

23      A    Yes.  We spoke a few times so I understand

24  the terminology and the rules of what we were going

25  to be doing today.
```



1      A    Yes, I would be.

2      Q    So how is it that you first came in contact

3  with your lawyers?

4      A    We have a mutual friend, and I'm very

5  passionate about keeping my kids healthy.  I've had

6  health challenges.  And so I had spoken to that

7  friend about being frustrated with GMOs and what's

8  put, like, even in baby bottles.  And how is that

9  okay?  And he referred me to Greg.

10     Q    Who is your friend?

11     A    His name is Steve.  Our kids are in the

12  same class or were back then.

13     Q    Uh-huh.  What's Steve's last name?

14     A    Altes.

15     Q    A-L-T-E-Z?

16     A    Yes -- I believe with an "S."

17     Q    And you said your kids are in the same

18  class?

19     A    They were in the same class back then, and

20  we -- they grew up together.  Like, doing jamboree

21  and preschool.  So we had known each other for a

22  while.

23     Q    Where does Mr. Altes live?

24     A    In Valencia.

25     Q    Still lives there?



Page 23

1    A    Before I spoke to Mr. Weston?

2    Q    Correct.

3    A    I wasn't angry, no.

4    Q    Okay.

5    A    Not until I saw that the label was

6    misleading.

7    Q    So you started to talk about this earlier,

8    but I want to make sure I get a full and complete

9    answer from you.

10           But why don't you give me a list of all of

11   the injuries that you have suffered that you contend

12   you suffered as a result of consuming Ortega taco

13   shells.

14   A    I wouldn't know.  I'm not a doctor.  I'm

15   not a scientist.  I don't know the details of it.

16   Q    Are you claiming that you suffered a

17   physical injury in this case?

18   A    I think it attributed to some of my health

19   issues.

20   Q    Which health issues?

21   A    Mutation of my cells.

22   Q    So I believe that you mentioned that you

23   had kidney cancer?

24   A    Yes.

25   Q    Is that something that you attribute to my



1   client?

2       A    I think it's the mutation of what happened

3   to cause the kidney cancer.

4       Q    Has your doctor opined on this?

5       A    Opined on what?

6       Q    On whether -- on what the causes of your

7   kidney cancer was.

8       A    It's unknown.  It's --

9       Q    Sorry.  Go ahead and finish your answer.

10      A    It's hard to tell.  It's a mutation of our

11  cells; right?  So where it actually stemmed from, I

12  don't know.

13      Q    Understood.

14           Has any doctor told you that your kidney

15  cancer resulted from eating taco shells?

16      A    No.  However, it's the misleading of the

17  label that had me take the taco shells.  It's just

18  an unhealthy choice.

19      Q    Uh-huh.  But in terms of physical injuries,

20  has any doctor examined you and given you some kind

21  of opinion that says, you know, "You have some kind

22  of physical injury to yourself as a result of eating

23  these taco shells"?

24      A    They couldn't --

25           MR. WESTON:  Objection to form.



Page 25

1           THE WITNESS:  They couldn't tell me exactly

2    what caused it.

3    BY MR. BORDEN:

4        Q     So I take it it's true that no doctor has

5    told you that eating these taco shells has caused

6    you any physical harm?

7              MR. WESTON:  Objection to form.

8              THE WITNESS:  So yes.

9    BY MR. BORDEN:

10       Q     So besides the -- I think you also

11   mentioned that you felt like there was a risk to

12   your health in the future that you attribute to my

13   client; is that true?

14       A     Well, I now have a blood cancer called PV

15   disease.

16       Q     And is the blood cancer something that you

17   attribute to eating taco shells?

18             MR. WESTON:  Objection to form.

19             THE WITNESS:  I'm not a doctor, so I'm

20   not -- I don't know.

21   BY MR. BORDEN:

22       Q     Is this the kind of blood cancer that makes

23   you really fatigued, and is it called PVC?

24       A     It's called PV.

25       Q     PV.



```
 1          Yeah.  And are you being treated for that?
 2     A    Yes, I am.
 3     Q    Has any doctor told you that the amount of
 4  trans fat that you consumed in a -- from eating
 5  Ortega taco shells has created any kind of risk of
 6  future injury to you?
 7     A    We did not discuss taco shells.
 8     Q    How about trans fat?
 9     A    We did not discuss trans fat.
10     Q    Okay.  So there's physical injuries.
11          Are there any other injuries that you
12  suffered as a result of anything that my client has
13  done?
14     A    That --
15          MR. WESTON:  Objection to form.
16          THE WITNESS:  Excuse me.  Losing my trust.
17  BY MR. BORDEN:
18     Q    Uh-huh.  Anything else?
19     A    That's it.
20     Q    Okay.  And we talked about this, and I want
21  to just make sure that we've covered this fully too.
22          All the relief that you're seeking in this
23  case, what are you actually asking for?
24     A    For Ortega to be held accountable and get
25  fined --
```



1    shells?

2        A    It was something we would do in the spring

3    and the summer.  So, yes.

4        Q    How often were you buying them?

5        A    I would say about 20 times.  I took a

6    cooking class, and it was one of the things that

7    they said would be fun for the kids, so we tried it.

8        Q    So when you say "20 times," you mean over

9    that period of roughly two years?

10       A    Each time.

11       Q    Okay.  Did you buy them in the same place?

12       A    No.  There would be two places.

13       Q    Okay.  Where were those?

14       A    Vons or Ralph's.

15       Q    And do you have any kind of a, like,

16   frequent-purchaser or, like, card that you use when

17   you bought the taco shells?

18       A    I don't recall.

19       Q    Do you have a Vons card now?

20       A    Yes.

21       Q    And a Ralph's card?

22       A    Yes.

23       Q    So did you always buy the same size box?

24       A    I believe so.

25       Q    Which size was that?



Page 32

```
 1      A      You mean like the amount?
 2      Q      Yeah.  How many taco shells were there in
 3   the box?
 4      A      I believe 12.
 5      Q      Okay.  And did you buy the yellow kind or
 6   the white kind or both?
 7      A      We tried the white kind once, but --
 8      Q      So you had -- I'm sorry.
 9      A      We would get both -- well, no, I tried the
10   white kind once, but we would lean towards the
11   yellow.
12      Q      Okay.  You liked the yellow better?
13      A      Yes.
14      Q      You liked the -- I think you said you liked
15   the taste?
16      A      Yes.
17      Q      And the crunchiness?
18      A      Yes.
19      Q      And it was reasonably priced?
20      A      Yes.
21      Q      And so I guess what I want to do now is,
22   like, just -- let's go back in time to the first
23   time you bought the product.
24             And I said you -- I think you said you had
25   already tried Trader Joe's taco shells at that
```



Page 35

1    pretty fast.

2        A    Pretty fast.

3        Q    And did you sit and deliberate about it, or

4    you just grabbed it off the shelf?

5        A    Read the label, trusted the label, and took

6    it off the shelves.

7        Q    When you said you read the label, did you

8    look at the front, the back, and the sides?

9        A    Oh, I'm in such a hurry.  I usually just

10   look at the front if it says, "No" -- you know, like

11   bright letters, sounds healthy.  "I trust it.  Let's

12   go."

13       Q    So I take it, when you first -- on the date

14   of this first purchase, you didn't -- you only read

15   the front of the label.  Is that what you're saying?

16       A    Yes.

17       Q    How much did it cost?

18       A    Below $2.

19       Q    What else did you buy that day besides the

20   Ortega taco shells?

21       A    Probably, if we're doing taco night,

22   ingredients for taco night.

23       Q    So is taco night something that you guys

24   had regularly at your house?

25       A    Back then, yes.



Page 40

```
 1      Q      When you say "pretty much," what is -- do
 2  you mean --
 3      A      I mean I --
 4      Q      Go ahead.
 5      A      I didn't let you finish.
 6      Q      Go ahead.
 7      A      I can't tell exactly what it says, but a
 8  general sense of what was on it.
 9      Q      Uh-huh.  Okay.  So why don't you tell me
10  your general sense of what is on the front of the
11  label of the box of taco shells that you bought for
12  the first -- when you bought Ortega taco shells for
13  the first time.
14      A      I remember it being bright blue, which is
15  what attracted me to it.
16      Q      Uh-huh.
17      A      The taco shell with the taco meat inside,
18  and then the label "Ortega" on top.  Big, bright
19  yellow, gluten free, which stood out because I'm
20  trying to be gluten free.  No trans fat.  And then I
21  don't remember what the last thing was.  But it
22  sounded really healthy.
23             I believed the label.  The other side might
24  have said something about how many shells are on
25  [sic] it and the weight.
```



Page 44

```
 1      A     Probably the ingredients and the
 2  nutritional benefits.  But at that time, I wasn't
 3  reading the back.  I was just in a hurry, and I
 4  trusted what was in the front as a label.
 5      Q     In the period that you were buying the
 6  product, did you ever look on the back of the box?
 7      A     No.
 8      Q     In the period that it was -- strike that.
 9            Did you ever -- during your first purchase,
10  did you ever look on the side of the box?
11      A     No.  I'm in a hurry.  Like, as a mom, I'm
12  constantly, like, trying to keep everyone happy,
13  feed them.  So I didn't take the time.
14      Q     But you concentrated on the trans fat
15  language?
16      A     Well, I trusted the label.  I believed it.
17      Q     Didn't the language say "zero grams trans
18  fat per serving" on it?
19      A     I don't remember exactly what it said.
20      Q     Do you think "zero grams trans fat per
21  serving" is a misleading characterization of the
22  product?
23      A     Yes.
24      Q     Why?
25      A     Well, zero means zero; means nothing.
```



Page 56

1    purchase; right?

2        A    Yes.

3        Q    And as you continued to buy it and have it

4    in your house, you continued to at least look at the

5    front of the label; is that fair?

6        A    Oh, no.  Because I'm just doing my thing.

7    I --

8        Q    Uh-huh.

9        A    You know, it's one of these things.  You

10   read once; you trust it.  I'm going to stick to

11   this.  I'm very loyal with my products.  So I'm

12   going to buy this over and over again.  It seems

13   healthy.

14            But I didn't always, like, "I'm going to

15   read the label" or get into it.  I'm just trying to

16   do my job as a mom.

17       Q    But you saw the label at least on the front

18   of the box when you had it sitting in your pantry or

19   when you were going to get out taco shells, and

20   you're at least looking at it?

21       A    Very -- yes.

22       Q    But you never looked at the side of the box

23   or the back of the box during that entire time

24   period?

25       A    No.



Page 66

```
 1              And I want to just understand what the
 2   truth is.
 3        A    Well, it's on occasion.  It's not like we
 4   counted after that.  So...
 5        Q    So you continued to buy the product in that
 6   2015 through 2019 period on occasion; is that fair?
 7        A    Yes.
 8        Q    Okay.  And then you stopped, though, when?
 9        A    I couldn't give you an exact date.  It's
10   not -- we don't buy it anymore.
11        Q    Uh-huh.  Well, earlier, throughout this
12   depo within the last hour, hour and a half, I've
13   been asking you questions about your purchases in
14   the 2012 to 2014 time period.
15              And now it appears that the time period
16   that you bought the product actually extended from
17   2012 to 2019.
18              Is that accurate?
19        A    My understanding was your question was
20   that -- was more often on a regular basis versus
21   occasionally.
22        Q    Okay.  So I want to be very clear:  You
23   first purchased the product in 2012; correct?
24        A    Consciously, yes.
25        Q    What do you mean by "consciously"?
```



Page 73

1            THE WITNESS:  It says "zero trans fat" on

2    the label.

3    BY MR. BORDEN:

4        Q    You didn't read the ingredients of the

5    product that you bought; right?

6        A    Correct.

7        Q    You didn't read the nutritional facts of

8    the product that you bought?

9        A    Not for taco shells.

10       Q    Let me show you another document.  I'll

11   have to go through the same cumbersome process.

12            All right.  Can you see my document?

13       A    Yes.

14            MR. BORDEN:  So, for the record, this is

15   going to be marked Exhibit 4, please, Madam Court

16   Reporter.

17            (Exhibit 4 was marked for identification by

18            the certified shorthand reporter.)

19   BY MR. BORDEN:

20       Q    This is a list of product attributes.  And

21   what I want you to do is to tell me, in terms of a

22   scale of 1 to 10 -- 10 being most important; 1 being

23   least important -- how important these factors were

24   to you in your purchase of taco shells and Ortega

25   taco shells.



```
1            Which is simply that:  If my client was
2    following all of the FDA's rules on trans fat and
3    how it's labeled and how it's disclosed and how it's
4    described in the product, would you still be suing
5    them?
6        A    That --
7             MR. WESTON:  Objection to form.
8             THE WITNESS:  I mean poison is poison.  So
9    whether the FDA approves it and it's okay, someone
10   needs to be held accountable.
11   BY MR. BORDEN:
12       Q    So your answer is even, if my client was
13   following all of the FDA rules, you would still be
14   suing them for their use of trans fat; correct?
15            MR. WESTON:  Objection to form.
16            THE WITNESS:  Yes.
17   BY MR. BORDEN:
18       Q    Okay.  So basically I'm trying to summarize
19   a little bit.
20            You bought the Ortega-brand taco shells a
21   lot of times, and it was in reliance on this trans
22   fat language on the front of the package because you
23   knew that trans fats were bad; fair?
24       A    Correct.
25       Q    If B&G Foods had removed the language "zero
```



Page 128

```
 1            And is that near where you are now?
 2      A     Yes.  It's in Newhall.
 3      Q     Where is that, Newhall?
 4      A     Close to Magic Mountain.
 5      Q     So up Highway 5?
 6      A     Yes.
 7      Q     Before or after the 14?
 8      A     Before the 14 -- oh, no.  After.  After the
 9   14.
10      Q     Did you go to any school after Hart High?
11      A     You mean college?
12      Q     Yeah.
13      A     Yes, I went to Art Center College of
14   Design.
15      Q     Do you have an MFA?
16      A     I have a bachelor's in fine art.
17      Q     And do you have like a specialty or
18   anything?
19      A     I'm a designer.
20      Q     What kind of stuff -- go ahead.
21      A     I was going to say...  So I'll do --
22   depending on what the client is -- textile designs,
23   illustrations, and all kind of things.  So
24   packaging.  Depends on the client.
25      Q     So is that the last school you completed
```



Page 129

1    was your bachelor's in fine arts?

2        A    Yes.

3        Q    And where did you work after -- immediately

4    after graduating?

5        A    Disney.

6        Q    What did you do for Disney?

7        A    I was a background painter for feature

8    animation.

9        Q    How long were you there?

10        A    About seven and a half years.

11        Q    Okay.  And where did you go from there?

12        A    I became a freelancer for the textile

13    industry.

14        Q    And how long did you do that?

15        A    It varied.  So there was several companies

16    that I freelanced for, and I also work for

17    stationary companies and mostly do concepts for

18    them.

19        Q    Uh-huh.  And is that still what you do, or

20    did you move on from there?

21        A    Well, I still freelance, but I also do

22    kids' entertainment.

23        Q    So just in this period, you know, from 2012

24    to the present, where have you worked?

25        A    Oh, freelance.



Page 130

1      Q      And so that --

2      A      It just depends on the client.

3      Q      Okay.  Pardon me.  I didn't mean to talk

4   over you.

5      A      So it's all freelance.

6      Q      So freelance design?

7      A      And illustration.

8      Q      So is this like in the entertainment

9   sector, or is this like technical illustrations, or

10  a combination of both?

11     A      I think it's a combination, so both.

12     Q      Uh-huh.  How many hours a week were you

13  generally working in this 2012 to present period?

14     A      Oh.  It would vary, and it would be

15  seasonal too.  So like, for example, January through

16  just before summer would be really busy, so that

17  would be while the kids were at school.  And then

18  the summer I would get to take a little bit of a

19  break.  And then again it would pick up right before

20  Fashion Week into the fall or like winter/fall.

21     Q      So you might not be able to tell by looking

22  at me, but I don't know what Fashion Week is.

23            So what is that, and when is it?

24     A      That is when the buyers -- usually in --

25  around October, the buyers go to the different



Page 131

```
 1   manufacturers to buy for the stores to go into

 2   Christmas.

 3        Q    Okay.  And you said that you do kids'

 4   entertainment.  That sounds interesting.

 5             What is that?

 6        A    I love doing that.  We bring princesses or

 7   superheroes to parties.  And we tell them stories,

 8   sing them happy birthday, or we'll go to schools.  I

 9   also teach like etiquette and mindfulness through

10   the characters.

11        Q    And is this a business of yours?

12        A    It's a little side business.  It was.

13   COVID has kind of put a damper on things.

14        Q    Yeah.  Did you have a name for your

15   business?

16        A    It's called Painted Monkeys and Company.

17        Q    And is it a registered business?

18        A    Because it's entertainment, no.

19        Q    Okay.  And how long have you been married

20   to your husband?

21        A    We got married in '04, so --

22        Q    Okay.

23        A    -- 16 years.

24             (Telephonic interruption.)

25             MR. BORDEN:  Sorry.  It's my kid's line.
```



MAGNA LEGAL SERVICES

# EXHIBIT N

# THE WESTON FIRM

1405 Morena Blvd., Suite 201
San Diego, CA 92110

## Firm Resume – October 2021

**Gregory S. Weston** has always devoted nearly all of his practice to representing consumers in class actions. Mr. Weston is a member in good standing of the bars of California, six federal district courts, and the Ninth and Sixth Circuit Courts of Appeals. Before founding his firm, he was an associate at the firm now known as Robbins, Geller, Rudman & Dowd.

Mr. Weston is a graduate of Ohio State University (2001), where he studied economics and Spanish, and Harvard Law School (2004).

## CLASS ACTION SETTLEMENTS

*In re Cobra Sexual Energy Sales Practices Litig.*, **No. 2:13-cv-5942-AB (C.D. Cal.);** *Lambert v. Nutraceutical Corp.*, **870 F.3d 1170 (9th Cir. 2017)** and *Nutraceutical Corp. v. Lambert*, **139 S. Ct. 710 (2019)**
In a case that lasted from 2013 to 2021, went to the Supreme Court once and the Ninth Circuit four times, the firm represented consumers who alleged the efficacy claims made on a purported aphrodisiac supplement were deceptive and rendered the product an unapproved new drug. The Weston Firm was appointed Co-Class Counsel and negotiated a settlement that provided the class with both monetary relief and five of the seven label changes demanded in the complaint.

*Garcia v. Iovate Health Services USA, Inc.*, **No. 1402915 (Santa Barbara Superior Court)**
As a result of a class-wide settlement, Defendant agreed to modify its labeling claims on a weight loss product and pay $8 million in monetary relief.

*Guttmann v. Ole Mexican Foods, Inc.*, **No. 3:14-cv-4845-HSG (N.D. Cal.)**
The firm was sole class counsel in an action that alleged false advertising and unlawful use of trans fat on defendant's tortilla products. A class action settlement resulted in the complete removal of trans fat.

*In re Quaker Oats Labeling Litigation*, **No. 5:10-cv-502-RS (N.D. Cal.)**
The firm represented consumers who alleged the claims made on Quaker's oatmeal and granola bar products were deceptive in light of the products' trans fat content. The

Weston Firm was appointed Class Counsel and obtained a settlement that provided the class with injunctive relief in the form of complete trans fat removal and labeling changes.

### *Red and Rosen v. Unilever United States, Inc.*, No. 5:09-cv-2563-JW (N.D. Cal)

The Weston Firm was lead class counsel for purchasers of soft spread and stick margarine products containing artificial trans fat, alleging false advertising and unlawful use of trans fat. As a result of a class-wide settlement, the defendant agreed to remove artificial trans fat from about forty products, including several leading national brands of margarine, as well as the generic margarines it manufactured for third party stores.

### *In re Nucoa Real Margarine Labeling Litigation*, No. 2:10-cv-927-MMM (C.D. Cal.)

The firm was sole class counsel for margarine consumers who alleged the claims made on Defendant's Nucoa Margarine products were deceptive in light of the products' trans fat content. The Weston Firm was appointed Class Counsel and obtained a settlement that provided the class with injunctive and monetary relief.

### *In re Ferrero Litigation*, No. 3:11-cv-205-HSC (S.D. Cal.)

The firm was class counsel for Nutella consumers who alleged Defendant engaged in deceptive labeling and marketing practices. The settlement provided the class with injunctive and monetary relief.

### *In re Qunol CoQ10 Liquid Labeling Litigation*, No. 8:11-cv-173-DOC (C.D. Cal.)

The firm was class counsel for consumers of a nutrition supplement. We obtained a nationwide California-law class, defeated a motion to decertify it after *Mazza*, and then, about one month before trial, negotiated a settlement providing for injunctive relief and restitution.

### *Gallucci, et al. v. Boiron, Inc. et al.*, No. 3:11-cv-2039-JAH (S.D. Cal.)

The firm was class counsel for consumers of homeopathic drug products in an action against Boiron, Inc., a leading manufacturer of homeopathic products. Plaintiffs alleged Boiron's labeling and advertising were misleading. The firm obtained a nation-wide settlement for the class which provided injunctive relief and restitution.

### *Adachi, et al. v. Carlyle/Galaxy San Pedro L.P.*, No. 09-cv-793-MMM (C.D. Cal.)

The firm was appointed sole class counsel to represent purchasers of approximately 145 Los Angeles condominiums, which resulted in a class-wide all-cash settlement of approximately $1.3 million.

***In re Apple & AT&T iPad Unlimited Data Plan Litigation*, No. 5:10-cv-2553-RMW (N.D. Cal.)**
The firm was co-class counsel for consumers who purchased Apple iPads with data plans through AT&T. Plaintiffs alleged Defendants' advertising and representations regarding "unlimited" data plans violated the Unfair Competition Law. The settle settlement provided monetary and injunctive relief.

## OTHER SUCCESSES PROTECTING THE PUBLIC

***Peviani v. Arbors at Cal. Oaks Prop. Owner, LLC,* 62 Cal. App. 5th 874 (2021), rev denied 2021 Cal. LEXIS 4857 (June 25, 2021)**
Since 2017 firm has represented about 2,000 current and former tenants of an apartment complex in Murrietta prosecuting claims about the condition of the property, false advertising, and failure to return security deposits. On March 9, 2021, the Fourth District Court of Appeal reversed the trial court's denial of class certification. It represents the first published decision on certification of a residential tenant class in California. On July 14, 2021, the California Supreme Court denied the defendants Petition for Review.

***Artificial Trans Fat Ban,* No. 2:13-cv-02180 (C.D. Ill.); FDA Docket No. 2013–N–1317**
The firm represented University of Illinois scientist Dr. Fred Kummerow in his efforts to ensure artificial trans fat is removed from the food supply. Following years of FDA inaction on the issue, the firm, as sole counsel for Dr. Kummerow, filed a suit against the FDA under the Administrative Procedures Act. After the suit was filed, the FDA provided notice that it had determined that artificial trans fat should be removed from the food supply. On June 17, 2015, the FDA finally determined that artificial trans fat was not safe for use in food and implemented a phased ban.

***Reid v. Johnson & Johnson, et al.*, No. 3:11-cv-1310-L-BLM (S.D. Cal.); No. 12-56726 (9th Cir.)**
The firm represented a consumer in his action against the manufacturer of Benecol Spread, alleging health claims on the product's packaging and advertising were deceptive in light of the product's trans fat content. The reversal of an order dismissing the action on preemption grounds resulted in a widely-cited published decision.

***Henderson v. The J.M. Smucker Company*, No. 2:10-cv-4524-GHK (C.D. Cal.)**
This action was the catalyst forcing the defendant to reformulate a children's frozen food product to remove trans fat. On June 19, 2013, the Honorable George H. King held the firm's client was a prevailing Private Attorney General and entitled to her costs and attorneys' fees.

***Red et al. v. Kraft Foods Global, Inc. et al*, No. 2:10-1028-GW (C.D. Cal)**
The firm represented consumers in their action against one of the world's largest food companies and was appointed lead counsel in a consolidated putative class action. Despite the denial of class certification because of the large number of products involved, the action resulted in a permanent injunction barring the use of deceptive health claims on Nabisco packaged foods containing artificial trans fat.

***Golden v. American Pro Energy*, No. 5:16-cv-891-MWF (C.D. Cal.)**
The firm was appointed Class Counsel after obtaining class certification in an action alleging a marketing company willfully used automatic telephone dialing equipment to solicit business in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. The lawsuit drove the defendant to completely shut down.

***Sandoval v. PharmaCare U.S., Inc.*, No. 3:15-cv-738-H-JLB (S.D.Cal.); No. 16-56301 (9th Cir.)**
The firm was counsel for Plaintiffs in two actions alleging Defendant fraudulently marketed a purported sexual enhancement supplement as a safe and effective aphrodisiac. After the district court issued orders granting summary judgment in favor of Defendants in each of the actions, Plaintiffs appealed. On May 31, 2018, the Ninth Circuit issued an order reversing the district court's summary judgment rulings and remanded the case for further proceedings. *Sandoval v. Pharmacare US, Inc.*, 730 Fed. App'x 417, 421 (9th Cir. 2018). The parties subsequently settled the case.

# EXHIBIT O

<u>United States District Court for the Northern District of California</u>

**If you purchased Ortega Taco Shells in California, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Michigan, Missouri, Rhode Island, Vermont, or Washington between January 1, 2010 and December 31, 2016 a class-action lawsuit may affect your rights.**

*A court authorized this Notice. This is not a solicitation from a lawyer.*

- A lawsuit has been filed against B&G Foods, Inc. and B&G North America, Inc. (collectively "B&G" or "Defendants"), that B&G violated California consumer protection laws by advertising its Ortega Taco Shells with the claim "0g Trans Fat!" when the taco shells contained artificial trans fat.

- The Court has allowed the lawsuit to proceed as a class action on behalf of all entities or persons who purchased Ortega Taco Shells in California, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Michigan, Missouri, Rhode Island, Vermont, and Washington between January 1, 2010 and December 31, 2016.

- The Court has not decided whether B&G has in fact violated the law. The purpose of this Notice is to inform you of the lawsuit so that you can make an informed decision as to whether you should remain in or opt out of this Class Action. There is no money available now and no guarantee that there will be later. However, your legal rights are affected, and you have a choice to make now:p

| | Your Legal Rights and Options in This Lawsuit |
|---|---|
| **Do Nothing** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of sharing in any recovery that may come from a trial or a settlement. But you give up any right you may have to sue Defendants separately about the same "0g Trans Fat" claim, and you will be bound by the outcome of this case. |
| **Ask To Be Excluded** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded you will not be bound by what the Court does in this case and will keep any right you might have to sue Defendants separately about the same "0g Trans Fat" claim. If a settlement or money judgment is later awarded in this case, you would not share in that recovery. |

- Your options are explained in detail in this Notice. To be excluded, you must act before [DATE].

### 1. What is this lawsuit about?

The lawsuit claims that B&G deceptively marketed Ortega Taco Shells with the claim "0g Trans Fat!" when the product contained trans fat and thereby violated California laws prohibiting false and misleading advertising. It also claims that Defendants violated federal food labeling laws, which do not permit the claim "0g Trans Fat!" Defendants deny any wrongdoing and believe that the packaging claims are lawful.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is known as *Silva v. B&G Foods, Inc.,* Case No. 4:20:cv-137-JST. The persons who sued are called the Plaintiffs, and B&G Foods, Inc. and B&G Foods North America, Inc. are called the Defendants.

The Court has not yet decided whether Plaintiffs or Defendants are correct.

### 2. Why is this a class action?

Individuals who bought Ortega Taco Shells have sued Defendants to recover money for themselves and other people who bought Ortega Taco Shells. On [DATE], the Court allowed the case to proceed as a class action for [CLASS DEFINITION]. All these people are a Class or Class Members. The Court will resolve the issues in the case for all Class Members, except for those who choose to exclude themselves from the Class. United States District Judge Jon S. Tigar is in charge of this Class Action.

More information about why the Court is allowing this lawsuit to be a class action is in the Order on Plaintiffs' Motion for Class Certification available at www.ortegatacoshells.com.

**3. Who is included in the Class?**

The Court decided that everyone who fits the following description is a Class Member: [CLASS DEFINITION]. If you are still not sure whether you are included in the Class, you can get more information at www.ortegatacoshells.com, or get free help by calling or writing the lawyers in this case, at the phone number or address listed below.

**4. What are Plaintiffs asking for?**

Plaintiffs are seeking to recover money for themselves and the Class based on Plaintiffs' claim that Defendants made claims on the packaging of Ortega Taco Shells which were false and unlawful. They are requesting that the actual purchase price of Ortega Taco Shells be refunded, plus nine times this amount as punitive damages, plus interest. B&G claims that Plaintiffs should recover no money because it has not violated the law.

**5. Is there any money available now?**

No money is available now because the Court has not yet decided whether Defendants have done anything wrong, and the two sides have not settled the case. There is no guarantee that any money will ever be available. If it is, you will be notified about your rights regarding any recovery.

**6. What happens if I do nothing at all?**

If you do not do anything now you will remain a member of the Class. If you stay in the Class and the Plaintiffs obtain a money fund, either as a result of a trial or a settlement, you will be notified about how to seek a share of the fund. If you do nothing, you will be bound by the Court's orders and will lose any right you may have to sue Defendants over the "0g Trans Fat" claim. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in the Class Action, including any judgment against Plaintiffs and in favor of Defendants.

**7. Why would I ask to be excluded?**

If you would like to pursue your own lawsuit or claim against Defendants for the claims in this case, do not want to be bound by what the Court does in this case, or if you simply do not want to be part of the Class pursuing claims against Defendants, you need to ask to be excluded from the Class. If you exclude yourself from the Class—sometimes called "opting-out" of the Class—you will not be permitted to make a claim from any settlement or judgment fund.

**8. How do I ask the Court to exclude me from the class?**

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail to Ortega Taco Shells Class Action Litigation, c/o The Weston Firm, 1405 Morena Blvd, Suite 201, San Diego, CA 92110. Your "Exclusion Request" should include your name and address. To be valid, your letter asking to be excluded from the Class must be signed and postmarked no later than [DATE].

**9. Do I have a lawyer in this case?**

The Court has appointed the Weston Firm as Class Counsel in this case. The Court has determined that the Weston Firm is qualified to represent you and all other Class Members. You will not be charged directly. More information about the law firm is available at www.WestonFirm.com.

**10. How will the lawyers be paid?**

If Class Counsel recovers any money for the Class, they will ask the Court for payment of their fees and reimbursement of their litigation costs. You will not have to pay these fees and expenses out of your own pocket. If the Court grants Class Counsel's request, the fees and expenses will be deducted from any money obtained for the Class or paid separately by Defendants.

**11. Where can I get more information?**

If you want more detailed information, you may visit the website www.ortegatacoshells.com, and other case-related documents. You can also contact Class Counsel at this address: The Weston Firm, 1405 Morena Blvd., Suite 201, San Diego, CA 92110. Please do not contact the Court. The Court and its staff cannot give you legal advice.